UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                              Plaintiff,<br>         - against -<br>HAMZA AHMED,<br>                              Defendant. | MOTION FOR BAIL<br>15-CR-49 (MJD/FLN) |

Hamza Ahmed, through his attorney, respectfully moves the Court for an order releasing him on bail.  Under all the criteria set forth in 18 U.S.C. § 3142(g), the government cannot meet its burden of establishing by clear and convincing evidence that Mr. Ahmed is either a risk of flight or a danger to the community.

**Facts and Procedural History**

Mr. Ahmed is charged in a three-count indictment with conspiracy "to provide material support and resources, as that term is defined in title 18 United States Code, Section 2339A(b)(1), namely personnel, to a foreign terrorist organization, namely Islamic State in Iraq and the Levant," from March 2014 through to February 2015, knowing such organization was a designated terrorist organization, that had engaged in or was engaging in terrorist activity and terrorism, in violation of  § 2339B(a)(1) (Count One); attempt "to provide material support and resources, as that term is defined in title 18 United States Code, Section 2339A(b)(1), namely personnel, to a foreign terrorist organization, namely Islamic State in Iraq and the Levant," on November 8, 2014, knowing such organization was a designated terrorist organization, that had engaged in or was engaging in terrorist activity and terrorism, in violation of  § 2339B(a)(1)

(Count Two); and making false statements to FBI agents on or about November 8, 2015, in violation of 18 U.S.C. § 1001 (Count Three).  *See* Indictment.

Mr. Ahmed was arrested on February 4, 2015, and arraigned on a complaint charging him with making false statements to FBI agents (the "Complaint").  The Complaint alleged that on November 8, 2014, then 19 year-old Mr. Ahmed had been removed from a flight bound from JFK International Airport in New York for Istanbul, Turkey, with a forwarding ticket to Madrid, Spain.  *Id.*, ¶ 7.  Prior to his detention, JFK officials prevented three other 19 and 20 year-old Minneapolis residents from boarding flights to Istanbul, Sofia, Bulgaria, and Athens, Greece, respectively.  *Id.*, ¶¶ 6, 7.  Questioned first by US Customs and Border Officers, and then by FBI agents, Mr. Ahmed allegedly stated that he was traveling alone; did not know two of the other individuals apprehended earlier by JFK officials; had funded his trip with his own money; and recognized the photograph shown to him of H.A.M., an individual allegedly known to have traveled to Syria in early 2014.  *Id.*, ¶ 7.  After this interview, Ahmed and three other individuals took a bus back to Minneapolis, arriving on November 9, 2014.  *Id.*, ¶ 8.  Upon his arrival, Mr. Ahmed was interviewed again by FBI agents, and he allegedly reiterated that he had been traveling alone; that he planned to vacation in Madrid for four days; that he did not have a hotel room in Madrid or know anyone there; that he chose to fly via New York because it was cheaper; and that he did not know the other travelers stopped by JFK officials.  *Id.*  Mr. Ahmed was again shown the H.A.M.'s photograph.  *Id.*, ¶ 9.  He stated he knew this individual "vaguely."  *Id.*  The Complaint notes that a review of Mr. Ahmed's publicly available Twitter account allegedly revealed "a lengthy series of messages" from November 2013 to March 2014 between H.A.M. and Mr. Ahmed, including one in December 2013 in which the H.A.M. says "I love you for the sake of Allah akh;" Ahmed replies "Lol my bro I love you;" and the two allegedly discuss

meeting each other at "the masjid (a mosque), and needing to talk "somewhere that ain't hot." *Id.*

The Complaint noted that video footage from the Minneapolis bus station indicated that Mr. Ahmed was travelling with one of the other individuals denied departure at JFK on November 8. 2014. *Id.*, ¶ 10. In addition, transaction records from Greyhound indicated that the two had purchased their bus tickets within 25 minutes of each other. *Id.*

At Mr. Ahmed's bail hearing on February 9, 2015, the government presented evidence of Mr. Ahmed's alleged "tweets" and "retweets" over his alleged Twitter account throughout the previous year, including tweets allegedly indicating Mr. Ahmed's commitment to the Islamic faith and support of a Caliphate (a form of Islamic government led by a Caliph). Describing these tweets as "threats," Magistrate Stephen Rau ordered Mr. Ahmed detained, both because he was a flight risk and because he was a danger to the community. *See* Transcript of 2/8/2015 Hearing.

