```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3   -----------------------------------------------------------
                                  )
     United States of America,     )   File No. 15-49(1)
 4                                 )             (MJD/FLN)
             Plaintiff,            )
 5                                 )
     vs.                           )   Minneapolis, Minnesota
 6                                 )   April 25, 2016
     Hamza Naj Ahmed,              )   11:50 a.m.
 7                                 )
             Defendant.            )
 8   -----------------------------------------------------------

 9
                        BEFORE THE HONORABLE
10                        MICHAEL J. DAVIS
                  UNITED STATES DISTRICT COURT JUDGE
11                   (CHANGE OF PLEA HEARING)

12   APPEARANCES
       For the Plaintiff:         UNITED STATES ATTORNEY'S OFFICE
13                                Andrew Winter, AUSA
                                  John F. Docherty, AUSA
14                                Julie Allyn, AUSA
                                  600 U.S. Courthouse
15                                300 South Fourth Street
                                  Minneapolis, MN 55415
16
       For the Defendant:         MURRAY LAW LLC
17                                JaneAnne Murray, ESQ.
                                  220 South Sixth Street
18                                Suite 1225
                                  Minneapolis, MN 55402
19
       Court Reporter:            STACI A. HEICHERT,
20                                RDR, CRR, CRC
                                  1005 U.S. Courthouse
21                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415
22

23      Proceedings recorded by mechanical stenography;
     transcript produced by computer.
24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1      THE COURT:  Let's call this matter.

2      THE COURTROOM DEPUTY:  The United States of

3  America versus Hamza Naj Ahmed; Court Case No. 15-CR-49.

4  Counsel, please state your appearances for the record.

5      MR. DOCHERTY:  Good morning, Your Honor.

6  Assistant U.S. Attorneys John Docherty, Andrew Winter and

7  Julie Allyn for the United States.

8      MS. MURRAY:  Good morning, Your Honor.  JaneAnne

9  Murray for Mr. Ahmed, and to my right is Mr. Ahmed.

10      THE COURT:  Good morning.  Please step forward.

11  Please step forward.  All of you.  My understanding this is

12  here for a change of plea.

13      MS. MURRAY:  That is correct, Your Honor.

14      MR. DOCHERTY:  That is correct, Your Honor.

15      THE COURT:  All right.  Mr. Docherty, will you go

16  over the plea agreement and sentencing stipulations for the

17  record?

18      MR. DOCHERTY:  Yes, Your Honor.

19  BY MR. DOCHERTY:

20  Q.  Mr. Ahmed, good morning.  I'm showing you about a

21  nine-page document, and I'm going to start on the last page.

22  Do you see your signature on that page?

23  A.  Yes, I do.

1    Q.  And this document is entitled a Plea Agreement and

2    Sentencing Stipulations, correct?

3    A.  Correct.

4    Q.  I'm going to spend a few minutes just going through this

5    with you and make sure that everybody has the same

6    understanding of what the negotiations are in this case,

7    okay?  If you have any questions, please ask.  If you need

8    time to speak with Ms. Murray in private, please ask, and

9    we'll accommodate that, okay?

10   A.  All right.

11   Q.  Number 1, you've been charged in a document called a

12   Second Superseding Indictment with a number of different

13   crimes, and under the negotiated resolution, you're going to

14   plead guilty to two of them.  You're going to plead guilty

15   to Count 2 which charges you with providing material support

16   -- or conspiring, excuse me, to provide material support to

17   a designated foreign terrorist organization, that being the

18   Islamic state in Iraq and the Levant or ISIL.  Do you

19   understand that?

20   A.  Yes, I understand that.

21   Q.  You're also going to be pleading guilty under this

22   resolution to student financial aid fraud.  Do you

23   understand that?

24   A.  Yes, I do.

25   Q.  And the other counts of the Second Superseding

1     Indictment will be -- the government will ask the Court to

2     dismiss them, but not today, rather at the time of

3     sentencing.  Is that your understanding as well?

4     A.  Yes, that is understood.

5     Q.  Okay.  Paragraph 2 of this document is called the

6     factual basis.  We'll come back to that at the end, and so

7     for now, we'll continue on to paragraph 3.  Ms. Murray, on

8     your behalf, has filed a number of motions with the Court,

9     and, in fact, there's a hearing on some of those motions

10    scheduled for tomorrow.  You understand that by pleading

11    guilty today, His Honor is not going to make a decision on

12    those motions and whatever benefit or relief you're asking

13    His Honor to grant will not be granted.  Do you understand

14    that?

15    A.  Yes.

16    Q.  And you agree to that?

17    A.  Yes, I do agree to that.

18    Q.  Paragraph 4 is called statutory penalties, and these are

19    the maximum penalties that Congress has provided for the

20    crimes you're going to be pleading to.  For Count 2,

21    providing material support to a designated foreign terrorist

22    organization, you could be sent to prison for up to

23    15 years.  You could be put on supervised release for up to

24    the rest of your life.  You could be made to pay a criminal

25    fine of up to $250,000, and then there's a mandatory special

1    assessment of $100 which is due and payable at the time of

2    your sentencing.  Is that your understanding of what the

3    maximums are?

4    A.  Yes, it is.

5    Q.  For Count 14, which is the student financial aid fraud,

6    you could be sent to prison for up to five years.  You could

7    be put on supervised release for up to three years.  There's

8    a criminal fine that could go as high as $20,000, and,

9    again, there's the mandatory special assessment of $100.

10   Again, is that your understanding of how -- the worst case

11   scenario for Count 14?

12   A.  Yes, that is my understanding.

13   Q.  So by putting these two together, you're exposing

14   yourself to a potential maximum of 20 years in prison, a

15   fine of $270,000, supervised release term of life, mandatory

16   special assessment of $200.  Do you concur with those

17   calculations?

18   A.  Yes, I do.

19   Q.  If you are on supervised release and you violate your

20   supervised release, you could be sent back to prison for an

21   additional term over and above what we've talked about

22   already.  Do you understand that?

23   A.  Yes, I do.

24   Q.  Now, when it comes time to fashion an appropriate

25   sentence for you, His Honor will be advised by the United

1    States Sentencing Guidelines.  Ms. Murray, on your behalf,

2    and myself and my colleagues have figured out what we

3    believe the guidelines provide for in your case, but the

4    final decision will be the Court's.  Do you understand that?

5    A.  Yes, I do.

6    Q.  Okay.  We start with what's called a base offense level

7    for Count 2, the material support count, and that's 26, and

8    we agree that there are no specific offense characteristics

9    that would alter that base offense level.  Do you understand

10   that?

11   A.  Yes.

12   Q.  For Count 14, we believe that the base offense level is

13   6, and, again, there are no what are called specific offense

14   characteristics that would make that go up or down.  Do you

15   understand that?

16   A.  Yes.

17   Q.  Because you're pleading guilty to two counts, we do

18   what's called grouping, and we wind up with the base offense

19   level being that of the highest offense which, in this case,

20   is 26, the material support group.  Do you understand that?

21   A.  Yes, I do.

22   Q.  Okay.  Now, I'm going through this rather rapidly, so if

23   you do have questions, please ask, okay?

24   A.  Okay.

25           THE COURT:  Slow down.  Slow down.

1           MR. DOCHERTY:  Yes, Your Honor.

2     BY MR. DOCHERTY:

3     Q.  There is a 12-level upward adjustment in the base

4     offense level, and that's because you're pleading guilty to

5     a federal crime of terrorism, so that takes that 26, add 12,

6     and it becomes a 38.  There's a little arithmetic.  Do you

7     understand that?

8     A.  Yes, I do.

9     Q.  Okay.  You are eligible for what's called acceptance of

10    responsibility.  So by coming in and pleading guilty and

11    also if you provide full, complete and truthful disclosures

12    to the probation office, because they're going to write

13    what's called a report of presentence investigation in this

14    case, and they'll interview you, and you're agreeing or

15    you're understanding that one of the things that you need to

16    do to earn acceptance of responsibility is to be full,

17    complete and truthful to them.  You also need to comply with

18    any conditions of release should you be released.  You also

19    have to testify truthfully here today and at your sentencing

20    hearing.

