UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 15-49(1) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S POSITION ON SENTENCING |
| HAMZA NAJ AHMED, | |
| Defendant. | |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys John Docherty, Andrew R. Winter, and Julie E. Allyn, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of fifteen years' imprisonment, followed by a lifetime of supervised release, is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.     INTRODUCTION

Defendant Hamza Naj Ahmed ("Defendant") was arrested on February 5, 2015. On April 25, 2016, shortly before he was to stand trial in a multi-count, multi-defendant trial, Defendant pled guilty to Count 2 and Count 14 of a Second Superseding Indictment. Count 2 charged Defendant with Conspiracy to Provide Material Support to a Designated Foreign

Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1); and Count 14 charged him with Financial Aid Fraud, in violation of 20 U.S.C. § 1097(a).  (PSR ¶ 6).

Several of Defendant's co-defendants proceeded to trial.  The evidence in the record and at the trial showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join, and fight for, ISIL – one attempt in the Spring of 2014 which resulted in two travelers reaching Syria, while a third traveler was denied boarding at the airport by law enforcement, and others were stopped by family; a second attempt, in the Fall of 2014, in which five travelers tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators tried to reach Syria via Mexico after driving to San Diego, California, to buy fake passports, then planned to use those fake passports to cross into Mexico, from where they would make their way to Syria.  This third attempt was unsuccessful, and resulted in the arrest of six of Defendant's codefendants.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the Report of Presentence Investigation ("PSR") prepared by the United States Probation Office.  The evidence shows Defendant was a full and willing participant in at least one these three efforts made by the conspirators to reach Syria and join ISIL.

Several men from Minnesota have died in Syria as a result of the conspiracy of which Defendant was a part.  Other men from Minnesota have reached Syria, and are active members of ISIL, a dangerous international terrorist organization which threatens the

national security of the United States.  Defendant Ahmed also lied to law enforcement when he had a chance to stop the plotting and fraudulently obtained money to help further the conspirators' goal of joining ISIL.  To protect the public from the danger which the defendant poses, to provide just punishment, and to deter others from joining foreign terrorist organizations, a fifteen-year sentence followed by a lifetime period of supervised release is appropriate.

## II.     THE FACTS OF THE CASE AGAINST DEFENDANT HAMZA AHMED

The evidence in this case shows that Defendant was a committed member of the group of men plotting and planning to join ISIL.  Defendant's involvement spanned from posting provocative pro-jihadist[1] tweets/photographs to taking substantial overt steps to leave the country by booking a flight to Spain via Turkey, traveling to JFK airport, and boarding a plane.  But for Government intervention of pulling him off the plane, certainly Defendant would have achieved his goal of becoming an ISIL fighter.

### A. Defendant Ahmed's Initial Radicalization and Participation in 2013 and Spring of 2014

Much of the evidence of this case focuses on the significant steps Defendant and his codefendants took to reach Syria over a year time period beginning in about March 2014. Defendant, however, revealed himself to be a person holding radical jihadist beliefs far in

---

[1] The word "jihad" is fraught with the possibility of misunderstanding.  As used in this memorandum, "jihad" means perpetrating acts of violence against non-Muslims, a category that includes many people who are Muslim, but are considered by ISIL to be either insufficiently zealous (most Sunnis), or else to hold beliefs that ISIL does not recognize as Muslim at all (the Shi'a).

advance of the overt steps the group took to reach Syria in the Spring of 2014. For example, as far back in August 2013, Defendant used his Twitter account to tweet: *"May allah give me Tawakal to do jihad inshalla".* (*See e.g.* PSR ¶ 79; 2/4/15 Twitter Account Search Warrant Return). Similarly, on November 2013, Defendant tweeted: *"Ya Allah give me the chance to Help and fight for the Muslims in Syria through you! I feel as though we've become desensitized to Genocide".* (*Id.*). Defendant's tweets reveal that early on, Defendant's allegiance was not just to Muslims in Syria, but specifically to ISIL, as demonstrated by this Twitter post from January 3, 2014: *"'...anyway, team ISIS. May Allah grant them and ISIS victory! Ameen' Ameen".* (*Id.*).

Defendant's early commitment to ISIL aligned with his friendship with one of the first Minnesota men to become an ISIL fighter. Defendant was close friends with Hanad Mohallim ("Mohallim"). Mohallim became an inspirational figure among the coconspirators since he managed to successfully leave Minnesota on March 9, 2014, to become an ISIL fighter in Syria. (PSR ¶¶ 20- 22; Transcript of testimony of Abdirizak Warsame, May 24, 2016, at page 14 (hereinafter "Warsame, 5/24/16, Tr. p.")). According to the cooperating witness in this case, Abdirahman Bashir ("Bashir"), Mohallim was considering jihad as early as 2013. (PSR ¶ 21; Transcript of testimony of Abdirahman Bashir, May 18, 2016, at pages 32-33 (hereinafter "Bashir, 5/18/16, Tr. p.")).

