UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

U.S.A.

        -against-

HAMZA NAJ AHMED,

           Defendant.

15 CR 49 (MJD/FLN)


REDACTED POSITION ON SENTENCING
ON BEHALF OF HAMZA NAJ AHMED

JaneAnne Murray, Esq.
Bar Number: 0384887
Attorney for Hamza Naj Ahmed
Murray Law LLC
The Flour Exchange Building
310 South Fourth Avenue, Suite 5010
Minneapolis, MN 55415
Tel:  (612) 339-5160
Fax: (866) 259-7819
Email: jm@mlawllc.com

TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ........................................................................................................... 3

    A.    Hamza Ahmed's Personal History ................................................................ 3

    B.    Hamza Ahmed's Offense Conduct ..................................................... 6

    C.    Hamza Ahmed's Twitter Account ..................................................... 8

    D.    Hamza Ahmed's Acceptance of Responsibility ................................. 12

    E.    Hamza Ahmed's Proposed Release Plan ........................................... 14

III.  ANALYSIS OF 18 U.S.C. § 3553 FACTORS .................................................... 15

    A.    Applicable Principles ....................................................................... 15

    B.    Nature and Circumstances of the Offense ........................................ 17

    C.    History and Characteristics of the Accused ...................................... 18

    D.    The Purposes of Sentencing ............................................................. 19

    E.    The Applicable Sentencing Guideline .............................................. 22

    F.    Sentencing Disparities .................................................................... 22

IV.  CONCLUSION .......................................................................................................... 24

APPENDIX OF ATTACHMENTS

    Exhibit A.    Psychiatric Report of Dr. Jerome Kroll (filed under seal)
    Exhibit B.    Mitigation Report by Amy Butler
    Exhibit C.    Photos from Hamza Ahmed's Twitter Account (with photos of siblings under seal)
    Exhibit D.    Declaration of Amano Dube of the Bryan Coyle Center
    Exhibit E.    Letters of Support

Defendant Hamza Ahmed respectfully submits this sentencing memorandum. Mr. Ahmed pled guilty to conspiracy to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 1344, and financial aid fraud, in violation of 20 U.S.C. § 1097(a). We ask the Court to grant Mr. Ahmed a substantial variance and impose a sentence that maximizes his prospects for successful reintegration with his family and community.

This is an extremely serious offense, as twenty-one year-old Hamza Ahmed fully acknowledges. His removal from a flight bound for Turkey on November 8, 2014, as he states himself in his statement of responsibility, likely saved his life, or saved him "from being part of something horrifying" had he made it to Syria. The U.S.-born child of Oromo refugees from the disputed Somalia-Ethiopian border, Mr. Ahmed found the "ungoverned virtual space"[1] on the Internet conquered by ISIL propaganda, while babysitting his three younger siblings at home when his mother worked the evening shift at a bakery. Eighteen years old and wrestling with identity issues, Mr. Ahmed was the perfect mark for ISIL's seductive ideology of statehood and citizenship, and proclaimed role as the only viable defender of Syrian innocents. His own prolific postings on his Twitter account illustrate his radicalization and the motives and yearnings underlying it.

Critically, following his interception at JFK, and with family intervention, Mr. Ahmed ceased tweeting, surrendered his passport to his parents, re-enrolled in classes he was taking at the Minneapolis Community and Technical College, and totally disengaged from his co-defendants. He did not try to travel to Syria again in the months following his aborted trip to Syria and his arrest on the instant charges in February 2015. While incarcerated, Mr. Ahmed has engaged in soul-searching, reflection and reading, culminating in his realization that:

---

[1] Alberto M. Fernandez, *Here to Stay and Growing: Combating ISIS propaganda Networks*, The Brookings Project on U.S. Relations with the Islamic World U.S.-Islamic World Forum Papers 2015, October 2015, at 12, available at https://www.brookings.edu/wp-content/uploads/2016/06/IS-Propaganda_Web_English.pdf.

> [T]here are better ways I can help myself, my family, my community and people around the world without having to take extreme actions and put my life and other lives in jeopardy. To show that if you want to bring about change in the world you can do it by knowledge and working together, not force and division. I am filled with remorse and sadness at the path I took. I truly want to make amends to my government, my family, and my community. I never want to take this path again and I want to help others not to want to take this path. And I want to hold and hug my parents, my little siblings again so much.

In addition to Mr. Ahmed's own process of psychological disengagement from his extremist path, there has been a groundswell of family and community support for Mr. Ahmed, which will help him reintegrate successfully upon release. As set forth below and in the accompanying attachments, his extended family (which numbers close to 100 people) has rallied around him to ensure his resolve for a productive life is not thwarted. Two mosques (the Dar Al-Hijrah Mosque and the Tawfiq Islamic Center) have pledged their support, as has the Brian Coyle Center, one of the premier non-profit organizations providing services to young East-African men in the community, working in consultation with the Center for Peacemaking and Restorative Justice at the University of Minnesota.

Finally, as this Court has recognized in its exploration of risk assessment and deradicalization initiatives, the issue of future risk is an omnipresent one in cases such as this. A psychiatric evaluation by University of Minnesota professor Dr. Jerome Kroll, submitted under seal with this position paper, concludes that Mr. Ahmed is at a low-risk of recidivism.

