## <u>COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL</u>

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad.  Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years.  Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution.  The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police.  The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.  President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.   U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support. The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building. The United States then withdrew its diplomats from Syria. The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition. For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies. Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization. Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda. With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan. In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

6

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them. Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters. Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups. Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier. At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it. These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

7

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state.  Second, ISIL used its extreme brutality as a recruiting tool.  To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam.  To publicize its brutal acts, ISIL has proven very savvy at using electronic media.  As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history.  At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought.  As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset.  The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time.  In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days.  So

8

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.    THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

10

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation. In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day. Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization. The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents. They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur). In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial. Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria. In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL. Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.