UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

───────────────────────────────────────────────

UNITED STATES OF AMERICA,

        Plaintiff,

v.                         **SENTENCING MEMORANDUM**
                               **AND OPINION**
                         Criminal File No. 15-49 (01) (MJD/FLN)

HAMZA NAJ AHMED,

        Defendant.

───────────────────────────────────────────────

John Docherty, Andrew Winter and Julie Allyn, Assistant United States Attorneys, Counsel for Plaintiff.

JaneAnne Murray, Counsel for Defendant.

───────────────────────────────────────────────

## I.    SUMMARY OF SENTENCING DECISION

The Defendant pleaded guilty to Count 2 of the Second Superseding Indictment which charged Conspiracy to Provide Material Support to a Designated Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1), and to Count 14 which charged Financial Aid Fraud in violation of 20 U.S.C. § 1097(a). When imposing a sentence in any criminal case, this Court must take into consideration the applicable guideline range calculated pursuant to the United

1

States Sentencing Guidelines ("USSG") and the statutory sentencing factors set forth in Title 18 U.S.C. § 3553(a).

The Court has carefully considered all of these factors and finds that a variance from the applicable sentencing guideline range is warranted. Accordingly, the Court finds that a sentence of one hundred-twenty (120) months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

This sentence also takes into consideration evidence[1] submitted by the Defendant, after his original sentencing hearing, that shows earlier plea negotiations between this Defendant and the government were interfered with by outside influences, and that such influences may have compromised the independence of the Defendant's decision-making.[2]

## II.    INTRODUCTION

Crimes that involve acts of terrorism "represent[] a particularly grave

---

[1] Doc. Nos. 768 and 774.

[2] The Court had originally sentenced the Defendant to a term of imprisonment for 120 months on Count 2 and 60 months on Count 14 to be served consecutively, for a total term of 180 months. By Order dated November 29, 2016 (Doc. No. 778) the Court granted the Defendant's motion to Amend/Correct for Concurrent Sentencing based on the evidence of interference with regard to plea negotiations.

2

threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal [] thus [] terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

In 2014, the Defendant agreed to conspire with others to join one of the most dangerous and violent terrorist organizations the world has ever known, the Islamic State of Iraq and the Levant ("ISIL"). By joining this conspiracy, the Defendant agreed to be part of the largest group of committed ISIL travelers from Minnesota; an ISIL terrorist cell that, left unchecked, could have caused immense destruction and the loss of many lives, both here and abroad.

As part of this cell, the Defendant watched some of the horrific propaganda videos produced by ISIL. These videos depict ISIL members killing innocent victims in the most violent and despicable manner, such as mass beheadings, shootings and in one case, a Jordanian pilot that was burned alive.

Each member of the conspiracy took affirmative steps to travel overseas to join and fight with ISIL. Some of the conspirators successfully traveled to Syria and joined ISIL; most of whom have since been killed.

The evidence at trial clearly demonstrated that each member of the

conspiracy knew that what they were doing was wrong. To avoid the scrutiny of their families, friends and most importantly, law enforcement, they followed the ISIL playbook, which counseled "fake it till you make it." This strategy required the conspirators to remain under the radar by going to school, working to provide financial assistance to their families, attending the Mosque, and remaining otherwise law-abiding. This strategy also provided that if confronted by law enforcement, they should loudly complain that they were being profiled because they were Muslim. In order to carry out this strategy, however, the conspirators had to lie to their parents and family, to the FBI agents investigating this case, to the grand jury and to the prosecutors.

The members of the conspiracy were deeply committed to the violent jihadist ideology of ISIL. Because of this commitment, they were **not** deterred when subpoenaed to testify before the grand jury or when they received a target letter[3] from the United States Attorney's Office. Members were **not** deterred when physically prevented from boarding flights here in Minneapolis or in New York City in their effort to join ISIL in Syria. They were **not** deterred when

---

[3] A target letter is sent from the United States Attorney's Office informing the recipient that he/she is a target of a federal criminal investigation.

confronted by their parents, grandparents or siblings.