On April 20, 2015, six additional young Minnesota residents were charged by complaint with conspiring to provide material support to ISIL ("Complaint II"). In Complaint II, Mr. Ahmed's abortive flight to Madrid is mentioned again, including noting that Mr. Ahmed had told FBI agents that he was traveling alone to Madrid on vacation. Complaint II, ¶ 46. It notes that significant cell-phone contact occurred between the four travelers seized at JFK, including Mr. Ahmed, leading up to November 8. *Id.*

Complaint II documents some of the "public content" on Mr. Ahmed's alleged Twitter account, noting that the posted Tweets "appear supportive of ISIL." *Id.*, ¶ 49. Specifically, it notes a tweet from July 11, 2014, stating "May this khilafa [caliphate] be the real thing," and a tweet from July 15, 2014, stating "Hate the kuffars [non-believers] and Oppressors and the likes,

love the Mumineen [the devout]." *Id.*, ¶ 49. It also notes three of Mr. Ahmed's alleged retweets (tweets by others forwarded by the account-holder to his/her followers), specifically:

    a.    March 3, 2014: "How can they defeat Us when we're already Destined for Victory? The Question is 'am I gonna take part of that Victory" [sic] ? #Islam"

    b.    July 15, 2014: "@AbuAlibaghdadi: We have all Kuffar, Rajidah, Hypocrites and AQ against us no LOL? What an honor subhanallah! #ISIS #IS

    c.    November 3, 2014: "Khaled al-Dakheel's last question: If the war against Al Qaeda gave rise to 100s of terror groups, how many groups will rise up after ISIS?"

Complaint II documents the alleged efforts of the three other individuals denied travel on November 8, 2014, at JFK to travel once again. Mr. Ahmed is not alleged to have participated in these efforts.

Discovery provided by the government in this case reveals that Mr. Ahmed's mother applied for his passport a year earlier so the family could take an overseas vacation; that the family had removed his passport from him when they had learned that Mr. Ahmed had been detained at JFK; that Mr. Ahmed had received financial aid from his college at about the time of his purchase of the airline ticket to Madrid; and that activity on his alleged Twitter account ceased on November 8, 2014.

After his removal from the Turkey-bound flight in November, 2014, Mr. Ahmed returned to Minneapolis and his studies at Minneapolis Community and Technical College (MCTC), where he was enrolled in a nursing course. Since his arrest on February 4, 2015, Mr. Ahmed – who has been in solitary confinement since his detention, although we have been advised he is slated for transfer to general population – has busied himself with reading and connecting with his family. He has agreed to meet with a counselor located by the undersigned as well as a

4

respected Imam (the counseling visits are currently on hold until it can be determined that they will be in-person as this Court has ordered; the clerical visits are also in the process of being established). Mr. Ahmed's extended family – numbering over 80 individuals – has rallied around Mr. Ahmed, and is committed to ensuring that he completes his education, and forge a successful, law-abiding future in Minnesota.

## Argument

### MR. AHMED IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY

A. **Applicable Standard**

Pretrial detention is appropriate "only if the government shows by clear and convincing evidence that no release condition or set of conditions will reasonably assure the safety of the community and by a preponderance of the evidence that no condition or set of conditions . . . will reasonably assure the defendant's appearance." *United States v. Kisling*, 334 F.3d 734, 735 (8th Cir. 2003); 18 U.S.C. §3142(c), (e) and (f). This Court's review of a pretrial release order pursuant to 18 U.S.C. § 3145(a)(1) is *de novo*. *United States v. Maull*, 773 F.2d 1479, 1484 (8th Cir. 1985) (*en banc*).