21    A.  Okay.

22    Q.  You have to comply with this agreement.  And then the

23    last one is a bit open-ended.  It says that you won't do

24    anything inconsistent with acceptance of responsibility,

25    nothing that would make a person say he said he was

1  accepting responsibility but look at what he did.  Do you

2  understand that?

3  A.  Yes, I do.

4  Q.  Okay.  If those conditions are satisfied, the government

5  at the time of sentencing will ask His Honor to take that

6  level 38 and reduce it by 3 down to 35.  Do you understand

7  that?

8  A.  Yes.

9  Q.  Again, however, the final decision is not ours, it's not

10  Ms. Murray's, it's not yours, it's the Court's.  Understood?

11  A.  Understood.

12  Q.  Okay.  One of the other things that this 12 -- that this

13  adjustment does in terrorism cases is that it puts you in

14  the highest criminal history category which is a Category 6.

15  And then what we do in subparagraph j is we take the

16  guidelines -- we calculate a guidelines range, and that's

17  really a grid when we look at the adjusted offense level of

18  35, the criminal history level of 6, and we wind up with a

19  range of 292 to 365 months in prison.  Do you understand

20  that?

21  A.  Yes.

22  Q.  However, because the maximum that you're exposing

23  yourself to is 240 months, it caps out at that level.  Do

24  you understand that?

25  A.  Yes.

1    Q.  The fine range is 20 to $200,000 --

2            THE COURT:  Well, explain to him what "cap out"

3    is.

4            MR. DOCHERTY:  I didn't hear Your Honor.

5            THE COURT:  Please explain to him what "cap out"

6    means.

7            MR. DOCHERTY:  Okay.

8            THE COURT:  And so I'm sure that he understands

9    that.

10   BY MR. DOCHERTY:

11   Q.  What that means is the guidelines range can't go higher

12   than the maximum penalty that Congress has established.

13   A.  Okay.

14   Q.  So in this case, the maximum penalty that Congress has

15   established is lower than the guideline range, and that's

16   what I meant by the phrase "cap out," meaning it stops, it

17   hits the ceiling, it hits a cap and it can't go higher.

18   Even though the guidelines say it ought to go higher, it

19   just can't.

20   A.  Okay.

21   Q.  Is that clear?

22   A.  Yes, it is.

23   Q.  Okay.  There's a fine of 20 to $200,000.  And supervised

24   release is two years up to life.

25   A.  Understood.

1    Q.  Any questions?

2    A.  No.

3    Q.  Okay.  We leave open the possibility that you, through

4    Ms. Murray, will argue for a downward departure or variance

5    from whatever the ultimate guidelines sentence turns out to

6    be.

7    A.  Understood.

8    Q.  So you have the right to come in here at your time of

9    sentencing and say that's what the guidelines say and it

10   ought to be less and here's why.

11   A.  Okay.

12   Q.  But, again, the final decision will be His Honor's.  And

13   then you, through your attorney, and myself and my

14   colleagues are agreeing that there are no other specific

15   offense adjustments that would change things in these

16   guideline calculations.  Okay?

17   A.  Yes.

18   Q.  Okay.  Any questions on the guidelines calculations?

19   A.  No, not at all.

20   Q.  And then paragraph 7 says something that I've mentioned

21   a couple of times already which is that this agreement is

22   between you, through your attorney, and the United States

23   Attorney's Office.  The Court is not a party to this

24   agreement.  And so what paragraph 7, which is called

25   discretion of the Court, says is that the Court is going to

1    make a final decision or, as it says here, the Court may

2    depart from the applicable guidelines, and if the Court

3    determines that the guidelines, the criminal history, is

4    different from what we've calculated, or if the Court

5    decides you ask to be moved downward in sentence and the

6    Court says no, you don't get to withdraw, we don't get to

7    withdraw, after today, at least the parties are bound with

8    what's in this paper.  Okay?

9    A.  Yes, understood.

10   Q.  I've mentioned that there's a special assessment.

11   That's $100 for every felony that a person pleads guilty to

12   or is convicted of by a jury.  You are pleading guilty to

13   two felonies, so your special assessment, which is due at

14   the time of sentencing, is $200.

15   A.  Okay.

16   Q.  Okay?  There -- we are reserving -- we, the government,

17   are reserving our right to forfeiture, which means that if

18   you've got property that was involved in this offense, we

19   can, either through an administrative bureaucratic action or

20   by a civil action in court, we can try and forfeit, that is

21   to say, take, that property.  Do you understand that?

22   A.  Yes.

23   Q.  There is a discussion of immigration consequences.  You

24   are a U.S. citizen.  Is that right?

25   A.  Correct.

1    Q.  Okay.  Nevertheless, we want to make sure that this is

2    in here and that you recognize that by pleading guilty, if

3    there was some way that there could be immigration

4    consequences for you, I cannot predict what those are.  Your

5    attorney cannot predict what those are.  The Court cannot

6    predict what those are.  And that despite that uncertainty,

7    you still wish to go ahead and plead guilty here this

8    morning.  Is that correct?

9    A.  Yes, that is correct.

10   Q.  Paragraph 11 is very short and simply says that this

11   is -- this document contains the full agreement.  There's

12   nothing else.  There are no side agreements.  There are no

13   unwritten understandings, no nudge-nudge, wink-wink,

14   nothing.  If it's not in here, it is not a part of the

15   agreement.  Do you agree with that?

16   A.  Yes, I do agree with that.

17   Q.  And then it's signed and dated today, April 25, 2016, by

18   myself, by you, and by your attorney.  Is that correct?

19   A.  Yes, that is correct.

20   Q.  Do you have any -- we haven't covered the factual basis

21   yet, paragraph 2, but other, with that exception, do you

22   have any questions about anything that we've gone through

23   here this morning?

24   A.  No, I did not have any.

25   Q.  Do you want to -- do you have questions for me or for

1        the Court?

2        A.  No, not at all.

3        Q.  Do you want time to speak with Ms. Murray about anything

4        that we've discussed up to this point?

5        A.  No.

6                   THE COURT:  Ms. Murray, is that your understanding

7        of the plea agreement?

8                   MS. MURRAY:  Yes it is, Your Honor.

9                   THE COURT:  Let's swear the defendant in.

10              (The defendant is sworn.)

11                  THE COURT:  Would you state your true and correct

12       name for the record, please?

13                  THE DEFENDANT:  Yes.  Hamza Naj Ahmed.

14                  THE COURT:  Now, that is not the name of your

15       father -- or your last name of your father.  Is that

16       correct?

17                  THE DEFENDANT:  No.  Ahmed?

18                  THE COURT:  No, your last name.

19                  THE DEFENDANT:  Yeah, my last name is Ahmed.

20                  THE COURT:  Yes.  Is that your father's last name?

21                  THE DEFENDANT:  No.

22                  THE COURT:  And that's not your mother's last name

23       either?

24                  THE DEFENDANT:  No, it's not.

25                  THE COURT:  Where does that come from?

1          THE DEFENDANT:  I believe that's from my father's

2     I think it's either his middle name or my grandfather's

3     name, I believe.  It's somewhat -- father, and I'm not quite

4     sure.

5          THE COURT:  And you were born in San Diego,

6     California?

7          THE DEFENDANT:  Yes.

8          THE COURT:  All right.  So you're a United States

9     citizen?

10          THE DEFENDANT:  Correct.

11          THE COURT:  All right.  And how old are you now,

12     sir?

13          THE DEFENDANT:  I am 21 years old.

14          THE COURT:  And you far have you gone in school?

15          THE DEFENDANT:  I stopped in my first year of

16     college.