In this early time-frame, just mere months before Mohallim slipped out of the United States to become an ISIL fighter, Defendant was exchanging tweets with Mohallim. In the context of Mohallim's success in reaching Syria in March 2014, and Defendant's later attempts to reach Syria in November 2014, these tweets reveal Defendant's

4

radicalization and subsequent desire to leave to become an ISIL fighter like Mohallim. Such tweets between the two included:

December 2013, Defendant tweeted to Mohallim: *"Lol my bro I love you."* Mohallim responded: *"I love you for the sake of Allah akh. Make dua for me that Allah guides me to become one of the righteous."* Later, on January 1, 2014, Defendant replied to a tweet from Mohallim with: *"We Gona needa good talk bro, like somewhere that ain't hot if I feel me aha".* (*See e.g.* PSR ¶ 79, 61; 2/4/15 Twitter Account Search Warrant Return).  About a year later, Defendant would lie to law enforcement and claim he was only "vaguely" aware of Mohallim. (PSR ¶ 61).

Mohallim's departure spurred Defendant's coconspirators to push forward to leave for Syria in the Spring of 2014.  (PSR ¶ ¶ 23).  Although Defendant did not specifically join with his coconspirators at that time by physically getting into a car or on a plane in the Spring 2014; nevertheless, immediately preceding those travel attempts, Defendant espoused on his Twitter account numerous pro-jihadi tweets.  For example:

**3/3/2014**:  *"@ukhtmuslimah: May Allah give us all the death of a Martyr."  Amen Ya Allah*

**3/4/2014**:  *"@Deen_first: In the hearts of green birds pic.twitter.com/l1QLdDsCld"*

**3/18/2014**:  *"@isaacskarruen: "The hardest test in life is the patience to wait for right moment."  #Sabr #Islam"  So true*

**3/30/2014**:  *youtuve.com/watch?v=-403mF  ...HOW ALLAH REWARD THE SHUHADA (Martyrs) Always love this video..*

(PSR ¶ 79; 2/4/15 Twitter Account Search Warrant Return). [2]

The co-defendants' attempts to leave for Syria in the Spring 2014, were mostly a failure, with many coconspirators needing to bide their time for the next attempt to join ISIL.  By the next round of efforts to leave for Syria, in the Fall of 2014, Defendant was fully involved with the group's plot to join and fight for ISIL.

### B. Defendant Ahmed's Participation with Coconspirators Summer of 2014

Defendant joined the group plotting to go to Syria in-between their Spring 2014 attempt and their next try in the Fall of 2014.  (Transcript of testimony of Abdullahi Yusuf ("Yusuf"), May 16, 2016, at page 21).  Bashir testified to hanging out with coconspirators in the Summer of 2014, to include Defendant.  (Bashir, 5/19/16, Tr. p. 46).[3]  It was also during this time that, as ISIL expanded its territory in Syria and Iraq through successful attacks and military campaigns, the terrorist organization's propaganda flooded the internet.  The evidence showed that the coconspirators consumed, discussed, and promoted these violent videos with each other.

---

[2] On February 11, 2015, Twitter provided content of Defendant's Twitter account in response to a Search Warrant served on Twitter on February 4, 2015.  Analysis of Ahmed's Twitter account reveals a suspicious change in volume of activity with respect to direct messaging (DMs) exchanges with other users. Ahmed was an extremely heavy user of Twitter's direct message feature until the Spring 2014 plot began in earnest.  That is, from 1/9/12 to 3/31/2014, Ahmed exchanged 500 direct messages with other Twitter users with no large gaps.  But then, from April 1, 2014 to July 15, 2014 – a 3.5- month period that represents a critical juncture in the conspiracy, there are no DMs. When Ahmed either begins using the direct messaging feature again (or stopped deleting), from 7/16/14 to 9/16/14, there are 22 DMs.

[3] Bashir previously met Defendant Ahmed through Mohallim back in February 2013.  (Bashir, 5/18/16, Tr. p. 27).