<u>BACKGROUND</u>

A.    <u>Hamza Ahmed's Personal History</u>

Hamza Ahmed was born on *****, **, 1995, in San Diego, California, the youngest of two children born to Fathia Good and Naji Ibrahim, both Oromo refugees from the disputed border region between Somalia and Ethiopia.[2]  The family moved to Minneapolis, Minnesota, when he was less than two years of age.  Ms. Good and Mr. Ibrahim worked hard to establish their foothold in American society.  Ms. Good attended English classes as well as a vocational program in cake decorating at Dunwoody College of Technology.  She now works full-time at a bakery.  Mr. Ibrahim came to the United States with the advantage of already knowing how to read and write in the English language.  He worked as a taxi-cab driver, occasionally as a translator, and is now self-employed as a medical transporter for pharmaceutical companies.  Both are naturalized U.S. citizens.  For Ms. Good, the citizenship test was a major hurdle given her limited knowledge of English, but she persevered, and obtained her citizenship certificate in a ceremony in 2012 attended by several family members and friends.

Mr. Ahmed's parents separated when he was about seven years old, ultimately divorcing.  Mr. Ahmed and his older brother Shahir continued to live with their mother, and his father would visit every week or so.  Mr. Ahmed was close with Shahir, who he believed looked out for him.  His mother briefly remarried and had a daughter when Mr. Ahmed was nine.  Mr. Ahmed did not get along well with his new stepfather.  The second marriage did not last long.

---

[2] Oromo people are Ethiopia's largest ethnic group and their population amounts to more than 25 million (around 35% of Ethiopia's total population).  The Oromo are a numerical majority but a political and social underclass in Ethiopia, and are always suspected by the Amharic Ethiopians of fomenting secessionist ambitions and persecuted accordingly.

When he was eleven, his mother moved the family to a suburban "Homes for Habitat" home on the border of Burnsville and Savage. A far cry from his childhood in the Sibley Apartments off Maynard Avenue, where the playgrounds teemed with playing Oromo, Ethiopian, and Somali kids, Mr. Ahmed was now part of a small minority of neighbors of color, and he experienced little mingling between the different ethnicities, and at times, anti-Muslim and anti-African sentiment. Around this time, his parents briefly reconciled, and had two more children, a boy now aged six and a girl now aged five.

After the failure of the trial reconciliation between his parents, Mr. Ahmed, a good student with average grades, would come home after school and take over the task of babysitting for his younger siblings, while his mother went to work at a bakery. He would help the older one with his homework, feed them the meals his mother had prepared, play with them, bathe them, read to them and put them to bed. This was the pattern of his teen years. Mr. Ahmed undertook these responsibilities conscientiously and without resentment, although he may inwardly have expressed frustrations at times. In their letters of support, his parents speak glowingly of his selfless commitment to his family and his love and care of his younger siblings.

When Mr. Ahmed was sixteen, his older brother, Shahir, abruptly left the United States without warning, and traveled to Ethiopia and perhaps to the Middle East. It was a devastating time for the family – Mr. Ahmed looked up to his brother and felt abandoned; Mr. Ahmed's mother was inconsolable. Shahir last called the family one or two years ago; no-one knows if he is dead or alive. Mr. Ahmed has speculated whether his brother became a foreign fighter, but has no information to corroborate that.

When he was seventeen, Mr. Ahmed was involved in a minor fight at his school and was suspended briefly. The altercation involved two racially-divided groups at school and Mr. Ahmed was not the instigator. Following that incident, Mr. Ahmed's family determined that it would be best if Mr. Ahmed did not return to school. Accordingly, dutifully following his parents' wishes, Mr. Ahmed stayed at home and studied for his GED, which he passed with ease.

It was during this year of home study that Mr. Ahmed began exploring his religious and Muslim identity, reading the Koran, and learning about the situation in the Middle East. Prior to that, Mr. Ahmed, like his parents, had been an observant Muslim, but not excessively devout – saying prayers daily, going to a mosque on the weekends when possible, and trying to follow the moral code of Islam, of kindness, obedience, abstinence, respect and charity. But at seventeen, as he engaged in the developmentally-appropriate identity exploration of that age, he began contemplating his Oromo versus Somali identity, his East African identity versus his identity as a young black American male, his identity as a young adult man, and his identity as a Muslim. This process brought him in touch with the voluminous Internet and social media output of ISIL (as described in the Joint Defense Memorandum). He learned about the civil war in Syria and the rise of ISIL. The pictures of injured and orphaned children affected him deeply. He came to view ISIL as the one organization that could defeat Assad, and was also seduced by ISIL's message of nationhood, citizenship and strict and fair government, with adequate services for the young and needy. He attempted to discuss this with his parents, but they shut down the conversation (as is typical among the East-African immigrant community

in the U.S.).[3]  Mr. Ahmed, however, continued his explorations through what are sometimes

termed the "echo chambers" of social media, and with his peers.

      B.     <u>Hamza Ahmed's Offense Conduct</u>

Hamza Ahmed was introduced to his co-defendants through Abirahman Bashir, who he

had met, in turn, though Mr. Ahmed's high school friend and Bashir's cousin, Hanad

Mohallim.  In the spring and summer of 2014, Mr. Ahmed met with his co-defendants and

Bashir to discuss the worsening civil war in Syria and the rise of ISIL.  It was during these

meetings that the issue turned to the young men themselves traveling to join and fight with

ISIL.  As Mr. Ahmed explained, the group members mutually reinforced each other's resolve

and reasoning.  During these meetings, the group would watch videos about ISIL, including

videos about its military activities as well as its provision of government services.  As Mr.