Despite all of the obstacles put in their way, the members of this conspiracy continued the march toward their admitted objective; to be a committed jihadi warrior, and to travel to Syria to fight, kill and become a martyr.

### III.   FINDINGS OF FACT

The Court adopts the factual statements contained in the presentence report ("PSR") as its findings of fact.  In addition, the Court adopts those facts set forth in Common Appendix A to the Government's Position on Sentencing [Doc. No. 723] and attached hereto as Common Appendix A.

### IV.   APPLICATION OF THE GUIDELINES

The Court found the applicable guideline range was based on a total offense level of 35 and a criminal history category VI, which results in a guideline range of 292 to 365 months.  However, because Count 2 carries a statutory maximum sentence of 15 years (180 months) and Count 14 carries a statutory maximum sentence of five years (60 months) the guideline range is adjusted to 240 months.

    **A.**    **Downward Departure Based on Criminal History Category**

CASE 0:15-cr-00049-MJD-FLN   Document 820   Filed 12/02/16   Page 6 of 20

The Defendant asserts that a criminal history category VI over-represents his criminal history and the likelihood he will reoffend. But for the application of the terrorism enhancement, his criminal history category would be I, resulting in a guideline range of 168 to 210 months. He argues that because the terrorism enhancement is universally and mechanically applied, it does not take into consideration any offender characteristics, such as a lack of prior criminal history, no history of violence, no possession of a weapon, or no threats against law enforcement or plans of domestic terrorism.

The Court recognizes that it has the discretion to depart downward under § 4A1.3 if it finds that the terrorism enhancement over-represents the seriousness of the defendant's past criminal conduct or the likelihood he would reoffend. The Court declines to exercise that discretion in this case, given the nature of the offenses of conviction, which involved traveling overseas to join and fight with ISIL, one of the most dangerous and violent terrorist organization the world has ever known, and using federal educational funds to achieve that goal. See Meskini, 319 F.3d at 92 (recognizing that "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation and the need for incapacitation.")

Accordingly, the Court will deny the Defendant's motion to depart downward based on overstatement of criminal history.

## V. SENTENCE

The Defendant is sentenced to a term of imprisonment for one hundred-twenty (120) months: one hundred-twenty months on Count 2 and sixty months on Count 14, to be served concurrently, followed by a twenty (20) year term of supervised release on Count 2 and a three (3) year term of supervised release on Count 14, to be served concurrently. Based on the Defendant's current economic condition, the Court did not impose a fine, but did impose a special assessment in the amount of $200.

## VI. STATEMENT OF REASONS

Pursuant to the Supreme Court decision in United States v. Booker, 543 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory. The Court is nonetheless required to take into account the applicable Guideline range and the pertinent Sentencing Commission policy statements. In addition, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the following sentencing purposes:

(A) to reflect the seriousness of the offense, to promote respect for

>the law, and to provide just punishment for the offense;
>
>(B) to afford adequate deterrence to criminal conduct;
>
>(C) to protect the public from further crimes of the defendant; and
>
>(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

The Court also considers the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

### A.   Section 3553(a) Factors

#### 1.   Nature and Circumstances of the Offense

At trial, evidence of the Defendant's use of Twitter was presented to show his support of ISIL, and that such support began early in 2013. In August 2013, he tweeted "May allah give me Tawakal to do jihad inshalla." In November 2013, he tweeted "Ya Allah give me the chance to Help and fight for the Muslims in Syria through you? I feel as though we've become desensitized to Genocide."

Then, in January 2014, he tweeted "anyway, team ISIS. May Allah grant them and ISIS victory! Ameen' Ameen."