Where, as here, the nature of the charges creates a rebuttable presumption that no condition or combination of conditions will assure the safety of any other person or the community, *see* 18 U.S.C. § 3142(e)(3)(C), "a defendant bears a limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight. *United States v. Abad*, 350 F.3d 793, 798 (8th Cir. 2003 (citation omitted). "Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.*

In determining if release conditions exist that will reasonably assure the appearance of a defendant at trial and the safety of the community, the court considers the following: (1) the nature and circumstances of the crime, including whether it is a crime of violence or a federal crime of terrorism; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including mental condition, family ties, employment, community ties, and past conduct; and (4) the seriousness of the danger to the community or to an individual.  *See* 18 U.S.C. § 3142(g).

### B. The Nature and Circumstances of the Crime Charged

The nature of the charges Mr. Ahmed faces is serious, but there are several counterbalancing mitigating factors relating to the particular circumstances of these charges.

First, the government does not claim or advance any theory that Mr. Ahmed has engaged in any violence, intended to engage in violence, or, indeed, advocated violence in connection with these charges.  Its theory is that Mr. Ahmed conspired to provide material support to ISIL in the form of himself, but does not delineate the nature of the personal support Mr. Ahmed would allegedly provide, much less that this support would take the form of physical violence.  While it is not a pre-requisite that the support to be provided be violent in order for the government to sustain a conviction in a § 2339B case, *see Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1, 16-17 (2010), whether the government has credible evidence that the support at issue would involve actual violence is nonetheless a mitigating factor in the detention analysis.

Second, any analysis of the circumstances of this offense cannot ignore Mr. Ahmed's youth.  Even assuming *arguendo* the truth of the accusations against him, Mr. Ahmed was only 19 in November 2014, and there is a wealth of developmental psychology and neuroscience research concluding that adolescents and young adults "do not develop psycho-social maturity,

6

capacity to exercise self-control, and competence to make adult-quality decisions until their early twenties."[1] In particular, this research emphasizes the impact of peer influence in teenagers' adoption of risky behaviors and conduct.[2] The overwhelming support Mr. Ahmed has received from his extended family, as well as elders in the community, counterbalances concerns that Mr. Ahmed's immaturity once led – and may lead him again – astray.

Finally, it is notable that after his trip in November 2014 was thwarted, the government makes no claim – because it cannot – that Mr. Ahmed attempted to travel overseas again, attempted to obtain another passport (after his family had taken possession of his current one), and tweeted/retweeted any issues of interest to him, much less support for ISIL or its philosophies. Again, assuming *arguendo* the truth of the government's allegations, practical withdrawal from a conspiracy is a mitigating factor that diminishes its severity, and thus the imperative to detain. *Cf.*, *Gall v. United States*, 552, U.S. 38, 57 (2007) (affirming probationary sentence in part because the district court there "quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding, on his own initiative, to change his life").

---

[1] *See* Barry C. Feld, B.J. Casey and Yasmin L. Hurd, *Adolescent Competence and Culpability: Implications of Neuroscience for Juvenile Justice Administration*, in Stephen Morse and Adina Roskies, eds., A Primer on Criminal Law and Neuroscience (New York: Oxford University Press, 2013), at p. 187 (hereinafter "Adolescent Competence and Culpability") (emphasis added).

[2] *See* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Developmental Review 76 (2008), at p. 83 (discussing developments in the teenage brain's "socio-emotional system that lead to increased reward-seeking, *especially in the presence of peers*"); id. at 98 (noting that peer influence begins to diminish as individuals reach their 20s, when they have developed the cognitive control necessary to limit "the impulsive reward-seeking behavior that is stimulated by the presence of peers through activation of the socio- emotional network"); *see also* Barry C. Feld, *The Youth Discount: Old Enough to the Do the Crime, Too Young to Do the Time*, 11 Ohio St. J. Crim. L. 107, 120-21 (2013) (noting that "the presence of peers stimulates greater neural activity in the reward centers of the brain which may increase risk-taking" and that "[y]ouths engage in riskier behavior when together than they would when alone").