17          THE COURT:  All right.  And where did you go to

18     high school?

19          THE DEFENDANT:  I went to Burnsville High School.

20          THE COURT:  And did you graduate from Burnsville?

21          THE DEFENDANT:  No, I did not.  I got my GED.

22          THE COURT:  From where?

23          THE DEFENDANT:  It's I took the test in Apple

24     Valley.  It was a center in Apple Valley that I took my

25     test.

1          THE COURT:  And how far did you go to school in

2     Burnsville?

3          THE DEFENDANT:  I went up until my last year,

4     senior year.

5          THE COURT:  What happened in your senior year?

6          THE DEFENDANT:  My senior year, I got actually

7     suspended and I was supposed to come back but my family

8     didn't want me coming back because of issues related to me

9     getting suspended, so they wanted me to stay -- not go back

10    to school, so I obeyed my parents and decided not to go

11    back.

12         THE COURT:  Okay.  And why did you get suspended?

13         THE DEFENDANT:  I was involved in a fight in high

14    school.  It was some person came to me and basically

15    initiated physical altercation with me, so I ended up

16    getting suspended.

17         THE COURT:  About what?

18         THE DEFENDANT:  Excuse me?

19         THE COURT:  About what?

20         THE DEFENDANT:  About it was a certain group of

21    students and another group of students had they just didn't

22    agree and they had problems with each other so that involved

23    me, so somebody felt like they didn't have -- that they

24    didn't like me and have problems with me, so they initiated

25    physical altercation based on that, and I got suspended for

1    it.

2              THE COURT:  And why didn't they like you?

3              THE DEFENDANT:  Because they felt like I was -- I

4    was part of a group that they didn't like, so.

5              THE COURT:  And what group was that?

6              THE DEFENDANT:  It was just a Somali group of

7    people in Burnsville High School that had problems with

8    other kids in the school for some reason, I don't even know

9    the reason why, but all I know is that they did not like

10   each other and they had problems so, and I was viewed as one

11   of those people by that other group.

12             THE COURT:  Okay.  And so you got your GED.  Is

13   that correct?

14             THE DEFENDANT:  That is correct.

15             THE COURT:  And you can read and write the English

16   language?

17             THE DEFENDANT:  Yes, I can.

18             THE COURT:  And I would ask you to read the first

19   paragraph of the plea agreement and sentencing stipulations

20   before you.  Read it out loud to me, please.

21             THE DEFENDANT:  Okay.  Okay.  The United States of

22   America and Hamza Naj Ahmed, hereinafter referred to as the

23   defendant, agree to resolve this case under terms and

24   conditions that follow.  This plea agreement binds only the

25   defendant and the United States Attorney's Office for the

1    District of Minnesota.  This agreement does not bind any

2    other United States Attorney's Office or any other federal

3    or state agency.

4              THE COURT:  All right.  Now, have you had time to

5    go over this plea agreement and sentencing stipulations with

6    your attorney, Ms. Murray?

7              THE DEFENDANT:  Yes, I have.

8              THE COURT:  And have you gone over this agreement

9    line by line?

10             THE DEFENDANT:  Yes.

11             THE COURT:  And has she explained everything to

12   you in the plea agreement?

13             THE DEFENDANT:  Yes, she has.

14             THE COURT:  And have you had time to ask her

15   questions about the plea agreement?

16             THE DEFENDANT:  Yes, I have.

17             THE COURT:  And did she answer your questions that

18   you had regarding the plea agreement and sentencing

19   stipulations?

20             THE DEFENDANT:  Yes.

21             THE COURT:  And were you satisfied with her

22   answers?

23             THE DEFENDANT:  Yes, I was.

24             THE COURT:  Now, you're Somali.  You're American.

25   Is that correct?

1          THE DEFENDANT:  Correct.

2          THE COURT:  And it would be accurate that your

3     family is very important to you.  Is that correct?

4          THE DEFENDANT:  Yes, that is very correct.

5          THE COURT:  Is any of your family here today?

6          THE DEFENDANT:  My -- I have a relative who is

7     here today.

8          THE COURT:  Okay.  What about your mother?

9          THE DEFENDANT:  My mother is working right now,

10    and my father is actually baby-sitting.

11         THE COURT:  All right.  And do they know that

12    you're here today?

13         THE DEFENDANT:  Yes, they do.

14         THE COURT:  And did you have an opportunity to

15    talk to them about this?

16         THE DEFENDANT:  Yes, I have contacted them.

17         THE COURT:  All right.  And so you have talked to

18    them about what you're doing here today?

19         THE DEFENDANT:  Yes, I have.

20         THE COURT:  All right.  And do you need time to

21    talk to them about anything?

22         THE DEFENDANT:  No.

23         THE COURT:  All right.  Now, you understand that

24    I'm not a party to this plea agreement?

25         THE DEFENDANT:  Yes, I do understand.

1          THE COURT:  All right.  And I would ask you to

2     turn to the last page of that plea agreement.

3          And you see your signature there?

4          THE DEFENDANT:  Yes, I do.

5          THE COURT:  You see your attorney's signature

6     there?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  And you see Mr. Docherty's signature

9     there?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you see my signature there?

12          THE DEFENDANT:  No, I do not.

13          THE COURT:  And so you know that I'm not a party

14     to this plea agreement?

15          THE DEFENDANT:  Okay.

16          THE COURT:  Not okay, but do you understand that?

17          THE DEFENDANT:  Yes, I do understand that.

18          THE COURT:  Now turn to page 4.  Now, paragraph 3,

19     waiver of pre-trial motions, you understand there have been

20     a number of motions that have been filed on your behalf by

21     your attorney that I have to rule on concerning your case.

22     Do you understand that?

23          THE DEFENDANT:  Yes, I understand.

24          THE COURT:  And you understand that by entering

25     into this plea agreement, you're giving up your right to all

1    of those pre-trial motions?

2                  THE DEFENDANT:  Yes, I do.

3                  THE COURT:  All right.  And then turning to page

4    7, paragraph j.  This is paragraph 6, subparagraph j,

5    sentencing range.  Do you understand that your guideline

6    range is 240 months in prison?

7                  THE DEFENDANT:  Yes, I understand.

8                  THE COURT:  All right.  And you know how many

9    years that is?

10                  THE DEFENDANT:  20.

11                  THE COURT:  Now, you understand that you could

12    continue on with your plea of not guilty and have a jury

13    trial of 12 persons.  Do you understand that?

14                  THE DEFENDANT:  Yes, I do understand.

15                  THE COURT:  And do you understand that you have a

16    jury trial set for May 9th of this year to try you on the

17    Second Superseding Indictment that has been brought against

18    you.  Do you understand that?

19                  THE DEFENDANT:  Yes, I do.

20                  THE COURT:  And do you also understand that at

21    your jury trial, you would be presumed innocent of any and

22    all charges against you.  Do you understand that?

23                  THE DEFENDANT:  Yes, I do.

24                  THE COURT:  And you understand the burden of proof

25    would be on the government to prove you guilty.  Do you

1    understand that?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  And you do not have to prove your

4    innocence.  Do you understand that?

5                    THE DEFENDANT:  Yes.

6                    THE COURT:  And the way the government would have

7    to prove you guilty is by calling witnesses into open court.

8    Do you understand that?

9                    THE DEFENDANT:  Yes.

10                    THE COURT:  And you would have a right, through

11    your attorney, to confront and cross-examine those

12    witnesses.  Do you understand that?

13                    THE DEFENDANT:  Yes, I do.

14                    THE COURT:  And do you also understand the burden

15    of proof that the government has to meet to prove you guilty

16    beyond a reasonable doubt is proof beyond a reasonable

17    doubt.  Do you understand that, sir?