For example, co-defendant Zacharia Abdurahman ("Abdurahman") explained the significant number of ISIL videos coming out during the summer of 2014, noting: *"[t]he Wilayaat[4] they make their own (UNI). So it's just daily, bro. It's like news. It's not even, uh, inspiration anymore. It's just news."* (Trial Exhibits 203 (audio), 204 (transcript p. 87)). The evidence is replete with examples of how various codefendants consumed violent ISIL videos. Defendant admitted to watching ISIL videos, including the ISIL video, "*Upon the Prophetic Methodology*".[5] (Transcript of Defendant Ahmed's Change of Plea hearing 4/25/16, (hereinafter "Plea Hrng. Tr.") p. 37). Released in the summer of 2014, this video graphically displayed the mass executions of young Shi'a men at an Iraqi Security Forces recruitment center, after the town of Tikrit was overrun by ISIL. Accompanied by a soundtrack of jihadi nasheeds, the video depicts the execution of hundreds of young men as they sat on the ground, their hands bound behind their back. Truckloads of the Shi'a victims are filmed begging for their lives, forced to denounce Iraqi political leaders, only to be marched to an open ditch where they are shot in the head as ISIL's ubiquitous black flag flaps in the wind strategically within the camera's view. At the close of this video, dozens of other victims were paraded to the edge of the Tigris River, unceremoniously shot in the head, and their corpses were then pushed into its waters.

Also during the summer of 2014, Ahmed began again to tweet pro-ISIL messages. (*See* PSR ¶ 79). Some of these tweets included:

---

[4] *Wilayaat* refers to ISIL provinces or administrative regions.
[5] Trial Exhibit 178.

**7/15/2014**: *"@AbuAlibaghdad: We have all Kuffar, Rafidah, Hypocrites and AQ against us now LOL? What an honour subhanallah! #ISIS #IS*

**7/16/2014**: *"I am ISIS I am Dowlah" – Raheemuhu Allah Never Forget that brother … Fly bro, Fly…*

**8/2/2014**: *"the World has become a battleground and now realize how important it is to be equipped with ilm.  Protect yourselves #JourneyOfilm.*

Defendant's tweets throughout these time periods were not just texts, but also innumerable pro-ISIL, pro-jihad photographs.  Just two of many, many similar examples:





Among these photographs was one with Arabic text and pictures demonstrating step-by-step instructions on how to make a gas mask from a soda pop can.  Defendant may like to argue his Twitter postings included photographs of children suffering in Syria, as if to support a claim that he had some humanitarian desire to become an ISIL fighter.  But this argument is belied by the fact that not even once in the nearly one hundred hours of statements by his codefendants that were recorded and introduced at trial does any of the codefendants speak about helping the Syrian people, or alleviating their suffering.

### C. Defendant's Participation in the Fall 2014 Plan by Traveling to New York City and Lying About the Plot to Join ISIL

In September 2014, Defendant and his co-conspirators engaged in meetings and preparations for travel to Syria to join ISIL.  (PSR ¶ 47).   Throughout the fall of 2014, they

discussed at these meetings many different possibilities for leaving to Syria undetected, for example, leaving with family to different countries in December 2014. (PSR ¶ ¶ 47, 48).

Ultimately, by October, the plot developed for four co-defendants – Defendant, Hanad Musse ("Musse"), Mohamed Farah, and Abdurahman – to travel by greyhound bus to JFK airport in New York City ("the JFK 4"), and fly from there to countries near Syria in November 2014.  (PSR ¶¶ 48-49).  By the end of October, Defendant once again took to Twitter.  This time, his tweets hinted at the need for patience – presumably because it was difficult for him to remain patient now that his goal of fighting for ISIL in Syria was within his grasp.  Defendant's tweets ahead of his planned departure included:

**10/23/2014**: *"AkhOnTheBlock: Good things come to those who wait … patiently…"*

**10/25/2014**: *"ABeautSinners_:Indeed, Allah is with the patient."*

**10/27/2014**: *Waiting is so painful…But we must remember Allah is AL HAKEEN. Ahh Rabbana Afrigh Alaynaa Sabrann!*

**10/29/2014**: *Just reflect imagine the moment you see Beautiful Angels descending from above upon your death. That split second you realize "Alas!" #Bliss*

(*See e.g.*, PSR ¶ 79).

Also, in October of 2014, Defendant appeared in Trial Exhibit 182, a "Flipagram" video produced by the younger brother of co-defendants Adnan and Mohamed Farah's. This video (essentially a slideshow) depicts many of the co-conspirators posing or displaying pro-ISIL imagery.  One photo within Exhibit 182 depicts the Defendant sitting next to his co-conspirator Musse.