Ahmed describes what he saw on these videos:

> A lot of -- it was a lot of messages talking about, you know, the
> reason why the organization was involved in the Syrian conflict,
> talking about that they wanted to help the oppressed people in the
> Syrian regime, the people from the Syrian regime, about showing a
> lot of innocent people getting killed, children and women, and
> saying that we were trying to help these people, and it showed a lot
> of fighting and a lot of them helping -- showing that they were
> helping the innocent people, like, kind of, you know, similar to
> governmental services and things like of those services.[4]

He was aware that ISIL was designated as, and viewed internationally, as a terrorist

organization, and had participated in atrocities, including for example the mass execution of

---

[3] Indeed, this is why Mr. Ahmed's parents were so shocked to learn of his removal from the flight to Turkey.
They had no idea about his private and virtual radicalization.
[4] Ahmed Plea Transcript at 36.

bound prisoners, which he saw in a video.[5]  In part, his decision to go to Syria was buoyed by Mohallim's successful departure in or about March 2014 to Syria.[6]

By September 2014, these discussions had transitioned to concrete plans to travel to Syria.  It was agreed that Mr. Ahmed, Mohamed Farah, Zacharia Abdurahman and Hanad Musse would travel by greyhound bus to New York City, and then fly from JFK to the Middle East.  Mr. Ahmed applied for financial aid from the college he was then attending, Minneapolis Community and Technical College (where he was pursuing general college course with a view to later specializing in pediatric nursing), falsely stating he intended to use the money for educational purposes.  On October 21, 2014, $2,750 was made available to him, which he withdrew and redeposited into a personal checking account he had opened.  Using these funds, on November 6, he purchased a greyhound bus ticket to New York City, and departed on the evening of November 7, traveling with Mohamed Farah.[7]  On November 8, Mr. Ahmed again used the financial aid funds, this time to purchase his flight to the Middle East – a flight to Istanbul later that day, with a connecting flight to Madrid, Spain.  Mr. Ahmed, however, did not plan to use the Istanbul-Madrid leg of his ticket, but rather to make his way from Istanbul to Syria.  Mr. Ahmed boarded his flight bound for Istanbul, but was identified before takeoff and escorted off the plane before it left the gate.  Interviewed in New York, Mr. Ahmed falsely stated that he was traveling alone on a vacation to Spain.  FBI agents at JFK did not detain him. He traveled by bus back to Minneapolis.  When he arrived in Minneapolis at the Greyhound Bus Terminal, he was interviewed again by FBI agents, and Mr. Ahmed again falsely reiterated the Spanish vacation explanation.  The agents did not arrest him at that time.

---

[5] *Id.* at 37, 44-45.  Mr. Ahmed did not participate in paintball practice with his co-defendants during the months when travel to Syria was being discussed and planned.

[6] Mr. Ahmed denies communicating with Mr. Mohallim after the latter's departure, but notes the group was in touch with fighters in Syria who would assist in arranging their passage.

[7] He also gave $200 of the funds to co-defendant Adnan Farah to assist the latter's purchase of a passport.

Following his return to Minneapolis, and FBI agents' notification to Mr. Ahmed's parents of their belief that Mr. Ahmed had been attempting to travel to Syria, Mr. Ahmed's family immediately realized the gravity of the situation and the necessity for an aggressive intervention. As his father explains:

> My family and I were devastated when we learned of Hamza's removal from a flight bound to Turkey in November. We immediately held family councils, met with local community leaders and sought guidance from the Imams at the mosques we attend to address the situation. We removed Hamza's passport from him, and required him to return to classes at MCTC. He began attending classes there again this past spring. We advised him to stop posting on his Twitter account, which he did. I began systematically bringing Hamza to the mosque with me every Friday and religious holiday. I also had him join me occasionally on my work trips.[8]

Mr. Ahmed had no further communication with his co-defendants following the aborted trip to Syria in November 2014, until their arrest in April 2015, after which some were housed with him at Sherburne County jail. He did not make or participate in making any plans to try to travel to Syria again. Later in November, he re-enrolled in classes for the upcoming spring term at MCTC. FBI surveillance reports from January and February 2015 reveal that Mr. Ahmed was indeed attending his classes at MCTC. He was arrested on the instant case on February 5, 2015.

C.    Hamza Ahmed's Twitter Account

Mr. Ahmed maintained a twitter account where he posted prolifically between 2012 and November 2014 (16,000 tweets in total). He posted his tweets using an application on his phone, a process that allowed him to post thoughts and links to other tweets or sites at will throughout the day. The posts range the gamut from musings about sports, music and television programs, to expressing frustrations about exams, family and babysitting duties, to

---

[8] Declaration of Naji Ibrahim, June 19, 2015, Docket #147.

his deepening commitment to his Muslim faith and community, to his exploration of jihadi ideology. Becoming almost exclusively religious in the months leading up to his attempted departure to Turkey from JFK, the tweets document his path to radicalization. They also chart a journey that is on all-fours with the research set forth in Defendants' Joint Sentencing Memorandum relating to the conflicts and dislocation experienced by young men in Minneapolis of East-African descent; the seductive power of ISIL's propaganda operations; and the particular susceptibility of young people to ISIL's message.