The Defendant also tweeted his support for those who had traveled or aspired to travel to join ISIL. One individual that joined ISIL in March 2014 was Hanad Mohallim. In late 2013, the Defendant and Mohallim exchanged tweets, and in one tweet, the Defendant stated "lol my bro I love you." In response, Mohallim wrote "I love you for the sake of Allah akh. Make dua for me that Allah guides me to become one of the righteous." In a later tweet in response to a tweet from Mohallim, the Defendant wrote "We Gona needa good talk bro, like somewhere that ain't hot if I feel me aha." When later questioned by law enforcement as to his involvement and knowledge of the conspiracy, the Defendant claimed he was only vaguely aware of Mohallim. Additional evidence at trial demonstrated that Mohallim was, in fact, an inspirational figure among the co-conspirators.

The Defendant also issued a number of tweets in March 2014 in support of jihad. For example, on March 3, 2014 he tweeted "May Allah give us all the death of a Martyr" and on March 4, 2014 he tweeted "In the hearts of green birds [martyr] pic.twitter.com/11QLdDsCld".

Another inspirational figure to the Defendant was his brother, Shahir. The Defendant believed his brother Shahir was fighting jihad and he took pride and longing in that - as demonstrated by a number of tweets. For example, on 9/2/2013, he tweeted "I'm sooo jealous of my older brother, when he first left I was jahiliya . . . it finally hit me Subhanallan! #Mujahid." The Defendant also tweeted pro-ISIL photographs. One such photograph included Arabic text and pictures demonstrating instructions on how to make a gas mask.

During the summer of 2014, the Defendant and his co-conspirators watched a number of ISIL propaganda videos that depict extreme violence in the form of mass executions. Then in October, the Defendant and Hanad Musse, Mohamed Farah and Zacharia Abdurahman developed a plan to fly to Turkey from New York. In a tweet shortly before he left for New York, the Defendant wrote "Just reflect imagine the moment you see Beautiful Angels descending from above upon your death. That split second you realize "Alas" #Bliss."

The Defendant used federal financial aid to purchase a bus ticket from Minneapolis to New York, and to purchase an airline ticket to Spain, in order to eventually travel to Syria to join and fight with ISIL. On the bus trip to New York, the Defendant met with Abdirizak Warsame during a short stop in

Chicago. Once in New York, the Defendant was escorted from the plane at JFK Airport by law enforcement. When the FBI agents asked about his travel plans, the Defendant repeatedly lied to them about the purpose of his travel, and that of the co-conspirators that had also traveled to New York by bus. He was allowed to return to Minneapolis, and once there, he again met with FBI agents. During this second interview, the Defendant again lied to the FBI about his travel plans and whether he knew Farah, Musse or Abdurahman. He also claimed to vaguely know Mohallim, which is belied by the tweets he exchanged with Mohallim.

### 2. History and Characteristics of the Defendant

The Defendant was born in San Diego, California to parents of Somali descent. He is the second of five children. In 1997, his family moved to Minnesota, and in 2002, his parents divorced. The Defendant and his brother often took the role of head of the household. This brother, Shahir, left the United States in 2011 or 2012; his last known whereabouts was in Ethiopia. His family has not heard from him for at least two years.

In high school, the Defendant was involved in a large group fight on school grounds. As a result of the fight, he was suspended from school. He did not go back to school, and eventually earned a GED. He has no other contacts

with the criminal justice system prior to this case. His family remains supportive, but they do not appear to recognize his extremist ideology, and believe that the Defendant has put this offense behind him.

The Defendant has admitted to the Court that he is a terrorist. Nonetheless, he argues the power of ISIL propaganda and his vulnerability to that propaganda is a factor that weighs in favor of a downward variance. Citing to numerous studies and court decisions that discuss the physical brain maturation process in the criminal sentencing context, the Defendant argues this Court can consider his young age as grounds for a downward variance. In support, he cites to the decision of the United States Supreme Court in Miller v. Alabama, 132 S.Ct. 2455 (2012). In Miller, the Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Id.,132 S. Ct. at 2469. The Court found that a mandatory sentencing scheme of life in prison was unconstitutional because it did not allow the sentencing court to consider that children are constitutionally different from adults for purposes of sentencing. "Because juveniles have diminished culpability and greater prospects for reform, we explained 'they are less deserving of the most severe punishments.'" Id., at 2464

(citations omitted). In reaching this conclusion, the Court also recognized that children "lack [] maturity and [have] an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; are more susceptible to peer pressure and have a limited control over their own environment; and their character is not well-formed and their "actions [are] less likely to be evidence of irretrievable depravity." Id. Because of these attributes, the Court held that "the penological justifications for imposing the harshest sentence" on juveniles are diminished, "even when they commit terrible crimes." Id. at 2465.