## C. The Weight of the Evidence

Here, and as more fully set forth in Mr. Ahmed's motion to dismiss filed last week, the weight of the evidence as to Mr. Ahmed's alleged conspiracy and attempt to provide material to ISIL is weak.

Section 2339B makes it unlawful to "provide[ ] material support or resources to a foreign terrorist organization, or attempt[ ] or conspire[ ] to do so...." 18 U.S.C. § 2339B(a)(1). In 2004, Congress passed the Intelligence Reform and Terrorism Prevention Act (IRTPA), which amended § 2339B in several key ways, including the concept of material support in the form of "personnel." Specifically, to address vagueness and overbreadth challenges, IRTPA delimited the prohibition on providing "personnel," by specifying that § 2339B(a) criminalizes the provision of "personnel" to a foreign terrorist organization only where a person, alone or with others, "[work]s under that terrorist organization's direction or control or . . . organize[s], manage[s], supervise[s], or otherwise direct[s] the operation of that organization." 18 U.S.C. § 2339B(h). Section 2339B(h) also states that the ban on "personnel" does not criminalize the conduct of "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives." *Id.*

Thus, to sustain a conviction under § 2339B where the material support being offered or provided is "personnel," the government must establish that the "personnel" were acting or were planning to act either under the terrorist organization's direction or control, or in some managerial capacity with respect to the organization. *See* § 2339B(h). In other words, there must be a nexus between the defendant's conduct or planned conduct and the master/servant limitations of § 2339B(h). *See HLP*, 561 U.S. at 23 (§ 2339B applies to "concerted activity, not

8

independent advocacy"). In the absence of such nexus, the statute, as applied to the conduct at issue, is impermissibly vague. *Id.* at 27 (no vagueness problem with material support statute because it "avoid[s] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

As fully outlined in the facts section of this brief, nothing in the discovery or previous filings in this case indicate any evidence – beyond speculation – that Mr. Ahmed was acting (or seeking to act) in that capacity for ISIL. A few public tweets with someone allegedly known to be in Syria in early 2014 do not constitute evidence of intent to provide material support in the form of personnel. Nor do a handful of tweets allegedly indicating support for a Caliphate or retweets allegedly indicative of support for ISIS. However unpopular these ideas might be, they fall well within the boundaries of First Amendment protection. *Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (dissemination of information and ideas is protected); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."); *Hill v. Colorado*, 530 U.S. 703, 787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of government's own policy are the essence of the tyrannical power the First Amendment guards against.").

Consistent with these principles, as the Supreme Court stated in *HLP,* the material support statute leaves persons free to "say anything they wish on any topic," including terrorism. *HLP*, 561 U.S. at 25. It does not prohibit independent advocacy of any kind. *See id.* at 24. Indeed, it does not prohibit or punish mere membership in or association with terrorist organizations. *See id.* at 39. As the Court explains:

> [The material support statute] does not seek to suppress ideas or opinions in the form of 'pure political speech.' Rather, [it]

> prohibit[s] 'material support,' which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

*Id.* at 26. While constitutionally protected activity, including speech, may also constitute evidence in a conspiracy charge, *see*, *e.g.*, *United States v. Rahman*, 189 F.3d 88, 177 (2nd Cir. 1999), courts have been mindful to ensure that defendants are punished for their illegal agreements and not for their constitutionally protected activities. They therefore carefully scrutinize the alleged link between that intent and First Amendment protected activity. *See*, *e.g.*, *Scales v. United States*, 367 U.S. 203, 229 (1961) ("all knowing association with the conspiracy is a proper subject for criminal proscription as far as First Amendment liberties are concerned"); *United States v. Spock*, 416 F.2d 165, 172-74 (1st Cir. 1969) (discussing courts' obligations when confronted with alleged "bifarious undertakings" involving both legal and illegal conduct). None of the evidence revealed thus far by the government, however, indicates that the government can sustain the material support charges against Mr. Ahmed with evidence that Mr. Ahmed acted, conspired or attempted to act "under the direction of, or in coordination with," ISIL. *Id.*[3]