18                    THE DEFENDANT:  Yes.

19                    THE COURT:  And have you gone over that with your

20    attorney and you understand that's the highest standard we

21    have in our law; that it's a very, very high standard the

22    government would have to meet before you could be found

23    guilty of any or all counts of the Second Superseding

24    Indictment that you've been charged with?

25                    THE DEFENDANT:  Yes, I have.

1          THE COURT:  Now, you understand that at your

2    trial, you would have a right to testify.  Do you understand

3    that?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And that means that you would have a

6    right to get on the witness stand and tell your side of the

7    story to the jury.  Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And if you did get on the witness

10   stand, you would be placed under oath like any other witness

11   and be subject to cross-examination by the government.  Do

12   you understand that?

13         THE DEFENDANT:  Yes, I do.

14         THE COURT:  Now, do you understand that no one

15   could keep you off that witness stand if you wanted to tell

16   your side of the story to the jury.  Do you understand that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  That means your attorney, your family,

19   your imam, your sheikh, or the government, or government

20   agents or anyone, they could not keep you off the witness

21   stand if you wanted to tell your side of the story to the

22   jury.  Do you understand that?

23         THE DEFENDANT:  Yes, I do.

24         THE COURT:  Now, you also understand that you have

25   the right to use the Court's power of subpoena to bring in

1    any witnesses or to bring into court any documents that

2    would be necessary for your defense.  Do you understand

3    that?

4            THE DEFENDANT:  Yes, I do.

5            THE COURT:  And do you understand that your

6    attorney has had approval from the Court to hire expert on

7    your behalf.  Do you understand that?

8            THE DEFENDANT:  Yes.

9            THE COURT:  And she's talked to you about that

10   expert?

11           THE DEFENDANT:  Yes, she has.

12           THE COURT:  All right.  And there are a number of

13   witnesses that you are potentially planning to call on your

14   behalf.  Do you understand that?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And there may have been documents also

17   or videos that you were going to also introduce to the

18   Court, and they would be subject to the Court's order of

19   subpoena be brought in to be used in your behalf.  Do you

20   understand that?

21           THE DEFENDANT:  Yes, I do.

22           THE COURT:  And you've had an opportunity to go

23   over the witness list that your attorney has generated for

24   any and all defenses that you may have in this -- in these

25   cases?

1          THE DEFENDANT:  Yes, I have.

2          THE COURT:  And were you satisfied with the people

3    that were going to be called on your behalf?

4          THE DEFENDANT:  Yes, I was.

5          THE COURT:  Now, do you also understand that you

6    have an absolute right to remain silent?  That means that no

7    one can force you to give evidence against yourself.  Do you

8    understand that?

9          THE DEFENDANT:  Yes.

10         THE COURT:  And that means that today you can say

11   I'm going to remain silent and just go to trial.  Do you

12   understand that?

13         THE DEFENDANT:  Yes, I do.

14         THE COURT:  And do you understand also that if you

15   did go to trial, you would have that constitutional right to

16   remain silent and no one, no one, could force you to take

17   the witness stand -- to testify or take the witness stand.

18   Your attorney, your family, your imam, any sheikh or any

19   governmental official, any government attorney or FBI agent

20   or anyone else couldn't force you to give up your right to

21   remain silent.  Do you understand that?

22         THE DEFENDANT:  Yes, I do.

23         THE COURT:  And that includes me.  Do you

24   understand that?

25         THE DEFENDANT:  Yes.

1        THE COURT:  And if you decided not to testify at

2    your trial, you understand that neither the government nor

3    the court could make any negative comments to the jury about

4    you not testifying.  Do you understand that?

5        THE DEFENDANT:  Yes, I understand.

6        THE COURT:  You understand that you have a right

7    to a speedy trial.  You would have the right to a trial

8    within a reasonable amount of time, and we have set your

9    trial for May 9th of 2016, which is just right around the

10    corner, and that fits within the speedy trial guidelines

11    that makes sure that you are tried in a prompt fashion.  Do

12    you understand that?

13        THE DEFENDANT:  Yes.

14        THE COURT:  All right.  Do you also understand

15    that before you could be found guilty of any count that

16    you've been charged with in the superseding indictment that

17    the jury of 12 persons all would have to agree that you are

18    guilty of that count beyond a reasonable doubt?  The verdict

19    would have to be unanimous.  All 12 members of the jury

20    would have to agree that you were guilty of that individual

21    count that you've been charged with in the Superseding

22    Indictment, Second Superseding Indictment.  Do you

23    understand that, sir?

24        THE DEFENDANT:  Yes.

25        THE COURT:  Do you understand that if I accept

1    your plea of guilty here today, you will not have a trial of

2    any kind.  You will not have a court trial, nor would you

3    have a jury trial of 12 persons.  You would not have a trial

4    at all.  Do you understand that?

5              THE DEFENDANT:  Yes, I do.

6              THE COURT:  Excuse me.  Do you also understand

7    that if I accept your plea of guilty and sentence you, you

8    will have a right to appeal my sentence to the higher court

9    which is the Eighth Circuit Court of Appeals, and that court

10   sits in St. Louis, Missouri, and that's the appellate court

11   that reviews all of my sentences to make sure that my

12   sentences are fair, they follow the law and the

13   Constitution.  Do you understand that?

14             THE DEFENDANT:  Yes, I do.

15             THE COURT:  And you have a right to appeal my

16   sentence to that court.  Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Now, have there been any threats made

19   to you by anyone to get you to enter a plea of guilty here

20   today?

21             THE DEFENDANT:  No, there hasn't.

22             THE COURT:  Any family members, your attorney, any

23   investigators, any co-defendants, any sheikhs or imams,

24   anybody from the government's side, maybe the defense, to

25   get you to enter a plea of guilty here today?

1          THE DEFENDANT:  No, not at all.

2          THE COURT:  Have there been any promises made to

3     you, other than what's in the plea agreement, that's been

4     made to you by anyone, your attorney, by anyone in the

5     community, or the government or anyone else to get you to

6     enter a plea of guilty here today?

7          THE DEFENDANT:  No, there hasn't.

8          THE COURT:  Now, are you under the care of a

9     doctor, healthcare practitioner or a nurse at this time?

10          THE DEFENDANT:  No, I do not believe so.

11          THE COURT:  Well, have you seen a doctor or a

12     nurse recently?

13          THE DEFENDANT:  No, I haven't.

14          THE COURT:  Are you taking any prescribed

15     medications at this time?

16          THE DEFENDANT:  No, I'm not.

17          THE COURT:  Have you ever seen a psychiatrist,

18     psychologist, or mental health practitioner?

19          THE DEFENDANT:  No, I have not.

20          THE COURT:  Now, your mother said that you were

21     forgetful and couldn't remember things.  Is that accurate or

22     not?

23          THE DEFENDANT:  No, no, I don't think that's

24     accurate.  I think I'm forgetful as any regular person is.

25          THE COURT:  Okay.  Is there any problems with your

1     schooling, of being able to understand what's going on in

2     school that would give your mother the impression that you

3     had some problems with memory?

4              THE DEFENDANT:  No, I don't believe so.

5              THE COURT:  Okay.  Now, have you had enough time

6     to go over all the evidence that the government has given to

7     your attorney regarding this case?

8              THE DEFENDANT:  Yes, I have.

9              THE COURT:  And has the Court made available the

10    necessary computers or video screens necessary for you to

11    view all of the evidence and to have time to read that

12    evidence and --

13             THE DEFENDANT:  Yes.

14             THE COURT:  All right.  And have you had

15    enough -- did you read it?

16             THE DEFENDANT:  Yes, I have.

17             THE COURT:  And have you studied it?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And have you gone over that evidence

20    with your attorney?

21             THE DEFENDANT:  Yes, I have.

22             THE COURT:  All right.  So there's no claim that

23    the -- you've been deprived of any access to any of the

24    government's evidence that they're going to use during your

25    trial?