**Defendant Committed Financial Aid Fraud to Fund his Trip to Join ISIL**

To succeed in his travel to Syria, Defendant, who already had his passport (Exh. 2), needed money.  Unable or unwilling to raise money on his own, Defendant resorted to scamming the federal government to achieve this objective by fraudulently obtaining student financial aid.  When he applied for this "aid," Defendant had no intention of attending school, but instead, knew he would use the money to finance travel to Syria to join and kill for ISIL.  (Plea Hrng. Tr. p. 38-39).

On October 21, 2014, Defendant obtained $2,700 in student financial aid provided to him on a debit card.  (PSR ¶ 67).  Over the course of several days, Defendant withdrew this money as cash.  (*Id.*).  Defendant used some of this money to buy gear for his upcoming travels. (Plea Hrng. Tr. p. 42).  By November 6, 2014, on the same day together, Defendant and Mohamed Farah both opened checking accounts at Wells Fargo to make cash deposits.  (PSR ¶ 52).  Defendant then proceeded to deposit approximately $2,700 in cash that he had withdrawn from his financial aid account.  (PSR ¶ ¶ 52, 67).  *See* Exhibits 160 and 161.  These funds would be used to purchase bus and plane tickets to travel to Syria on November 6th and 8th, respectively.  (PSR ¶ 53).

Bashir testified that he learned of the Fall 2014 plot through his cousin, Mohallim, and through Abdi Nur; both of whom were then ISIL fighters in Syria and Iraq.  After receiving the information about his co-conspirators' imminent departures, Bashir immediately confronted several of the co-defendants.  (Bashir, 5/19/16, Tr. p. 101-102).  First, he confronted co-defendant Abdurahman, and then they drove to a second location where they found co-defendants Daud and Adnan Farah.  As the co-defendant's explained

the November plot to Bashir, they called co-defendant Mohamed Farah and Defendant Ahmed to join them. (Bashir, 5/19/16, Tr. p. 104).  Bashir, wanting to join the group asked Defendant for money.  (*Id.*; PSR ¶ 51).  Defendant agreed to give Adnan Farah money, but claimed he would check with Omar to see if Bashir could use some of Defendant's money. (Bashir, 5/19/16, Tr. p. 105; PSR ¶ 51).  Ultimately, he did not provide money to Bashir, but did give money to Adnan Farah to help fund Adnan Farah's attempts to reach Syria. (Plea Hrng. Tr. p. 44).

With money in hand, Defendant and his coconspirators proceeded jointly with their plot to fly to join ISIL.  Although Defendant's bus ticket was ostensibly purchased separately from Mohamed Farah's bus ticket, in actuality, the bus purchases were made from the same internet protocol address.  (PSR ¶ 53).  Similarly, Defendant's plane ticket was purchased within 12 minutes of Mohamed Farah purchasing his plane ticket.  (PSR ¶ 53).

Defendant and Mohamed Farah departed Minneapolis on a Greyhound bus together shortly after midnight on November 7, 2014.  (PSR ¶ 55).  Later on the 7th, the bus stopped in Chicago, Illinois where the two conspirators met with Warsame.  (PSR ¶ 55).  Warsame testified that he then spent approximately thirty minutes with Mohamed Farah and Defendant, at which time Mohamed Farah informed Warsame that he and Defendant were destined for JFK airport.  (Warsame, 5/25/16, Tr. p. 20-21).  Because Warsame had originated the Turkey-via-JFK plan as a recommendation for Spring 2014 traveler Yusuf Jama, he knew precisely what Mohamed Farah and Ahmed were attempting to do.  (*Id.*).

When Mohamed Farah and Defendant arrived in New York, they met with co-defendants Abdurahman and Musse.  The four conspirators proceeded to JFK airport and booked their respective overseas flights, for stays lasting only one to three days.  (PSR ¶ 56).  Defendant himself purchased a round-trip ticket to Spain, but the flight had a stop in Turkey.  (PSR ¶ 56).  Defendant successfully boarded his flight and took his seat before law enforcement was able to intervene and escort him off the plane.  (PSR ¶ 57).

Law enforcement interviewed Defendant at JFK airport.  Like many of his co-conspirators, he lied to them about the purpose and destination of his travel and other details.  For starters, he told the FBI that he was traveling alone to Spain for vacation.  (PSR ¶ 60).  Similarly, despite Defendant's clear coordination of travel with Mohamed Farah, Defendant tried to deny to the FBI that he knew Mohamed Farah, stating that he only recognized someone on the Greyhound bus to NYC, but he maintained he did not know this person's name.  Defendant only finally admitted that he recognized Mohamed Farah after law enforcement showed him a picture.  (*Id.*).  Defendant at this time evidently also attempted to hide evidence, as law enforcement discovered Defendant had deleted contacts from his phone while on the bus.  (PSR ¶ 60).  The FBI did not arrest Defendant and his codefendants at that time, but rather, the four travelers caught a bus in Manhattan and returned to Minnesota the same way they had left, on Greyhound buses.