Like many young men of his generation generally, and his background in particular, Mr. Ahmed wrestled with his efforts to form and establish his identity, and with the identity conflicts he experienced in his own life. Thus, Mr. Ahmed tweeted: July 16, 2014: "RT @Truthhurts_alie: None of us should be feeling comfortable in our own homes while the ummah suffers in the way that they are;" August 1, 2014: What a strange situation... Born and raised in a land only to be homesick, familiar landscape yet he feels out of place. #Darulkfr [Land of Disbelief];" August 1, 2014: "Sometimes i feel fake for just RTing palestine/Gaza situation and the Ummah being oprressed.. Like cant i do more than RTs? .........;" March 11, 2014: "I'm afraid I've been ungrateful, Those in Syria and elsewhere starving till their soul departs, and I complain if I get shoes from Walmart . . .;" March 7, 2014: "I'm just Scared man . . . I live good alhamdulilah [praise God], I eat, no real hardships. I don't wanna get lost in the ease and be Ungrateful." He tweeted too about his Oromo heritage, and the differences between Somalis and Oromos, an additional layer in his adolescent identity struggle (March 9, 2014: "Oromos are typically nicer, but Somalis are way better when it comes to Deen [religion], coming together").

These conflicts found resolution in his devotion to his Muslim faith and, ultimately with his embrace of the identity as potential Caliphate fighter, intent on defeating Assad and forging an Islamic state that would unite Muslims worldwide. In elucidating Mr. Ahmed's decision to travel to Syria to join ISIS, scores of tweets reveal Mr. Ahmed's preoccupation with the bloodshed and misery in Syria and Iraq (July 15, 2014: "Women & children inside #Syria continue to be displaced. Do not forget them this #Ramadhan"), including numerous photographs documenting the tragedy of war, and in particular, its impact on children. A sampling of these photographs is attached hereto as Exhibit C.

And, to address these abuses, Mr. Ahmed was prepared to volunteer as a fighter for ISIL, accepting that he could be killed or "martyred" in that process (*e.g.*, July 14, 2014: "@CaptivatingDeen: Their smiles. Wallahi they blow me away. The look of complete bliss on their face. Shaheed [martyr] . . . Look other worldy [sic]"); March 30, 2014: [link to a video] "HOW ALLAH REWARD THE SHUHADA [Martyrs] Always love this video....").

Mr. Ahmed also reveals how he was hooked by ISIL's propaganda machine. He describes life in the Islamic State as "beautiful." *See*, *e.g.*, July 16, 2014: [link to video] "Great Video takes you inside the life of people in Shaam [Syria] under Law of Allah swt *Eye Opener;" July 16, 2014: "Im gona share this really informative inside Shaam its really beautiful <3 Law of Allah in full swing #Raqqah." He speaks frequently of his willingness to be "patient" about waiting for the opportunity to embark on his journey (e.g. "@AkhOnTheBlock: Good things come to those who wait . . . patiently . . .").

It should be noted that nowhere in his tweets does Mr. Ahmed indicate *any* intention of being a suicide bomber, or an interest in violence for its own sake. Indeed, Mr. Ahmed's tweets elide the stark reality of ISIL's brutality, focusing instead on ISIL's own propaganda

narrative of nationhood, governmental services and defeat of Assad's regime. In addition, while he occasionally expresses opposition to American foreign policy, he *never* advocates terrorist acts within the United States. The tweets reveal his primarily religious and ideological motivation, not a bloodthirsty or sadistic motive.

The tweets also show Mr. Ahmed's human, teenage side: his love for his parents (e.g., March 14, 2013: "I can never repay my mom . . . Forever indebted to her;" January 3, 2014: "❤ My parents ❤ The most precious people in my life. Allah will always take care of me, but my parents are there to guide me, Allah preserve them"); his filial sense of duty (October 27, 2014: "Take care of your parents wholeheartedly in their twilight years the way they cared for you when you were young"); his frequent role (and acceptance of the role) as babysitter to his younger siblings (January 16, 2012: "My lil bro just decided to go tarzan and take a leak on the floor, awsome ;" December 27, 2012: "Why wont this Girl Sleep . . . Struggles of Babysitting;" March 2, 2013: "Babysitting the reason my plans die.. Wtf;"); and his love for the siblings he helped raise (e.g. August 24, 2012: "My baby sister got the flu :( love her more than this world; I wish I could just take flu into my body for her;" January 19, 2014: "Wallahi [by God], only until they pass away will u realise how those little moments u spent with your siblings was the most sweetest moments in life"). Photographs he tweeted of his siblings, including several of them sleeping on his chest, are also included in Exhibit C.

Mr. Ahmed ceased tweeting on November 4, 2014, with a retweet that read "May Allāh guide us, forgive us, purify our hearts, and rectify our affairs." Following his removal from the Turkey-bound flight, Mr. Ahmed never tweeted again. At my request, his family took the account down shortly after Mr. Ahmed's arrest on criminal charges in February 2015.[9]

---

[9] It took some time to remove the account because, just prior to his aborted trip to Turkey, Mr. Ahmed had erased all the information on his phone, including the password to the Twitter account. After the Turkey trip, Mr.

The FBI had been aware of Mr. Ahmed's twitter account for some time prior to the meeting with Mr. Ahmed, but had not taken steps to determine the identity of the user. It was only after Mr. Ahmed had been intercepted at JFK that they linked Mr. Ahmed to this Twitter account.