The Court has previously addressed the issue of youth as a factor in sentencing in United States v. Robert James Jefferson. In that case, the Court re-sentenced the defendant who had previously been sentenced to a mandatory life term of imprisonment for murders committed when he was sixteen years old. Applying the principles set forth in Miller, and specifically as to whether the crimes of conviction involved reckless or impulsive behavior due to a lack of maturity in the Jefferson case, this Court found that

> [w]hile the criminal conduct at issue here is certainly reckless, the Court finds that such criminal conduct did not involve rash or impulsive behavior. The fire bombing of the Coppage home involved planning, the

13

> creation of molotov cocktails and then waiting until dark to set the house on fire. Jefferson had plenty of time to consider what he was doing and the consequences of starting a home on fire. He had plenty of time to back out of the plan, but he did not do so.

United States v. Jefferson, No. 97-276, 2015 WL 501968, at * 5 (D. Minn. Feb. 5, 2015).

Applying the principles set forth in Miller in this case, the Court finds that the Defendant has not demonstrated that a downward variance from the applicable guideline range based on his young age is warranted. As conceded by the Defendant, he was not a juvenile at the time he committed the offense of conviction, and was a member of the charged conspiracy since its inception. He attempted to travel overseas to join ISIL in November 2014, and used financial aid funds to purchase a bus ticket to New York and an airline ticket overseas.

In addition, there is nothing impulsive about the offense of conviction. The conspiracy took place over the course of a year during which the Defendant participated in multiple meetings to discuss the situation in Syria, to plan travel routes, and discuss plans to raise funds for travel costs. Even after Abdullahi Yusuf's failed attempt to travel in May 2014 and his own failed attempt to travel in November 2014, his participation in the conspiracy continued until his arrest

in February 2015.  The Defendant had many opportunities to leave the conspiracy, but he failed to do so.

The Court also notes that the Defendant continues to minimize ISIL's true nature, stating ISIL was a way to help the oppressed people of Syria, and that images of violence in ISIL videos were simply depictions of "war."  This minimization is evident from the report prepared by Daniel Koehler, which is discussed below.  He also told Koehler that he personally would have avoided the violence in Syria and would have delivered humanitarian aid instead.

As to the claim that the Defendant would have only provided humanitarian aid to the people of Syria, the Court categorically rejects such a claim.  No reasonable person would believe that ISIL was an organization involved in charity, the protection of innocent Syrians or the pursuit of fair government because no evidence was submitted to support such a contention.

To the contrary, the government's expert, Charles Lister, testified that al Qaeda separated from ISIL in 2014 because of the sheer brutality of ISIL's blood lust.  Further, ISIL distributed and publicized a number of videos showing the beheading of hostages, the shooting of innocent civilians and the burning of a Jordanian pilot.  These videos dispel any notion that ISIL was a "charitable"

organization.

### 3. Seriousness of the Offense, Respect for the Law and Just Punishment, Deterrence and Protection of the Public

The atrocities committed by members of ISIL are well-known, and were known to this Defendant when he made the decision to join ISIL in Syria. The fact that the Defendant took affirmative steps to join ISIL is of paramount concern given that four men have died in Syria as a result of this conspiracy: Douglas McCain, Abdi Nur, Yusuf Jama and Hanad Mohallim.

Although the Defendant is a young man with no criminal history, his participation in this conspiracy cannot be viewed as a discrete event, borne out of a rash or youthful impulse. The Defendant took deliberate steps to provide material support to ISIL and he repeatedly lied to law enforcement. The Defendant had the opportunity to renounce his radical ways and help the FBI stop the wave of Minneapolis men leaving for Syria, but he consciously chose not to help the investigation. These undisputed facts demonstrate that a sentence of ten years is necessary to reflect the seriousness of the crime and to promote respect for the law.