### D. Mr. Ahmed's History and Characteristics

Mr. Ahmed's history and characteristics also weigh in favor of release. Apart from the first 18 months of his life when he lived in San Diego, U.S.-born Mr. Ahmed has lived his entire life in Minnesota, attending Minnesota's public schools, and prior to his arrest, the MCTC. Until his arrest and detention in February 2015, he resided in Savage, with his mother, and three siblings, aged 10, 5, and 3, respectively. By all accounts, he was a devoted son and brother,

---

[3] Notably, the government has advanced no evidence that Mr. Ahmed communicated with Abdi Nur.

10

giving his mother extensive help with childcare and housework.  His mother, Fathia Good, works in a bakery.  His father, Naji Ibrahim, delivers medical supplies to nursing homes.  While divorced, Mr. Ahmed's parents maintain a close co-parenting relationship.  Prior to his arrest, Mr. Ibrahim saw Mr. Ahmed regularly, and the two attended a mosque together on Fridays.

After he was denied travel in November 2014, Mr. Ahmed's parents removed his passport from him.  (Mr. Ahmed's passport had been obtained at the end of 2013 along with other family members, but in the end, the family did not travel.)  They spoke willingly with authorities.  The extended family – numbering more than 80 people – united around Mr. Ahmed, making a point of engaging with him, listening to him, and giving him guidance.  They have continued to do that during his incarceration, although these efforts are sorely limited by the video-conferencing visits at Sherburne jail, the limitations on number of approved visitors, and the jail's distance from Minneapolis.  Mr. Ahmed's parents, along with several cousins, aunts and uncles, are willing to co-sign a bond on his behalf.

E. **Alleged Danger to the Community**

In finding Mr. Ahmed to be a danger to the community, and ordering detention on that separate basis, Magistrate Rau described Mr. Ahmed's alleged tweets as "threats."  *See* 2/9/15 Transcript.  It is not clear precisely which tweets the court viewed as threatening, since none of the tweets highlighted by the government at the February 9 detention hearing constituted threats of actual violence or physical harm.  *See Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942) (defining "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace").

To the extent the court was addressing the threat intrinsic in any alleged support of ISIS (a position, we submit, as outlined above, runs afoul of the First Amendment), "a set of

11

conditions" exists that "reasonably assure[s]" Mr. Ahmed is not a danger to the community. *See Kisling*, 334 F.3d at 735. As an initial matter, Mr. Ahmed is no longer in possession of his passport, and in any event, according to the government's discovery, he is on the no-fly list. His family and community have rallied around him, to ensure he completes his studies, obtain gainful employment and otherwise live a law-abiding life. Indeed, between his abortive flight in November 2014 and his arrest in the instant case in February 2015, that is precisely what he did – attending his classes at MCTC and devoting himself to his family, in particular his younger siblings. While in custody, he is focused on using his time productively, and has agreed to counsel's efforts to engage him with respected community leaders. In short, Mr. Ahmed is a prime candidate for halfway house placement, with a structured program of study, employment, and counseling.

## CONCLUSION

For the foregoing reasons, defendant Hamza Ahmed respectfully requests that the Court grant his motion for an order releasing him on bail to a half-way house, with electronic monitoring and a stringent schedule of classes, employment and counseling.

Date:   New York, New York                     Respectfully Submitted.
        May 6, 2015
                                                       /s/

                                               JANEANNE MURRAY
                                               Registration No. 0384887
                                               Murray Law LLC
                                               Attorneys For Hamza Ahmed
                                               The Flour Exchange Building
                                               310 Fourth Avenue South, Suite 5010
                                               Minneapolis, MN 55415
                                               Tel.  (612) 339-5160