1          THE DEFENDANT:  Yeah, there's no -- no, not at

2     all.

3          THE COURT:  And you've had an opportunity to go

4     over it and understand it?

5          THE DEFENDANT:  Yes, I have.

6          THE COURT:  All right.  Now, have you had enough

7     time, have you had sufficient time, to talk to your attorney

8     about your case?

9          THE DEFENDANT:  Yes, I have.

10          THE COURT:  All right.  And have you had an

11     opportunity to go over the evidence that the government has

12     against you with your attorney?

13          THE DEFENDANT:  Yes.

14          THE COURT:  And has she talked about any defenses

15     that you may have and what the law is on those defenses and

16     whether or not you should proceed with trial or not?

17          THE DEFENDANT:  Yes, she has.

18          THE COURT:  And do you feel that she's represented

19     you in a fair and accurate manner?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  And are you satisfied with her

22     representation of you?

23          THE DEFENDANT:  Yes, I am.

24          THE COURT:  And, again, you understand that I am

25     not a party to the plea agreement that you've entered into

1    with the United States government.  Do you understand that?

2              THE DEFENDANT:  Yes, I do understand.

3              THE COURT:  And the reason I say that is because

4    your family comes from a country where there is corruption

5    and no government in Somalia and the judges there are maybe

6    corrupt or nonexistent, and that is not the case in the

7    United States.  Do you understand that?

8              THE DEFENDANT:  Yes, I do.

9              THE COURT:  Do you want a minute to write?

10             MR. WINTER:  No, Your Honor.  Perhaps we can have

11   a short inquiry regarding the point in time where there was

12   contemplated that new counsel would be put on the case.

13             THE COURT:  New counsel?

14             MR. WINTER:  Mitch Robinson.

15             THE COURT:  Oh.

16             MR. WINTER:  Just make a brief record on that.

17             THE COURT:  All right.  Yes.  Let's go over that.

18   Mr. Ahmed, you understand that at some point recently I

19   think maybe you or your family members were contemplating

20   getting a different attorney for you.

21             THE DEFENDANT:  Yes.

22             THE COURT:  All right.  And it was Mr. Robinson, I

23   believe, is that his name?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And he filed the appropriate papers to

1          be a substitute attorney for you.  Do you understand that?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  And you understand that I denied

4          his -- I denied your right to have a substitution of

5          counsel.  Do you understand that?  At least of Mr. Robinson.

6          Do you understand that?

7                    THE DEFENDANT:  Yes, I do.

8                    THE COURT:  And you understand Mr. Robinson, in

9          the Court's view, was not competent to represent you in this

10         matter.  Do you understand that?

11                   THE DEFENDANT:  Yes, I do.

12                   THE COURT:  And you understand that the Court so

13         stated that in its order denying his representation of you;

14         that he had been publically reprimanded by the Minnesota

15         Supreme Court about not representing at least one client in

16         the proper manner, and the Court even dug deeper into that

17         and found out that he had totally not represented a client

18         in Texas in federal court and in a habeas petition the

19         federal court judge in Texas found that he was incompetent

20         and that the person that he represented spoke Spanish and he

21         had not hired an interpreter, he had not done any

22         investigation on the case and did nothing on the case and,

23         in fact, had almost helped the government convict her, and

24         it turned out that she was innocent of any and all charges.

25         Do you understand that?

1           THE DEFENDANT:  Yes, I do.

2           THE COURT:  And I made sure that you knew about

3      that, because you didn't know about that, did you?

4           THE DEFENDANT:  I did not know that.

5           THE COURT:  And you understand the Court was

6      looking out for your interests?

7           THE DEFENDANT:  Yes, I do.

8           THE COURT:  All right.  Now, is there any need for

9      you to make another motion to have another attorney

10     represent you or are you satisfied with Ms. --

11          THE DEFENDANT:  I am satisfied with my current

12     attorney.

13          THE COURT:  Okay.  And you said that at the

14     hearing that we had with Mr. Robinson.  Is that correct?

15          THE DEFENDANT:  Yes, I did.

16          THE COURT:  And that the hiring of Mr. Robinson

17     had a substantial fee to get you to enter a plea of guilty

18     was done by your parents.  Was that correct?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And he's returned the money to your

21     parents.

22          THE DEFENDANT:  Thank you.

23          THE COURT:  Is that satisfactory, Mr. Winter?

24          MR. WINTER:  Yes, Your Honor.  Thank you.

25          THE COURT:  Now, I've gone over all the rights,

1   constitutional rights, with you today.  Do you understand

2   those rights, sir?

3            THE DEFENDANT:  Yes, I do.

4            THE COURT:  And in order to plead guilty, you have

5   to give up those rights.  Do you understand that?

6            THE DEFENDANT:  Yes, I do.

7            THE COURT:  And you have to knowingly and

8   voluntarily and intelligently give up those rights.  Do you

9   understand that?

10           THE DEFENDANT:  Yes.

11           THE COURT:  And do you do that to enter a plea of

12  guilty to Count 2 and Count 14 of the Second Superseding

13  Indictment?

14           THE DEFENDANT:  Yes, I do.

15           THE COURT:  All right.  To Count 2, which charges

16  you with conspiracy to provide material support and

17  resources to members of ISIL, Islamic State of Iraq and the

18  Levant, a designated foreign terrorist organization, in

19  violation of Title 18, United States Code, Section 2339(b),

20  how do you plead to that count?

21           THE DEFENDANT:  Guilty.

22           THE COURT:  Count 14 charges you with financial

23  aid fraud in violation of Title 20, United States Code,

24  Section 1097(a).  How do you plead to that count?

25           THE DEFENDANT:  I also plead guilty.

1        THE COURT:  Sir, just because you've entered a

2    plea of guilty to those two counts does not, in fact, mean

3    that you are guilty.  Do you understand that?

4        THE DEFENDANT:  Yes.

5        THE COURT:  And I will have to hear from you, just

6    not yes or no answers, I will have to hear a lengthy

7    discussion on why you are guilty of Count 2 and Count 14.  I

8    don't want words put into your mouth.  I need to hear it

9    come from you exactly what occurred here that makes you

10   guilty of those two counts.  Do you understand that, sir?

11       THE DEFENDANT:  Yes, I do.

12       THE COURT:  All right.  Mr. Docherty will start

13   with the questioning, and I may interrupt to ask you some

14   further questions.

15   BY MR. DOCHERTY:

16   Q.  Mr. Ahmed, as His Honor said, we're going to talk today

17   not with yes or no questions, and we're going to start off

18   with one just to get you to the right orientation and right

19   time and place.  Between March the 1st of 2014 and June the

20   1st of 2014, were you associated with, hanging around with a

21   particular group of people?

22   A.  Yes, I was.

23   Q.  All right.  Let's -- who were those people?

24   A.  Adnan Farah, Zacharia Abdurahman, Hanad Musse, Mohamed

25   Farah, Guled Omar and Abdirahman Daud.

1    Q.  And what was it that you and all the people you've just

2    named were planning to do or talking about?

3    A.  We talked about going over to Syria and finding -- and

4    being able to help any way that we could, and we talked

5    about the organization which is known as ISIS, and we

6    talked, we motivated each other in terms of what the reason

7    why we would go there and what their ideology is, and

8    basically we talked about that group and any way that we

9    could help in joining that and any way that we could help,

10   basically.

11   Q.  Now, when you say "that group," what group is that?

12   A.  I'm taking about ISIL or ISIS, Islamic State of Iraq and

13   Levant.

14   Q.  And you said in your answer that one of the things you

15   did was you sort of used a slang term "hyped each other up."