When Defendant arrived back in the Twin Cities from New York after being thwarted in his effort to join ISIL, FBI agents attempted another interview with Defendant.  Again, Defendant lied.  Defendant maintained he was traveling alone to Spain; only recognized Mohamed Farah; and only "vaguely" knew Mohallim.  (PSR ¶ 61).  Defendant

persisted in his claims that he "really don't know these people." (*Id.*).   As amply demonstrated by the tweets between Mohallim and Defendant, he clearly was more than "vaguely" aware of Mohallim.

A few months after this aborted attempt to join ISIL, Defendant was arrested on February 5, 2015.  Although his co-defendants were not similarly arrested at this time, Defendant did not cooperate or warn authorities about their plotting to join ISIL.

### D. Defendant's Coconspirators Discussed his Role During the Undercover Recordings.

Since Defendant was in custody at the time Bashir[6] began cooperating with authorities and recording conversations among the coconspirators, Defendant's voice is not on any of the recordings.   Nevertheless, his participation and desire to join ISIL was frequently referenced in the conversations.   For example, there are recordings wherein co-defendant Guled Omar describes the multiple plots to join ISIL.   During one of those soliloquies, on March 3rd 2015, Omar described how Defendant Ahmed came to be a member of the conspiracy and the JFK 4.   Defendant Omar said that he had originally made plans with Ahmed to travel to Syria: "*Hamza wanted to go with me.  Beginning, Hamza wanted to go with me 'cause he was like, 'Yo, Guled, I'm gonna go with you to Spain'.*"  (Trial Exhibits 197 (audio), 198 (transcript p. 27)).   Later in that same recording,

---

[6] From February 12 until April 19, 2015, coconspirator Bashir, was a cooperating individual with the FBI.   As part of that cooperation, he recorded dozens of hours of conversation between many of the co-conspirators.

Omar stated, "*I remember when me and Hamza came, when we became friends, you know? That was our plan.*" (*Id.*).[7]

Later, during a March 15, 2015, recording, co-defendant Abdurahman compared his, Defendant's, Mohamed Farah's, and Musse's allegiance to ISIL as being far deeper than that of their co-conspirator Yusuf:

> ZA:   *Abdullahi's in way, Abdullahi's in a way better situation than Hamza.*
>
> GAO: *Why you say that?*
>
> ZA:   *First of all, college student, {he is}. This guy, Abdullahi (UNI), he goes to high school.  ISIS wasn't a big deal to him. {But us} four people…They, they know that, uh, this is not no radicalization. They know like somehow we believe it.*

(Trial Exhibits 203 (audio), 204 (transcript p. 82-83); PSR ¶ 117).[8]

In an April 3, 2015 recording, Mohamed Farah spoke of their next upcoming travel plot and discussed what Ahmed and Yusuf, who were incarcerated at the time, would do if they were free:  *"And then Abdullahi [Yusuf]… we gotta do it for Hamza [Ahmed] and Abdullahi [Yusuf], [I swear], if they were in our situation … if they were taken out from there right now … they'd dip."*  To which Abdurahman agreed: *"they'd dip … they would."* (Trial Exhibits 232 (audio), 233 (transcript p. 90-91); PSR ¶ 96).  Later, on April 6, co-defendant Musse speculated they would all would have been locked up within one day if Defendant had told law-enforcement about the group's commitment and dedication to join

---

[7] Three weeks before his March 3 confession to Bashir, co-defendant Omar similarly admitted, "*I was planning on Hamza coming with me.  I already told Hamza.  I was like, 'Hamza, listen...'  I told him to get a flight. Go to, take your flight.  When you get to California, wait for me there.*"  *See* Trial Exhibits 189 (audio) and 190 (transcript, p. 17).

[8] The speakers in the undercover recordings are identified by their initials.

ISIL (*"If he gives a deal right now we'd probably get locked up the next day. The court can be the next day bro."*).  (PSR ¶ 109; Trial Exhibits 237 (audio), 238 (transcript p.11)).

Defendant, of course, never assisted law enforcement with any facts or insight into the group of men plotting to become terrorists.  Instead, the group was free and unfettered to continue meeting and planning for their next attempt to sneak to Syria in Fall 2015.