D.     Hamza Ahmed's Acceptance of Responsibility

On September 4, 2015, the government offered Mr. Ahmed a plea offer of one count of material support to a designated terrorist organization, a charge that carried a maximum of fifteen years in prison. Shortly thereafter, Mr. Ahmed indicated to the undersigned that he intended to accept this plea offer and plead guilty, together with his co-defendants, Zacharia Abdurahman and Adnan Farah. On September 15, 2016, Mr. Ahmed communicated to the undersigned a change of heart. The plea offer expired. A modified version of this offer was made again in April 2016. On April 25, 2016, Mr. Ahmed pled guilty to the two counts of conviction. As the government explained at his guilty plea, it had re-extended the expired plea offer in essential terms "because we believe that there was sufficient evidence of impermissible interference which caused Mr. Ahmed not to have a full and fair opportunity to review the offer that was extended in September/October of 2015." Ahmed Plea Transcript at 55.[10]

In a handwritten "statement of responsibility" submitted in connection with his presentence investigation, he stated as follows:

> Your Honor today I share with you my experience and the importance of what I learned, I share my feelings and the sense of loss I've had for the actions that have lead me to where I am today. I share my truth and the significance that it entails, and lastly I

---

Ahmed's family canceled his phone number. The phone number needed to be reactivated in order to reset the password to the account. Accordingly, it was a timely process to generate a new password in order to access the Twitter account settings.

[10] *See also*, Ahmed Plea Transcript at 50-51 (in which Mr. Ahmed explains how he came to reject the plea offer); *see also* Declaration of Jon Hopeman, Docket 394 (elucidating additional details regarding the "impermissible interference" that led to the expired offer being re-offered).

share my hope because despite the severity of how my situation may seem it could have been a lot worse, there could have been no second chance, no hope. Responsibility to me is willing to lay yourself bare, to change, improve, to accept a problem needs to be fixed and acknowledge something may not seem as it once was. For me, accepting that is by accepting I was on my way to a path that would have brought about misery and loss, harm that I never fully grasped, harm that not only affected me but those around me and who cared for me. I was on my way to joining a terrorist organization, I was willing to become a fighter for that organization. I knew it was an organization that committed atrocities. But I chose to listen only to ISIS's one sided narrative that they were the ones that were trying to stand up against injustice, oppression, calling on all the Muslims to unite and be role models of the world. After seeing the scale of oppression being committed daily by the President in Syria I felt tired, helpless and hopeless, so I convinced myself that ISIS's narrative was true and also the answer to those problems. It's only after I was taken off the plane to Turkey that I really came to terms with what I was doing. The advice and love of my family helped me see the error of my ways. To be honest, being stopped by the F.B.I. was the best thing that happened to me. I am sure it saved my life or at least saved me from being part of something horrifying if I had made it to Syria. And it helped me see with fresh eyes how lucky I am to have such wonderful parents, uncles, aunts, and cousins, as well as to live in the United States of America. The more I read articles about ISIS, news coverage of horrible attacks on innocent people and their lack of mercy towards the world, the more I felt so ashamed that I chose to be blinded by their false messages. During the almost two years since my trip, I want you to know, I've done a lot of reading including books about peaceful leaders. And I've done a lot of soul searching. I realize there are better ways I can help myself, my family, my community and people around the world without having to take extreme actions and put my life and other lives in jeopardy. To show that if you want to bring about change in the world you can do it by knowledge and working together, not force and division. I am filled with remorse and sadness at the path I took. I truly want to make amends to my government, my family, and my community. I never want to take this path again and I want to help others not to want to take this path. And I want to hold and hug my parents, my little siblings again so much. Thank you for this opportunity to express myself. Hamza Ahmed.

E.     Hamza Ahmed's Proposed Release Plan

On June 19, 2015, the undersigned, in cooperation with Mr. Ahmed's family, Sheikh

Abdisalam Adam (the board chair of the Islamic Civic Society of America, "ICSA") and the

elders and Imams at the Dar Al-Hijrah Mosque, proposed a bail release plan for Mr. Ahmed.

With two additional elements recently provided by the Brian Coyle Center and the Center for

Restorative Justice and Peacemaking at the University of Minnesota, all parties are committed

to this release plan if given an opportunity to implement it.   The plan addresses Mr. Ahmed's

release residence, religious instruction, counseling, training, education, and work options, and

was prepared with a view to engaging Mr. Ahmed productively with his family and

community.

- Mr. Ahmed would initially live with his father, Naji Ibrahim, who resides with Mr. Ahmed's uncle, Kamal Ibrahim, and aunt, Naima Osman, in North Minneapolis.[11]

- Mr. Ahmed would regularly attend religious services and Islamic instruction at the Dar Al-Hijrah Mosque, one of Minneapolis' busiest mosques, located in the Cedar-Riverside neighborhood of Minneapolis.[12]   The Dar Al-Hijrah Mosque is run by ICSA (http://icsaweb.org/), established in 1998 by community leaders committed to the simultaneous advancement of Islamic principles and democratic values.   Members of ICSA are strongly committed to democratic ideals, principles of tolerance, and the rule of law.   Moreover, board chair Sheikh Abdisalam Adam, who has visited Mr. Ahmed at Sherburne County Jail many times, is well-known in the community for his anti-extremist teachings.

- Mr. Ahmed would engage in a counseling and mentoring program at the Brian Coyle Center, with Abdirahman Mukhtar, the Center's Youth Program Director as his mentor.[13]   This would consist of one-on-one mentoring as well as family counseling.