A significant sentence is also needed for individual deterrence, given the

Defendant's persistent and long-lasting role in the conspiracy. A ten year sentence is justified to protect the public from Defendant's deeply held desire to become an ISIL fighter. A ten year sentence will also deter others from committing similar crimes and will ensure the safety of the public.

Finally, the Court would note that the Defendant's proposed release plan would return him to the precise circumstances he was in when he chose to join ISIL in 2014. As discussed below, the Court has not yet identified a qualified program for the disengagement and deradicalization of defendants convicted of crimes involving terrorism.

### 4. Unwarranted Sentencing Disparities

The government has filed reports on national terrorism sentencings that summarize sentencing data from cases around the country in which one or more defendants have been convicted of charges involving the provision of material support and resources to a designated foreign terrorist organization.

The report includes information on 26 defendants. Of these, 20 have been convicted of charges under § 2339B, either standing alone or combined with other charges, and 13 were sentenced to a term of imprisonment of 180 months or more.

The Court has reviewed the information concerning these terrorism sentencings and determined that of the 20 defendants convicted of violating § 2339B, 10 defendants pleaded guilty to at least one count of violating § 2339B, and their criminal conduct underlying the criminal charges is somewhat similar to the Defendant in this case in that the defendant attempted to travel to join a terror group or they recruited and/or assisted others to join a terror group. For these 10 defendants, the sentences ranged from 82 months to 180 months.

Based on this data, the count of conviction and the Defendant's history and characteristics, the Court finds that a sentence of ten years avoids unwarranted sentencing disparities.

### 5. To Provide Needed Educational/Vocational Training, Medical Care or other Correctional Treatment in the Most Effective Manner

The Defendant submitted to a presentence examination and study to provide the Court a risk assessment evaluation and recommendations as to intervention needs for de-radicalization of defendants involved in terrorism related cases. The Court appointed Daniel Koehler, Director of the German Institute on Radicalization and De-radicalization Studies, to conduct this

examination.[4]

Koehler has provided the Court a report of his risk assessment evaluation and recommendations as to intervention needs for de-radicalization.[5]  His findings are based on interviews with the Defendant, family members, his review of transcripts, court filings, excerpts from the PSR, and open source information.  The bases and reasons for Koehler's findings and opinions represent an overall qualitative assessment that includes elements of the VERA2 or ERG22+ protocols, and is based on Koehler's case worker experience.

In his report, Koehler found that based on his structured risk assessment, the Defendant has a medium to high risk of future offending and a medium stage of radicalization.  Koehler adds that the Defendant's current stage of risk and radicalization does not warrant an immediate release on probation.

Based on this Court's experience handling a high number of terror cases, and imposing sentences on a number of defendants convicted of terrorism

---

[4]Koehler has extensive experience working with individuals involved with terror groups, including Somali jihadists and violent neo-nazi extremists.  He has counseled approximately 200 cases in the last six years, and is working to develop programs for the successful de-radicalization of those involved in terrorism related cases.

[5]Koehler also testified during a two day hearing concerning his reports as to each defendant, and was subjected to cross examination by the Court, the government and the defense.

crimes, the Court substantially agreed with Koehler's analysis of this Defendant. Because of the risks of re-radicalization for defendants convicted of terrorism offenses, and the fact that no program exists, either within or outside of the federal prison system, that meets the standards of a qualified disengagement and deradicalization program[6], the Court finds this factor does not support a more substantial variance from the applicable guideline range.

### 6. Conclusion

Taking into account all of the above, the Court finds that a sentence of one hundred-twenty (120) months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

Date: December 2, 2016

s/Michael J. Davis
Michael J. Davis
United States District Court

---

[6]Koehler has suggested that such a program should involve expert personnel in the areas of religion, psychology, education and socialization.