16   Is that fair?

17   A.  Yeah, that is a correct term.

18   Q.  How did you do that?

19   A.  We argued, we basically debated or I would say argue and

20   also talked about things that were in the media which were

21   social media things, videos, current events that were

22   pertaining to that group or to that -- anything that has to

23   do with that basically we were talking about it and

24   look -- mainly looking at those videos.  I would say the

25   media was a very crucial aspect of it.

 1                    THE COURT:  You're talking about social media,

 2        right?

 3                    THE DEFENDANT:  Yes, I am.

 4                    THE COURT:  And you're talking about the videos

 5        that were put on YouTube and other sites that the Islamic

 6        State had made?

 7                    THE DEFENDANT:  Yes.

 8                    THE COURT:  Okay.

 9        BY MR. DOCHERTY:

10        Q.   What sorts of things did you see on those videos?

11        A.   A lot of -- it was a lot of messages talking about, you

12        know, the reason why the organization was involved in the

13        Syrian conflict, talking about that they wanted to help the

14        oppressed people in the Syrian regime, the people from the

15        Syrian regime, about showing a lot of innocent people

16        getting killed, children and women, and saying that we were

17        trying to help these people, and it showed a lot of fighting

18        and a lot of them helping -- showing that they were helping

19        the innocent people, like, kind of, you know, similar to

20        governmental services and things like of those services.

21        Q.   You -- did you see images in those videos of violence

22        being committed by ISIS or ISIL?

23        A.   Yes.  In terms of war-like scenes, it showed war-like

24        scenes that you would see in other war-like situations of

25        fighting and shooting and other types of violent acts.

1    Q.  Did you see treatment of prisoners by ISIL?

2    A.  Yes, I did.  I --

3    Q.  What sorts of things did you see ISIL doing to

4    prisoners?

5    A.  I seen -- I seen shooting style executions.  I have not

6    seen any beheadings, I would say, but I've seen videos of

7    shootings and them executing in terms of shooting and pretty

8    much those types of executions and killings.

9    Q.  You've seen more than one prisoner being shot?

10   A.  Yes.  Correct.

11   Q.  And have you seen a video called "Upon The Prophetic

12   Methodology"?

13   A.  Yes, I have.

14   Q.  And can you tell the Court approximately how many

15   prisoners are executed in that video?

16   A.  I would say the number wise, more than 30.  I don't

17   know, a lot.  I would say a lot.  I can't say exactly, but I

18   would say maybe close to 70, 60.  I mean, I don't know.  It

19   could be up to a hundred, I'm not sure, but it was a lot.

20   It was a group of multiple groups of people that were being

21   executed.

22   Q.  And were these people being executed, were their hands

23   bound?

24   A.  Yes, they were.

25   Q.  Were they armed?

1    A.  No, they were not armed.

2    Q.  And who was doing the shooting?  Which group?

3    A.  ISIS, I -- the group's members.

4    Q.  You've talked about, so far, what you and your

5    associates talked about.  Did this transition into making

6    concrete plans to actually go to Syria?

7    A.  Yes.  We contemplated, talking about where could we go

8    or what flights could we take or basically how could we get

9    there.

10   Q.  Now, flights you mentioned.  Flights cost money.  Where

11   were you going to get money?

12   A.  My idea was that I would get money through the financial

13   aid which was provided from the college that I attended,

14   MCTC, and I was -- I believe that those loans would give me

15   the ability to purchase those tickets.

16   Q.  Now, in order to get the student financial aid, there

17   are some forms you have to fill out.  Is that correct?

18   A.  Correct.

19   Q.  And this will be a yes/no question, but you saw on the

20   form that you had to promise to use this money only for

21   school.  Is that correct?

22   A.  Yes, I have.

23   Q.  And when you signed the form, did you intend to use that

24   money for school?

25   A.  No, I did not.

1    Q.   What did you intend to use the money for?

2    A.   I intended to use it to travel to Syria.

3    Q.   Did you, in fact, get student financial aid?

4    A.   Yes, I did.

5    Q.   Do you remember approximately how much you got?

6    A.   It was I would say the 2,750, that amount is

7    approximately the correct.

8    Q.   And when you say the 2,750 amount, you're reading what's

9    in the plea agreement.  Is that correct?

10   A.   Yes.

11   Q.   You see these specific numbers there?

12   A.   Yes, I do.

13   Q.   In the fall of 2014, was there a concrete plan for you

14   and some other people to travel to Syria to join ISIL?

15   A.   Yes, there was.

16   Q.   Can you outline that plan for the Court, please?

17   A.   Yes.  It was basically to have an amount of money to

18   purchase the tickets to go to Syria and to, you know, go

19   from -- take a Greyhound and go to a New York airport and

20   from there, go and to be able to go to Turkey so I can be

21   able to go and travel over to Syria.

22   Q.   Why were you taking Greyhound busses to New York when

23   there's an airport here in Minneapolis-St. Paul?

24   A.   Well, we felt like that it would be more -- in terms of

25   surveillance, it would be more successful in making it to

1    Syria by going Greyhound first and going to the airport in

2    New York so they wouldn't be in Minnesota, so by having it

3    in a different state, it wouldn't be more -- likely to be

4    more successful and not detected so yes.

5    Q.  Were you aware of people in -- of a person in the past

6    who had traveled to New York by Greyhound and from there

7    made his way into Syria to fight with ISIL?

8    A.  Yes, I have heard a person who has -- who had did that.

9    Q.  What was that individual's name?

10   A.  I believe it was Nur, and his nickname was Curry, I

11   believe, and I don't know his full name, but Abdi Nur I

12   think it was, yes, Abdi Nur.

13   Q.  Was there another person, though, that actually traveled

14   to New York as you and your friends were thinking of doing

15   it?

16   A.  At that time, exact moment?

17   Q.  In the fall of 2014, when you and your friends, you and

18   your associates are talking about this plan, were you aware

19   of someone who had done this same thing earlier who had

20   taken a Greyhound bus to Kennedy airport and flown from

21   there to Turkey and then gone to Syria?

22   A.  I believe that was, it should have been the person that

23   I referred to as Curry or I think that's the only person

24   that I -- or Yusuf Jama possibly.

25   Q.  So you know the name Yusuf Jama?

1    A.   Yes, I have.  I've heard of that name.

2    Q.   Tell me and tell the Court who the people were that were

3    planning to go to New York and fly from there to make their

4    way to Syria.

5    A.   In November?

6    Q.   In November of 2014, yes, sir.

7    A.   Yes.  Me, Zacharia Abdurahman, Hanad Musse and Mohamed

8    Farah.

9    Q.   Did you reach New York?

10   A.   Yes.

11   Q.   Were you able to fly out of Kennedy airport?

12   A.   No, I was not.

13   Q.   Why were you not able to fly out?

14   A.   I was stopped by airport security.

15   Q.   And returned -- did you then return to the Twin Cities?

16   A.   Yes, I did.

17   Q.   All right.  In the days leading up to your departure to

18   New York, had you -- let me back up.  When you get student

19   financial aid, how is the money actually, what form do you

20   have that money in?

21   A.   It is in cash.

22   Q.   Did you have a credit type card or a debit type card?

23   A.   Yes, it was transferred onto a debit card, so it was on

24   the debit card, the money was on there.

25   Q.   Could you use that debit card to get cash?

1    A.  Yes.

2    Q.  Did you?

3    A.  Well, yes, I have.

4    Q.  And once you had that cash in your hand, what did you do

5    with that cash?  And, again, I'm talking about the days

6    right before the travel to New York.

7    A.  I used some of it to purchase clothing and I would say

8    clothing and things of those sorts, socks, gloves and, like,

9    things that would prepare me for travel.