## III.    SENTENCING GUIDELINES

The United States has no objections to either the factual statements or the guidelines calculations contained in the Report of Presentence Investigation prepared by the United States Probation and Pretrial Services Office.[9]

The U.S. Probation Office's Report of Presentence Investigation correctly calculated Defendant's total offense level as 35, and correctly placed him in criminal history category VI. (PSR ¶ ¶ 174, 180).  The resulting guidelines sentence is 292 months to 365 months, but given the maximum sentence allowed by statute of fifteen years for Count 2, and five years for Count 14, the guideline term of imprisonment is effectively 240 months. (PSR ¶ 212).

This total offense level and criminal history score are high for this defendant in part because of the application of the terrorism enhancement at U.S.S.G. § 3A1.4.  This victim-related, Chapter Three adjustment recognizes that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of

---

[9] The Government would note, however, there appears to be a typographical error in PSR ¶ 79, wherein it states Defendant's tweets date back to March 2014. The Search Warrant return for Defendant's tweets, in fact, went back to January 2012.

deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.) *cert. denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Stewart*, 590 F.3d 93, 143 (2d Cir. 2009) (*quoting Meskini, supra,* 319 F.3d at 92).

As discussed below, a sentence of 180 months' imprisonment is appropriate in this case. This is a variance downwards from the advisory Sentencing Guidelines sentence of 240 months. This sentence satisfies 18 U.S.C. § 3553(a) standard of being sufficient, but not longer than necessary, to effectuate the objectives of federal sentencing law and policy. The downward variance, from 20 to 15 years, is necessary to appropriately differentiate among differently culpable defendants in this particular case, while at the same time treating equally those of similar culpability: that is, the defendants who pled guilty but did not cooperate with the government, (Ahmed, Adnan Farah, Musse, and Abdurahman). In the government's view, these four defendants all share about the same level of conduct and culpability. Defendant Ahmed, however, was the only one of those defendants to also plead to Financial Aid Fraud, which increased his guideline sentence to 20 years from 15 years' imprisonment. In the government's view, requiring Ahmed to accept responsibility for this second offense is appropriate to account for the full breadth of the conduct of his role in this conspiracy. In the final analysis, however, Defendant Ahmed's culpability is

sufficiently similar to Adnan Farah, Musse, and Abdurahman, that the Government does recommend the same 15-year sentence for all four of these defendants.  This sentence also appropriately distinguishes those four from the far more culpable Defendants Mohamed Farah, Omar and Daud, for whom the Government will be seeking much longer sentences.

## IV.   ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*  Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from

further crimes of the defendant," and "the need to avoid unwarranted disparities."  18 U.S.C. § 3553(a).

Defendant Ahmed should be sentenced to a term of imprisonment of 15 years.  This sentence satisfies 18 U.S.C. § 3553(a) standard of being sufficient, but not longer than necessary, to effectuate the objectives of federal sentencing law and policy.

## A.  Nature and Circumstances of the Offense

The nature and circumstances of the offense are set forth in detail above and in Common Appendix A.  This Defendant now stands convicted of two crimes – both related to, or in furtherance of, international terrorism.  The terrorist organization he sought to assist, ISIL, is one of the most dangerous and violent in existence.  ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Brussels, Nice, and San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.  This of course does not even include the murder and mayhem ISIL commits in Syria.  Even just amongst this small group of coconspirators, several of the men are presumed dead.  The loss of life at the hands of ISIL is incalculable.

The threat to the national security of the United States for these crimes is grave.  The seriousness of the nature and circumstances of a terrorism case wherein the terrorist organization is ISIL, justifies a 15-year sentence in this case.

## B.  History and Characteristics of the Defendant

Defendant is a young man with hardly a criminal history.  He described in the PSR having had a "nice childhood" in a supportive environment, never suffering any abuse or

violence during his upbringing.  (PSR ¶ 186).  He obtained his GED and was employed until he decided to leave for Syria.  (PSR ¶ ¶ 198, 203).  And yet, despite this promising foundation, he nurtured a single-minded pursuit to join ISIL, a goal he would have achieved except for last-minute law enforcement intervention.

The most overt and outward signs of Defendant's radicalization and dedication to joining ISIL manifested itself in November 2014 when he sat on the plane bound for Turkey.  But Defendant's history reveals his respect and brewing passion to be a jihadist long before November 2014.  As discussed, Defendant exposed himself to be a person holding radical jihadist beliefs since at least August 2013.