- The Center for Restorative Justice and Peacemaking at the University of Minnesota has pledged to assist the Brian Coyle Centre in "designing and implementing restorative dialogue processes for Mr. Ahmed and his family."[14]

---

[11] *See* Declaration of Naji Ibrahim; *see also* letter from Kamal Ibrahim and Naima Osman, attached as Exhibit E.
[12] *See* Declaration of Sheikh Abdisalam Adam, June 19, 2015, Docket #144.
[13] *See* Declaration of Amano Dube (Exhibit D).
[14] *Id.*

- Subject to available slots, the Brian Coyle Center can offer job training and employment through its barista training program and a culinary arts program run by an affiliate.[15]

- Mr. Ahmed would also engage in volunteer work at both the Brian Coyle Center and the Dar Al-Hijrah Mosque, such as sports-coaching, food distribution needy families, snow shoveling, etc.[16]

- To the extent possible, Mr. Ahmed would enroll again at Minneapolis Community and Technical College or another third level institution to complete his nursing studies.

- Both Dar Al-Hijrah and the Brian Coyle also offer social opportunities with peers, with a view to inspiring and guiding Mr. Ahmed "to a vision of social engagement that is entirely contrary to any desire to build and reside in a separatist state overseas."[17]

## ANALYSIS OF § 3553 FACTORS

A.    Applicable Sentencing Standard

As the Supreme Court reaffirmed in *Pepper v. United States*, the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.*, 131 S.Ct. 1229, 1240 (2010) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)). That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 125 U.S. 738 (2005), which changed the "sentencing landscape . . . substantially" to "emphasiz[e] a sentencing court's broad discretion in crafting an individualized sentence." *United States v. Forde*, 664 F.3d 1219, 1223 (8th Cir. 2012); *see also United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (*en banc*) ("the district court is prohibited from presuming that the Guidelines range is reasonable" and instead "must 'make an individualized assessment based

---

[15] *Id.*
[16] *Id.*
[17] *Id.*

on the facts presented'") (*quoting Gall v. United States*, 552 U.S. 38, 50 (2007)).  The

deference granted a district court's determination springs from its "special competence of

sentencing courts" to make "defendant-specific determinations." *Feemster*, 572 F.3d at 464

(*quoting United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)).

Consistent with the principle of individualized sentencing is the wide discretion

afforded the sentencing judge "in the sources and types of evidence used to assist [.] in

determining the kind and extent of punishment to be imposed," in particular, "the fullest

information possible concerning the defendant's life and characteristics." *Pepper*, 131 S.Ct. at

1240 ("[p]ermitting sentencing courts to consider the widest possible breadth of information

about a defendant ensures that the punishment will suit not merely the offense but the

individual defendant") (citations omitted).  Indeed, as the Court in *Pepper* points out, this

principle is codified in 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information

concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate

sentence").  *Id*; *see also United States v. Jordan*, 573 F.3d 586, 590 (8th Cir.2009) (district

court must "specifically address[.] the defendant's proffered information in its consideration of

the 18 U.S.C. § 3553(a) sentencing factors").

The Guidelines provide "the starting point and the initial benchmark" for the district

court, but they do not usurp the district court judge's "superior position to find facts and judge

their import under § 3553(a)." *Gall,* 552 U.S. at 51.  Under § 3553(a), "[t]he court shall

impose a sentence sufficient, but not greater than necessary" to fulfill the purposes of

sentencing.  18 U.S.C. § 3553(a).

Below, we explain how "an individualized assessment" of the § 3553(a) factors in Mr. Ahmed's case strongly supports a variance here.

B. <u>Nature and Circumstances of the Offense</u>

Mr. Ahmed fully appreciates the gravity of his conduct and criminal convictions. Without in any way diminishing this conclusion, there are nonetheless several mitigating factors. First, Mr. Ahmed was not a leader, organizer, manager or recruiter of others. He did maintain a public Twitter account, but while that may have had incidental recruitment and reinforcement value to others, Mr. Ahmed maintained this account primarily as his way of participating in an international *conversation* about the meaning of Islam, Muslim identity in the modern world, and the role of Muslims in responding to the Syrian crisis. Second, when his plans were intercepted and he was removed from the plane bound for the Middle East, he complied fully with his family's intervention, gave up his passport, ceased tweeting, re-enrolled in classes at MCTC, resumed his baby-sitting duties, and expressed his remorse to his family. He disengaged from his co-defendants and did not make any plans to travel to Syria again. Third, Mr. Ahmed's motivation for participating in the offense was religious and ideological, not sadistic, driven by his concern for the plight of the Syrian people. Mr. Ahmed has *never* advocated terrorist acts within the United States. Fourth, as more fully set forth in the accompanying Joint Defense Memorandum, his offense is mitigated by his age, the power of ISIL propaganda, and his vulnerability to that propaganda. Finally, he has used his almost two years in custody to reflect on his conduct and process what led him to this place. He now fully accepts how misguided and blind his adherence to ISIL was. He is deeply remorseful.

C.  Personal History and Family Ties

After *Booker*, as the Eighth Circuit emphasized in *United States v. Burns*, 577 F.3d 887
(8th Cir. 2009), the district court's discretion under 18 U.S.C. § 3553(a) "is near its zenith," in
part, because the court "has discretion to consider virtually unlimited information."  577 F.3d
at 903-04, *citing* 18 U.S.C. § 3661.