10   Q.  Did you use that money to buy your Greyhound ticket to

11   New York?

12   A.  Yes, yes, I have.

13   Q.  Did you use that money to buy your airplane ticket from

14   New York to Istanbul and then on to Madrid?

15   A.  Yes, that's correct.

16   Q.  And I just mentioned what your itinerary was.  It was

17   New York to Istanbul to Madrid.  Am I right about that?

18   A.  Yes, you are correct.

19   Q.  Did you really plan to go to Madrid?

20   A.  No, I did not.

21   Q.  What was your plan?

22   A.  To go to Syria.

23   Q.  So once you got to Istanbul, were you going to transfer

24   to that Madrid flight?

25   A.  No, I was not.

1    Q.  What were you going to do?

2    A.  Get off the stop in Istanbul, Turkey, and then find my

3    way over to Syria.

4    Q.  Okay.  And where were your associates, Mohamed Farah,

5    Hanad Musse and Zacharia Abdurahman, were they also going to

6    Syria?

7    A.  I believe so, yes.

8    Q.  And from New York, do you recall what their -- your

9    itinerary said Istanbul and Madrid.  Do you recall what

10   cities in Europe they were going to go to?

11   A.  I can't say in particular for every individual, but some

12   of them were I think Abdurahman and Hanad was Greece, I

13   believe, and I'm not quite sure where Mohamed Farah's flight

14   was going to take him, but I think it was Bulgaria.

15   Q.  Okay.  So was Mohamed Farah going to be on the same

16   flight as you to --

17   A.  Yes, yes, yes.

18   Q.  And after that, was Mohamed Farah going to go to

19   Bulgaria?

20   A.  No, I don't believe so.

21   Q.  Again, he was going to get off the plane in Istanbul and

22   go to Syria?

23   A.  That's correct.

24            MR. DOCHERTY:  If I may have one moment, Your

25   Honor?

1          THE COURT:  You may.

2   BY MR. DOCHERTY:

3   Q.  You mentioned, sir, that you got a total of about $2,750

4   in student financial aid.  Is that correct?

5   A.  Yes, that is correct.

6   Q.  Did you spend all of that on yourself or did you help

7   someone else with their financial needs?

8   A.  Yes, I gave some money to Adnan Farah.

9   Q.  Which Farah?  For which person?

10  A.  The first name is I believe Adnan Farah.

11          MR. DOCHERTY:  Adnan Farah.  Okay.  All right.

12  That's all I have for a factual basis, Your Honor.

13          THE COURT:  Did he know that ISIS was a terrorist

14  organization designated by the United States government?

15  BY MR. DOCHERTY:

16  Q.  We've talked about you watching videos in which ISIS

17  members execute tens, dozens of unarmed, bound prisoners.

18  Is that correct?

19  A.  Yes, that is correct.

20  Q.  And from that and other things that you saw, did you

21  understand that ISIL is an organization that engages in

22  terrorism and terrorist activity?

23  A.  Yes, I understand that.

24  Q.  Did you know that ISIL was designated as a terrorist

25  organization by the United States Department of State?

1    A.  Yes.

2    Q.  And did you know that before you left for New York?

3    A.  Yes, I did.

4    Q.  How did you learn that?

5    A.  Well, by mainly the news coverage talking about that

6    group, and they were all talking about it was terrorism,

7    basically it was a terrorist organization so.

8             THE COURT:  Are you Sunni or Shia?

9             THE DEFENDANT:  Sunni.

10            THE COURT:  And you knew that by going to Syria,

11   you'd be fighting Shia?

12            THE DEFENDANT:  Yes, I did understand that.

13            THE COURT:  And what was your understanding of or

14   thinking of what Shia Muslims were?  Were they Muslims?

15            THE DEFENDANT:  Well, their belief, a lot of them

16   believe, to my understanding, that they -- they don't follow

17   the teachings of -- a lot of teachings that are in Islam

18   which is following the Quran and following the Prophet's

19   tradition, and they have their kind of their own -- their

20   own religious books and texts, so it's kind of separate from

21   the mainstream, I would say, Islam.

22            THE COURT:  And so what did you think of Shias?

23            THE DEFENDANT:  Well, I believe that their

24   understanding and teachings were not in line with what I

25   would say Sunni or mainstream Islam understanding and

1    thinking.

2            THE COURT:  So were they nonbelievers?

3            THE DEFENDANT:  I would say according to what

4    they --

5            THE COURT:  No, what did you think?

6            THE DEFENDANT:  Yes, yes.  I do believe that some

7    of them did not believe in the same Islam as Muslims

8    believed in.

9            THE COURT:  Now, one of the issues in this case is

10   whether or not you or the other defendants were entrapped to

11   getting involved in this conspiracy.  Do you understand

12   that?

13           THE DEFENDANT:  Yes, I do.

14           THE COURT:  And you understand the government has

15   the burden of proving beyond a reasonable doubt that you

16   were not entrapped by showing either that the defendant,

17   you, was willing to commit the crime charged before he was

18   approached or contacted by law enforcement agents or someone

19   acting for the government; or two, that the government or

20   someone acting for the government did not persuade or talk

21   you into committing the crime charged.  Now, you understand

22   the government has a confidential informant by the name of

23   Bashir.

24           THE DEFENDANT:  Yes, I do.

25           THE COURT:  And you know who that person is?

1              THE DEFENDANT:  Yes.

2              THE COURT:  And you've met with him before?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And you've had conversations with him?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And you thought he was part of this

7     conspiracy?

8              THE DEFENDANT:  Yes.

9              THE COURT:  All right.  Now, you've gone over the

10    entrapment defense with your attorney.  Is that correct?

11             THE DEFENDANT:  Correct.

12             THE COURT:  And are you satisfied that you were

13    not entrapped in being involved in this conspiracy by the

14    confidential informant?

15             THE DEFENDANT:  Yes, I do.

16             THE COURT:  And why is that?

17             THE DEFENDANT:  Well, firstly, I know I was

18    arrested before he was involved in cooperating as an

19    informant, I knew I was arrested by that time.  And also

20    before that, that he -- I was not -- he didn't force me or

21    he did not entice me or anything, coerce me into doing these

22    actions, so I knew it was -- it was not because of him that

23    these -- that these conspiracy was happened.

24             THE COURT:  Okay.  Now --

25             MR. DOCHERTY:  Your Honor, may I follow-up on that

1    briefly?

2          THE COURT:  You may.

3    BY MR. DOCHERTY:

4    Q.  Mr. Ahmed, a few minutes ago Judge Davis was asking you

5    about the discovery that's been provided to you, and it's on

6    a computer at the jail, and you can go and watch and view

7    documents.  Do you remember that discussion?

8    A.  Yes.

9    Q.  All right.  Part of that discovery is a number of

10   tape-recorded conversations, correct?

11   A.  Yes.

12   Q.  Are you on any of those tape-recorded conversations?

13   A.  No.  Not me specifically talking, no.

14   Q.  Okay.  Why are you not on those tape-recorded

15   conversations?

16   A.  I know that those recordings started after I was

17   arrested so there was no way that I guess he could record me

18   talking because I was arrested at the time.

19   Q.  So you were arrested in February, some months before

20   many of the other people in this case.  Is that right?

21   A.  Correct.

22          MR. DOCHERTY:  Thank you, Your Honor.

23          THE COURT:  Now, because you were arrested in

24   February, there has been pre-trial motions made that

25   arguments were going to be made on your behalf that you had

1    withdrawn from this conspiracy as of February because you

2    were arrested and that after you were arrested you

3    were -- you withdrew from the conspiracy and you did not get

4    involved with the conspiracy after that.

5                THE DEFENDANT:  Yes.

6                THE COURT:  Is that accurate?

7                THE DEFENDANT:  Yes, that is correct.

8                THE COURT:  All right.  And I need the government

9    to go over why you are -- you still are part of that

10   conspiracy even after you were arrested in February.

11   BY MR. DOCHERTY:

12   Q.  Mr. Ahmed, you were arrested back in February, correct?

13   A.  Correct.

14   Q.  But you did not come forward and tell what you knew

15   about the activities of your associates, did you?