Similarly, Defendant's brother, Shahir, left the United States in 2011 and 2012, and his last known whereabouts was in Ethiopia.  (PSR ¶ 184).  There are conflicting stories as to why Sharir allegedly left the country, but in any event, his family has not heard from him for approximately 2 years.  (PSR ¶ ¶ 184, 189).  Evidently Defendant believed his brother was fighting jihad and he took pride and longing in that, as the following tweets about his brother as a "mujahid" demonstrate:

> **9/2/2013**: *"I'm sooo jealous of my older brother, when he first left I was jahiliya…it finally hit me Subhanallah! #Mujahid"*

> **12/24/2013**: *Oh mother forgive for the future in shaa Allah & Even my older brother has left, should not answer The call to eternal bliss?"*

> **1/11/2014**: *"May Allah give my dear brother Jannah firdows and accept him as Shaheed"*

(*See e.g.,* PSR ¶ 79; 2/4/15 Twitter Account Search Warrant Return).

Ultimately, Defendant took his jihadist beliefs from words to action when, in the Fall of 2014, he tried to reach Syria and join ISIL. Although Defendant pled guilty to his crimes, even while providing the factual basis for that plea before this Court, Defendant could not conceal his sympathy for ISIL or suppress his desire to justify ISIL's horrific brutality. Indeed, when the government asked Defendant about what he saw in ISIL videos, Defendant answered by focusing on how the videos depicted ISIL as *"want[ing] to help the oppressed people in the Syrian regime… ."* (*See* Plea Hrng. Tr. p. 36). Even a follow-up question by the government regarding images of violence, resulted in a response by Defendant claiming such violence was in the context of "war." (*Id.*). Only after more detailed questions by the government did Defendant get around to admitting specifics like watching violent ISIL videos such as "On the Prophetic Methodology." (*Id.*). Given that specific video's graphic depictions of mass murder, if Defendant was truly repentant and on the path to de-radicalization, he would not have minimized and evaded any questions about ISIL propaganda videos.

Defendant went even further in persisting in his self-serving minimizing and claimed delusions about ISIL's true nature during his interview with this Court's de-radicalization expert Daniel Koehler. To Koehler, Defendant claimed the group's "common denominator" in describing ISIL was to allay the suffering of women and children. (PSR DK.4). Defendant further claimed that he personally would have avoided the violence in Syria and delivered humanitarian aid instead. (*Id.*). Defendant also indicated that his focus on the Assad regime was "*pushed* by discussions" of the group. Defendant, conveniently, completely ignored the fact that he posted tweets about fighting

for Muslims in Syria long before he joined the conspiracy. It is patently absurd and contrary to the weight of the evidence for this Defendant to claim he was pushed by his friends, or that his true and primary goal in joining ISIL was to render humanitarian relief. Defendant's continued insistence on this narrative despite the plain truth of what ISIL is speaks to Defendant's deep radicalization, and his failure to truly take responsibility. Such minimizing, even lying, to this Court's expert merits a guideline sentence of 15 years' imprisonment.

Finally, although Defendant has essentially no criminal history given his prior conviction was a petty misdemeanor disorderly conduct, his history and characteristics still merit a 15-year sentence. That is, even though his convictions in this case represents his first felony convictions, these convictions do not stem from a single event, rather, multiple steps, taken over a period of months to achieve his objective to become an ISIL fighter. To achieve this singular objective, Defendant did what he thought necessary, lawful or unlawful, to include stealing taxpayer money. Defendant's decision and ability to steal financial aid represents not only an additional level of dedication and sophistication, but his patient, thoughtful commitment to join ISIL. By this crime, Defendant betrayed the taxpayers, and other students who genuinely seek to educate themselves as a means by which to contribute to society and to better themselves. Defendant willingly took what was offered and used it against the government, making a mockery of the system.

Defendant's multiple crimes, multiple steps, and continued radicalization supports a sentence of 180 months' imprisonment.

### C. Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Defendant Ahmed stands before the court convicted of some of the most serious crimes in the federal criminal code.  In fact, the Supreme Court has recognized combating terrorism as "an urgent objective of the highest order."  *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S. Ct. 2705, 2724 (2010).  Four people, at least, have died in Syria as a result of this conspiracy – Douglas McAuthur McCain, Abdi Nur, and Yusuf Jama and Hanad Mohallim.  Since this Defendant pled to Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, instead of a conviction of Conspiracy to Murder Outside the United States, a fifteen-year sentence most adequately reflects the offenses' seriousness, as well as respect for the law and just punishment.