Mr. Ahmed's personal characteristics – youth, vulnerability, efforts to establish
identity, obedience to parents, commitment to family, kindness, generosity, gentleness and
peace-loving nature – are fully set forth in the accompanying mitigation report, psychiatric
report and the letters of support from family and community members.  In particular, we draw
the Court's attention to the following description from Ms. Butler's report:

> The Hamza that was described to me is a kind, helpful, generous
> young man. His mother stated that Hamza is a young man who
> couldn't pass a homeless person without giving them money. She
> told of a time when she gave Hamza $10 for food, only for him to
> give it away to someone panhandling on the street. When she
> confronted him, upset that he didn't use the (limited) money she
> had given him on himself, Hamza simply told her that, "somebody
> needed it more than me."
>
> Other family members shared similar stories of Hamza's
> generosity. I was told that Hamza often played the role of
> peacekeeper and provided a mellow, relaxed presence when others
> were stressed. In addition to caring for the young children in his
> life, Hamza also cared for his father when he was ill, helped
> elderly neighbors, and was pursuing a nursing degree. Based on
> the stories I heard, there is likely some truth in Hamza's claim that
> he was initially attracted to ISIL by recruitment videos that showed
> children and families suffering and in need of aid (as opposed to
> violent or anti-American sentiments). Hamza insists his
> participation in these crimes began out of a misguided attempt to
> help those suffering.[18]

---

[18] *See* Mitigation Report at 3.

a. The Purposes of Sentencing

We submit that a sentence that maximizes Mr. Ahmed's potential for rehabilitation – as set forth in our proposed release plan with community and family members – and his opportunities to engage in advanced educational or vocational training and/or actively seek full-time employment, would adequately serve the purposes of sentencing set forth in § 3553(a)(2): just punishment, adequate deterrence, protection of the public from the defendant, and rehabilitation.

1. Just Punishment

Mr. Ahmed, who was arrested on February 5, 2015, has spent almost two years in custody already, most of it at Sherburne County Jail, where visitations with his family are by video. This has been punishing for his family and for him. Additional punishment in this case includes the widespread media exposure it has garnered, publicly labeling him as a "terrorist" for the rest of his life, with the attendant collateral consequences in terms of educational and employment prospects. Notably, probationary supervision is a significant punishment in and of itself – particularly with the release plan that we have proposed, which would severely restrict Mr. Ahmed's liberty. *See Gall*, 128 S.Ct. at 594 (pointing out that "probation is not merely 'letting an offender off easily'" and in fact "substantially restrict [one's] liberty") (citation omitted).

2. General and Specific Deterrence

As demonstrated by his guilty plea, self-reflection, remorse, and his determination to forge a productive career path, Mr. Ahmed has proved that he has been chastened by his encounter with the criminal justice system, and has no inclination to break the law again.

With respect to general deterrence, we submit that a felony conviction for a terrorism-related offense and even a short period of confinement would constitute sufficient general deterrence, particularly given that over the last year ISIL's propaganda has been increasingly and more effectively countered by media dissemination of its horrors

(3) Protection of the Public

Incapacitation is often one of the over-riding sentencing purposes in terrorism cases. Importantly, however, there is no generally-accepted, validated risk assessment model for terrorists. Nor is there any agreed terrorist profile. As Professor John Horgan writes, "[t]he journey into and out of terrorism is as personal as it is complex."[19]

While we appreciate the difficulty of the Court's task in this regard, and the innovation of using a risk assessment expert with experience and success in deradicalization techniques, we object to the risk assessment made in his case by Daniel Koehler. Through no fault of Mr. Koehler's, the circumstances of Mr. Ahmed's interview – through a broken, faulty Skype connection, the majority of which was done by audio alone – did not permit an effective and comprehensive evaluation of Mr. Ahmed, even accepting the validity of Mr. Koehler's "semi-structured, open narratives" methodology, which relies on eye-contact, analysis of body language, use of certain vocabulary, and conclusions drawn from omissions.[20]

Accordingly, we request that the Court adopt instead the psychiatric analysis of Dr. Jerome Kroll, who determined that Mr. Ahmed is at a low risk of recidivism. Dr. Kroll, a professor of psychiatry at the University of Minnesota, has fifty years of professional and academic psychiatric experience, including extensive experience since 1980 working with refugee populations from war-torn countries, initially with the four Southeast Asian groups

---

[19] John Horgan, *What Makes A Terrorist Stop Being A Terrorist*, Journal of Deradicalization, Winter 2014, at 4.
[20] Transcript of Koehler Testimony at 60.

(Hmong, Cambodian, Vietnamese, and Lao), and since the late 1990s, with over 800 Somali and Oromo refugee patients.  Dr. Kroll's report is attached hereto under seal as Exhibit A.

(4) Rehabilitation

As discussed above, Mr. Ahmed is deeply remorseful, has abandoned his prior adherence to ISL, and is committed to living a law-abiding life after sentencing.  In any event, to the extent that rehabilitation or additional deradicalization is necessary here, "imprisonment is not an appropriate means of promoting [it]."  18 U.S.C. § 3582(a).   This is especially true in the context of terrorism.  Terrorism researchers have concluded that prisons are "places of vulnerability," connecting and radicalizing those with terrorist leanings and creating troubling "opportunities for networking" and "skills transfers."[21]

Successful deradicalization programs focus on "disengagement," and accordingly, we seek a sentence that maximizes opportunities to engage Mr. Ahmed productively with his family and community.[22]  Such a program – as set forth in Mr. Ahmed's release plan – focuses strongly on Mr. Ahmed's family and his reintegration with it,[23] and includes one-one-one mentoring,[24] family and individual counseling,[25] religious instruction, education, volunteer work and employment.