16   A.  No, I did not.

17   Q.  And it was only because you had been -- it wasn't due to

18   some action on your part that you stopped going to these

19   meetings and meeting with your associates, is it?

20   A.  Correct.

21   Q.  It's because you had been arrested and put in jail.  Is

22   that correct?

23   A.  Yes, that is correct.

24   Q.  All right.  And the conspiracy to travel to Syria went

25   on even though you were not physically attending meetings

1   anymore.  Is that correct?

2   A.  Correct.

3   Q.  And you could have, by talking to law enforcement about

4   what you knew, probably told what was going on in those

5   meetings, correct?

6   A.  Correct.

7   Q.  But you did not do so, did you?

8   A.  No, I did not, sir.

9           MR. DOCHERTY:  Okay.

10          THE COURT:  Now, was there any outside pressure by

11   anyone, a sheikh, an imam or family member or co-defendants

12   or others inside the United States or outside the United

13   States that kept you from not entering a plea of guilty

14   earlier?

15          THE DEFENDANT:  Well, yes, my family, my mother,

16   actually, was talking before, last time, she wanted -- she

17   didn't want me to plead, but at the -- I believe the day

18   before I was supposed to talk with my mom -- I mean my

19   lawyer about entering a plea deal, you know, she had

20   changed -- had a different mindset, basically wanted me to

21   go to trial and decide and that it wasn't probably the best

22   interest to plead, so I decided to follow my mom and what

23   she wanted me to do, I decided to go with that, so that was

24   a big factor in making me change my mind and sticking with

25   going to trial.

1          THE COURT:  Was she influenced by anyone?

2          THE DEFENDANT:  I do not know that.  I can't

3    answer that question.  I have no idea if she was or she was

4    not.  I have no contact with much people outside of the

5    jail.  I haven't really had a chance to call people besides

6    my family.  So I can't -- I don't know at all if she was.

7          THE COURT:  Well, at some point then your family

8    hired an attorney to get you to enter a plea of guilty.

9          THE DEFENDANT:  Yes.

10          THE COURT:  So what happened here?  What

11    influences happened to get that to happen?

12          THE DEFENDANT:  Again, I do not know.  This -- I

13    contacted them, and they just told me that they felt like I

14    should get a different attorney, and so I just went along

15    with what they have in mind.

16          THE COURT:  Okay.  You understand I'm sentencing

17    you in this matter?

18          THE DEFENDANT:  Yes.

19          THE COURT:  All right.  And you have to be

20    truthful to me?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Is there anyone, a sheikh, imam,

23    anyone in the United States or outside of the United States

24    contacted you or your family to get you not to enter a plea

25    of guilty in this matter?

1          THE DEFENDANT:  As far as I know, I do not know of

2     anybody that has influenced my -- me or my family.  Like I

3     said, I don't have any -- I have very limited contact, so

4     it's very difficult for me to even know if that would

5     happen, so I could just go by my knowledge as of now, I

6     don't -- I don't know of anybody who has influenced

7     me -- for me, myself, I can say yes, nobody has not

8     influenced me, but my family, like, I believe not so

9     according to my knowledge.

10          THE COURT:  Any other questions from the

11    government?

12    BY MR. DOCHERTY:

13    Q.  Just to make that clear, you have been incarcerated, in

14    custody, correct?

15    A.  Correct.

16    Q.  Your mother has come and spoken with you, correct?

17    A.  Correct.

18    Q.  Your mother's advice to you was 180 degrees different

19    from what Ms. Murray was telling you, wasn't it?

20    A.  Yes, it was.

21    Q.  So your mother was talking to somebody, wasn't she?

22    A.  I would believe so.  I mean, that is the only thing that

23    would make sense, but I don't have any concrete evidence or

24    knowledge that would say --

25    Q.  I understand you weren't in the room when these talks

1    went on, but your mother certainly wasn't getting her advice

2    from Ms. Murray, right?

3    A.   No.

4    Q.   Because her advice was different from Ms. Murray's?

5    A.   Correct.   Correct.

6    Q.   So your mother was talking to somebody?

7    A.   I would believe so.

8    Q.   But you don't know who that somebody might be?

9    A.   No, I do not.

10   Q.   But there has to be someone, right?

11   A.   Yeah.   That's --

12   Q.   Because you're mother is not a lawyer, is she?

13   A.   No, she is not.

14             THE COURT:   Okay.   Any questions, Ms. Murray?

15             MS. MURRAY:   Your Honor, I have no questions.

16             THE COURT:   All right.   The Court will accept the

17   plea of guilty, and I will order a presentence investigation

18   report, returnable to this Court within a reasonable time.

19   I will sign an order ordering this defendant to be involved

20   in the risk assessment program that the Court has set up and

21   as part of the presentence investigation report.   It will be

22   part of the pre-sentence report; it's not the report.   The

23   probation office will complete the presentence investigation

24   report, and a copy of that report will be sent to your

25   attorney and also to the government.   You will have an

1      absolute right to read that report.  If there's anything in

2      that report that you feel is incorrect or inaccurate or you

3      feel that something should be supplemented in that report,

4      you make sure that your attorney, Ms. Murray, knows about it

5      so she can talk to the probation officers about those

6      issues.  The government will have the same opportunity to

7      read the report and to make any objections or ask for

8      corrections in that report.

9           Once the final report is completed, it will be

10     sent to me, and I will set down a date for your sentencing.

11     If there's any motions to be made on your behalf, those

12     motions will be made in open court, and I will rule on those

13     motions in open court.  Then we'll move right into the

14     sentencing phase of the hearing.

15          Ms. Murray will have an opportunity to argue and

16     advocate for a certain sentence for you.  And you will have

17     an absolute right to talk to me.  You will have an absolute

18     right to tell me anything that you think I should know

19     before I sentence you.  And you will have as much time as

20     you want to talk to me.

21          The government will then have an opportunity to

22     respond to anything that you have said or anything that your

23     attorney has said, and then they can advocate and argue for

24     a certain sentence for you.  Then I will sentence you.

25          Do you understand the procedures that we'll be

1    using from now on?

2              THE DEFENDANT:  Yes, I do.

3              THE COURT:  All right.  Now, the question I have

4    for you, are you, in fact, guilty of this offense?

5              THE DEFENDANT:  Yes, I am.

6              THE COURT:  And there's no doubt in your mind

7    about that?

8              THE DEFENDANT:  No, there is no doubt.

9              THE COURT:  You may submit the plea agreement and

10   sentencing stipulations to the Court.

11             All right.  Anything further from the government?

12             MR. DOCHERTY:  Your Honor, I just wanted to say

13   regarding to the point about the re-extension of the plea

14   offer that has expired, the defendant has testified this

15   morning as to what his state of knowledge was.  But over and

16   above that, the government re-extended, with some

17   modification, an offer that had expired because we believe

18   that there was sufficient evidence of impermissible

19   interference which caused Mr. Ahmed not to have a full and

20   fair opportunity to review the offer that was extended in

21   September/October of 2015.

22             THE COURT:  All right.  Anything further for the

23   defense?

24             MS. MURRAY:  Nothing further, Your Honor.

25             THE COURT:  Anything further?

1          THE DEFENDANT:  No.  Thank you, Your Honor.

2          THE COURT:  All right.  You're remanded to the

3   custody of the marshal.

4      (Proceedings concluded at 12:58 p.m.)

5

6                          *      *      *

7

8

9          I, Staci A. Heichert, certify that the foregoing is

10   a correct transcript from the record of proceedings in the

11   above-entitled matter.

12

13              Certified by:  *s/ Staci A. Heichert*

14                              Staci A. Heichert,
                                RDR, CRR, CRC
15

16

17

18

19

20

21

22

23

24

25