Defendant and his group of coconspirators had no respect for the law.  Throughout the conspiracy defendants knew fully that what they were doing was illegal and that law enforcement would be trying to stop them.  Instead of respecting the laws and those efforts, when Defendant was confronted directly by the FBI he lied, not once, but twice, and thereby obstructed the investigation.  Defendant had an opportunity to renounce his radical ways and help the FBI stop the wave of Minneapolis men leaving for Syria, many to their deaths, but Defendant consciously chose not to help the investigation.  Defendant's disrespect for the law and all its processes justifies a guideline sentence.

Respect for the law is a particularly important factor in this case beyond just the defendants themselves.  During the trial for Defendant's co-defendants, there was an atmosphere of intimidation and harassment.  Especially for the families of cooperating

defendants.  At various points, multiple individuals had to be ejected from the courtroom for not following the Court's reasonable, non-onerous rules of behavior.  A serious sentence is needed to promote respect for the law, not just for defendants, but for those who purport to support them.

The dangerous nature of his crime and Defendant's dedication to that objective calls for a 15-year sentence to provide just punishment for the offense.

### D. Need for the sentence imposed to afford adequate deterrence to criminal conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

A significant sentence in this case is needed for individual and general deterrence and to protect the public from this Defendant.  Individual deterrence discourages a defendant from ever committing such a crime again.  General deterrence is necessary to deter other people from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration  . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)).

Not too long ago, Minnesota suffered a wave of young men traveling to join al Shabaab, and presumably many of those young men are now dead.  Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists.  Defendant himself should have been deterred by the disappearance of his own brother.  General deterrence in this District, at this time, is no small matter.  General deterrence is necessary to impress upon

the greater community that no matter the circumstances, trying to become a terrorist for ISIL has dire consequences.

A substantial sentence is necessary to deter individuals, like Defendant, from supporting international terrorism. As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project*, 130 S. Ct at 2725.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of Defendant, is extensively laid out above in this position pleading and the Appendix. The details of Defendant's extensive, persistent, and long-lasting desire for jihad speaks for itself as an argument of Defendant's threat level to public safety and national security. The fifteen-year sentence sought by the government is justified to protect the public from Defendant's deeply held aspiration to become an ISIL fighter.

Terrorism, being motivated by fanaticism, is difficult to deter. The effort must nevertheless be made. If deterrence, however, should be unavailing, then a fifteen-year sentence is amply justified as a means of incapacitating the defendant.

### E. The Kinds of Sentences Available, the Need to Avoid Disparities, the Need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

At this time, it is difficult to identify any particular programming that will benefit Defendant. No such programming is identified by the PSR. As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is at this time no counter-radicalization programming offered by the Bureau of Prisons. In any event, there is no indication that Defendant would participate in, or benefit from, such counter-radicalization programming, especially given his lies to Koehler. This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of Defendant receiving any programming that will reduce the risk he currently represents to the safety of the public.

With respect to the kind of sentences available, the United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization. *See,* Docket No. 698.

A review of the sentences imposed is telling. Of 20 defendants, in 14 cases, convicted of an 18 U.S.C. § 2339B violation, 14 of those defendants, or nearly three-quarters, were sentenced to the statutory maximum sentence of fifteen years' imprisonment. Only four of these convictions followed trial; the rest were all the result of guilty pleas. In short, courts are imposing the maximum sentences allowed by law in

26

2339B cases, even when defendants have admitted to their wrongdoing and initiated the rehabilitative process by pleading guilty.

The sentence of fifteen years' imprisonment requested by the government is consistent with the national sentencing pattern in similar cases.

## V.     CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence Defendant Ahmed to a term of imprisonment of fifteen years, followed by supervised release for the rest of his life.

Dated: November 3, 2016                    Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Julie E. Allyn*

BY: JULIE E. ALLYN
Assistant United States Attorney
Attorney ID No. 0256511

JOHN DOCHERTY
Assistant United States Attorney
Attorney Reg. No. 017516X

ANDREW R. WINTER
Assistant United States Attorney
Attorney Reg. No. 232531

27

**<u>COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL</u>**

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad.  Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years.  Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution.  The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police.  The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.   President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.   U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support. The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building. The United States then withdrew its diplomats from Syria. The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition. For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies. Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I.  THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A.  Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization. Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda. With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan. In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

5

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

6

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B.  ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state.  Second, ISIL used its extreme brutality as a recruiting tool.  To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam.  To publicize its brutal acts, ISIL has proven very savvy at using electronic media.  As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history.  At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought.  As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset.  The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time.  In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days.  So

8

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.     THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation.  In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day.  Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization.  The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents.  They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur).  In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial.  Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria.  In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL.  Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.