---

[21] See Rajan Basra, Peter R. Neumann, and Claudia Brunner, *Criminal Pasts, Terrorist Futures: European Jihadists and the New Crime-Terror Nexus* (ICSR 2016) at 4, available at http://icsr.info/wp-content/uploads/2016/10/ICSR-Report-Criminal-Pasts-Terrorist-Futures-European-Jihadists-and-the-New-Crime-Terror-Nexus.pdf.

[22] See Rabasa et al., *Deradicalizing Islamic Extremists*, Rand Corporation (2010) (the "Rand Report") at xiv, available at http://www.rand.org/content/dam/rand/pubs/monographs/2010/RAND_MG1053.pdf (noting that in the context of terrorist rehabilitation programs, repressive measures can backfire, and the goal should not be deradicalization but rather incentivized disengagement); *see also id.* at 192-93 ("aftercare [for former radicalized detainees] should include locating the ex-radical in a supportive environment and facilitating his or her reintegration into society").

[23] See Rand Report at 186 (noting that rehabilitation programs that include an alleged ex-extremist's family "appear to increase the probability that the individual will remain disengaged").

[24] The most successful of the deradicalization programs across the world have provided credible mentors to the individual participants (*see*, *e.g.*, the Aarhus Model: http://www.theguardian.com/world/2015/feb/23/home-jihadi-denmark-radical-islamic-extremism-aarhus-model-scandinavia).

4. <u>Advisory Sentencing Guidelines and Policy Statements</u>

The guideline estimate in Mr. Ahmed's plea agreement (level 35, CHC VI, yielding a guideline range of 292 to 365 months) is accurate. Mr. Ahmed moves for a departure from CHC VI to CHC I, on the grounds that CHC VI, as dictated by § 3A1.4(b) over-represents the seriousness of Mr. Ahmed's criminal history (which would be CHC I but for the terrorism enhancement), and the likelihood he will commit other crimes. *See* § 4A1.3; *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) (criminal history departure available in terrorism cases). With such a departure, Mr. Ahmed's guideline range would be 168 to 210 months.

5. <u>Avoiding Disparity in Treatment of Similar Offenders</u>

Sentencing courts are mandated to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records." 18 U.S.C. § 3553(a). Of course, as the Eighth Circuit has acknowledged, "some disparity will inevitably exist because of the unique facts of each individual defendant's case." *United States v. Wong*, 127 F.3d 725, 728 (8th Cir.1997). This conclusion is readily apparent here in the government's list of recent cases in which individuals were convicted of a count of material support to a designated terrorist organization. Multiple differences with Mr. Ahmed's case are readily apparent in these cases – ranging from the age of the defendants (Wolfe); their roles in recruiting others (Bell, Mohammed, Said, Elfgeeh); their provision of money overseas (Hasbajrami, Said, Mohammed); their provision of advice to ISIL fighters (Amin, Elfgeeh); their participation in military training either here or overseas (Conley, Wolfe, Pham); their actual travel overseas

---

[25] *See* Rand Report at xviii ("[t]he best-designed rehabilitation programs (for instance, the one in Singapore) continue to offer (and sometimes require) theological and psychological counseling for those who have been released. Continued interaction with a credible interlocutor provides ongoing emotional support, helps to dispel doubts, and ensures that behavioral and ideational changes endure.").

and return in a context to suggest a continuing danger to the community (Nguyen, Morgan, Pham); their conviction on conspiracy to kill charges (Deleon, Kabir); and failure to express remorse or statements or other actions indicative of an ongoing threat to the United States (Teausant, Elhuzayel, Edmonds and Edmonds).  Moreover, others not listed in the government's graph, but also relevant, are those where individuals who engaged in similar conduct but were permitted to plead to much lesser charges: Jasminka Ramic (36 months), Heather Coffman (54 months), Bilal Abood (48 months*)*.[26]

Importantly, it is worth emphasizing here an additional disparity that may not be readily apparent from an examination of the public filings in these cases, and that is the extent of community support and resources to ensure the individuals' successful reintegration into society.  As noted above, the community support for the defendants in the cases before the Court has been overwhelming – exemplified in Mr. Ahmed's case, which has garnered the support of two of the leading mosques in town, prominent and respected community leaders, the Brian Coyle Center, the Center for Restorative Justice and Peacemaking at the University of Minnesota, and a large, extended family of hard-working, productive members of Minneapolis society.

Aside from these disparities, the bottom line is that the sample size in the government's filing is simply too small to extrapolate national sentencing patterns.  Thus, as the Court has recognized with its research into deradicalization programs, the pending nine sentences before this Court permit it to establish a new paradigm.  We submit that Mr. Ahmed is a perfect candidate for a new paradigm of sentencing in material support cases that recognizes the

---

[26] We join in our co-counsels' analysis of other material support prosecutions and discussion on the issue of sentencing disparity to the extent applicable to Mr. Ahmed's case.

youthful vulnerability of these defendants, the seductive power of ISIL's propaganda, and the strong potential for rehabilitation.

Conclusion

For all the foregoing reasons, the Court should depart to CHC I and vary below the applicable guideline, and sentence Mr. Ahmed to a sentence that maximizes his potential for rehabilitation and reintegration.

Dated: November 3, 2016

Respectfully submitted,

/s/

_____
JaneAnne Murray
Bar Number: 0384887
Attorney for Hamza Naj Ahmed
Murray Law LLC
The Flour Exchange Building
310 South Fourth Avenue, Suite 5010
Minneapolis, MN 55415
Tel: (612) 339-5160
Fax: (866) 259-7819
Email: jm@mlawllc.com