1       UNITED STATES DISTRICT COURT
        DISTRICT OF MINNESOTA
2

3  ------------------------------------------------------------
             )
  United States of America,  ) File No. 15-49
4           )    (MJD/FLN)
     Plaintiff,    )
5           )
  vs.         ) Minneapolis, Minnesota
6           ) April 1, 2016
  (1) Hamza Naj Ahmed,   ) 2:08 p.m.
7  (2) Mohamed Abdihamid Farah, )
  (3) Adnan Abdihamid Farah,  )
8  (4) Abdirahman Yasin Daud,  )
  (7) Guled Ali Omar,    )
9           )
     Defendant.    )
10 ------------------------------------------------------------

11       BEFORE THE HONORABLE
        MICHAEL J. DAVIS
12   UNITED STATES DISTRICT COURT JUDGE
        **(MOTION HEARING)**
13

14 <u>APPEARANCES</u>
  For the Plaintiff:  UNITED STATES ATTORNEY'S OFFICE
15          John F. Docherty, AUSA
          Andrew Winter, AUSA
16         600 U.S. Courthouse
          300 South Fourth Street
17         Minneapolis, MN 55415

18  For Defendant Hamza  MURRAY LAW LLC
  Ahmed:       JaneAnne Murray, ESQ.
19         310 South Fourth Avenue
          Suite 5010
20         Minneapolis, MN 55415

21  For Defendant Mohamed NWANERI LAW FIRM, PLLC
  Farah:       P. Chinedu Nwaneri, ESQ.
22         4655 Nicols Road
          Suite 106
23         Eagan, MN 55122

24         MURAD DEFENSE, P.A.
          Murad M. Mohammad, ESQ.
25         333 South Seventh Street
          Suite 2850
         Minneapolis, MN 55402

```
1      For Defendant Adnan          KENNETH UBONG UDOIBOK, P.A.
       Farah:                       Kenneth U. Udoibok, ESQ.
2                                   The Flour Exchange, Suite 5010
                                    310 Fourth Avenue South,
3                                   Minneapolis, MN 55415

4      For Defendant                DE LEON & NESTOR, LLC
       Abdirahman Daud:             Bruce D. Nestor, ESQ.
5                                   3547 Cedar Avenue South
                                    Minneapolis, MN 55407
6
       For Defendant Omar:          MITCHELL BRUDER & JOHNSON
7                                   Glenn P. Bruder, ESQ.
                                    7505 Metro Boulevard
8                                   Suite 325
                                    Edina, MN 55439
9
       Court Reporter:              STACI A. HEICHERT,
10                                  RDR, CRR, CRC
                                    1005 U.S. Courthouse
11                                  300 South Fourth Street
                                    Minneapolis, Minnesota 55415
12

13         Proceedings recorded by mechanical stenography;
       transcript produced by computer.
14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1            THE COURT:  All right.  Let's call this matter.

2            THE COURTROOM DEPUTY:  The United States of

3     America versus Hamza Naj Ahmed, Mohamed Abdihamid Farah,

4     Adnan Abdihamid Farah, Abdirahman Yasin Daud, and Guled Ali

5     Omar; Criminal Case No. 15-CR-49.

6            Counsel, please state your appearances for the

7     record.

8            MR. DOCHERTY:  Good afternoon, Your Honor.

9     Assistant U.S. Attorneys John Docherty and Andrew Winter for

10    the United States.

11           MS. MURRAY:  JaneAnne Murray for Mr. Ahmed.

12           MR. MOHAMMAD:  Murad Mohammad on behalf of Mohamed

13    Farah.

14           MR. NWANERI:  Good day, Your Honor.  Patrick

15    Nwaneri for Mohamed Farah.  And with me is Hassan Mohamud.

16           THE COURT:  Good afternoon.

17           MR. UDOIBOK:  Your Honor, Kenneth Udoibok for

18    Adnan Farah.

19           THE COURT:  Good afternoon.

20           MR. NESTOR:  Good afternoon, Your Honor.  Bruce

21    Nestor for Abdirahman Daud who is present.

22           MR. BRUDER:  Good afternoon, Your Honor.  The name

23    is Glenn Bruder, last name is spelled B-R-U-D-E-R, appearing

1    on behalf of Guled Ali Omar who is seated to my right.

2              THE COURT:  Good afternoon.  And counsel that are

3    at the other table, please make your --

4              MR. HOPEMAN:  Jon Hopeman and Marnie Fearon.  We

5    represent Zacharia Abdurahman.  I don't think we're really

6    making an appearance but --

7              THE COURT:  Okay.  I understand.  Good afternoon.

8              MR. BIRRELL:  Good afternoon, Your Honor.  Andy

9    Birrell and Ian Birrell and Paul Dworak.  We represent Hanad

10   Musse who is also not here.

11             THE COURT:  Good afternoon.  All right.  There

12   have been a number of motions that are before the Court:

13   The government's motion for inquiry, Docket No. 384;

14   Defendant Guled Omar's motion in limine, Docket 388;

15   Defendant Mohamed Farah's motion to dismiss the motion,

16   Docket No. 389; Defendant Abdirahman Daud's motion for

17   severance, Docket No. 390; Defendant Hamza Ahmed's motion to

18   exclude or for severance, Docket No. 395; and motion to

19   withdraw as counsel for Mohamed Farah, Docket No. 401.

20   We'll do the last one first, the motion to withdraw as

21   counsel.

22             MR. NWANERI:  Thank you, Your Honor.  Your Honor,

23   with due respect, and in consideration of the Court's time,

24   I rely on my filed documents, so I move the motion as filed.

25   If the Court has any questions for me.

 1            THE COURT:  All right.  And any questions by the

 2    government?

 3            MR. DOCHERTY:  No, Your Honor.  No questions.  We

 4    don't believe that the grounds as stated in the written

 5    motion are adequate, however, to justify withdraw of counsel

 6    at this stage of these proceedings.

 7            THE COURT:  Any comments by any of the

 8    co-defendant counsel?

 9            All right.  Let's go into your reasons for wishing

10    to withdraw, sir.

11            MR. NWANERI:  With due respect, Your Honor, on

12    March 25, 2016, approximately a week today, the prosecution

13    sent a letter to the joint defense counsel for second

14    defendant Mohamed Farah, and in that letter, the government

15    requested that Hassan Mohamud, which is that I work with --

16            THE COURT:  Can you back away from that microphone

17    just a little bit?

18            MR. NWANERI:  Back away?

19            THE COURT:  Yes.

20            MR. NWANERI:  Okay.  Thank you.  And that he be

21    excluded from the trial team of second defendant Mohamed

22    Farah.  Following that letter, Your Honor, a flurry of

23    events engulfed the entire prosecution and defense counsel,

24    including this honorable Court.  Your Honor, it is not in

25    doubt that those events essentially detract defense counsel

1    from concentrating solely on the defense of the defendants

2    and it also has created a future of uncertainty in this

3    complex matter.  And by that I mean some counsel are now

4    asking do I have to recuse my client or sever my client from

5    joint trial, issues of what do we do in motions in limine,

6    talking about who will be called as a witness or not.  And,

7    Your Honor, I have spoken with some of my colleagues, and I

8    also have the benefit of their thoughts.  Consequently,

9    after very careful considerations, I have decided to

10   withdraw as co-counsel for Farah.

11       It should be known, Your Honor, that at all times

12   two law firms represent Mr. Farah, my law firm and the law

13   firm of Murad Defense, headed by Mr. Murad Mohammad.  So and

14   my proposal of doing this is to stop these distractions in

15   this matter.  I hope that by withdrawing, the honorable

16   Court, the parties, the remaining counsel can concentrate on

17   the remaining issues.

18       I must state with all due respect, though, that my

19   withdrawal as co-counsel for Mohamed Farah in no means an

20   agreement with the issues raised by the prosecution in their

21   letter dated March 25, 2016, or by any other person

22   whatsoever.  And by that, I also mean that I have seen some

23   affidavits sworn by counsel, and that affidavit is

24   essentially wrong, with due respect, Your Honor, because

25   it's a statement of fact of what a particular witness had.

1    We saw an affidavit to where somebody say my clients told me

2    X, Y, Z and my client's told -- father's father told me X,

3    Y, Z.  I don't want to dwell much on that.  Everybody knows

4    that this can not be an affidavit sworn to by counsel.

5              So having said that, you know, Your Honor, I

6    respectfully ask the honorable Court to grant my motion to

7    withdraw as co-counsel.  I am not leaving Mr. Farah without

8    counsel, Your Honor.  My learned friend, Mr. Murad Mohammad,

9    will continue as counsel for Mr. Farah.  I've also had

10   discussions with him, and he's okay with it.  Thank you,

11   Your Honor.

12             THE COURT:  Well, let me ask you this.  I never

13   inquire on this until we would start right before trial, who

14   is lead counsel for your client?  You say you're co-counsel,

15   but there has to be a lead counsel.  Who was the lead

16   counsel?

17             MR. NWANERI:  Well, Your Honor, I started with the

18   case and eventually Mr. Murad Mohammad had joined but now

19   that I'm leaving, I don't know whether that is still the

20   case, but otherwise we shared responsibilities, Your Honor.

21             THE COURT:  All right.  Well, let's -- tell me

22   about how do you share responsibilities?

23             MR. NWANERI:  Most of the motions and prior to

24   trial I agree that Mr. Murad Mohammed would be doing it and

25   if this matter would proceed to trial, then we have to

1    review of that arrangement.  But drafting of the motions

2    before trial and looking at the discovery is a joint

3    responsibility of both law firms.  But coming to court to

4    move and argue those motions, we assigned that

5    responsibility to Mr. Mohammad prior to trial.

6              THE COURT:  Dealing with the discovery, you said

7    that that was divided between the two of you?

8              MR. NWANERI:  Yes, Your Honor.  Because they are

9    quite voluminous and some of them are in language that some

10   of us don't even understand and that is not familiar to my

11   office.  So we have some languages like Somali language, we

12   need somebody who is fluent in that language.  And Arabic,

13   Mr. Mohammad, because of his position, he knows that, so

14   there's quite a -- we complemented each other in that.

15             THE COURT:  Well, I'm having a difficulty

16   understanding how Mr. Mohammad is going to be ready for

17   trial in a month if you've done half the discovery.

18             MR. NWANERI:  Pardon, Your Honor?  Can I --

19             THE COURT:  Well, you've looked at half of the

20   discovery and done your analysis of that.  Mr. Mohammad will

21   not have your expertise of that discovery at trial if you

22   are excused from this case and that you were lead counsel in

23   this case.

24             MR. NWANERI:  Well, Your Honor, I appreciate what

25   the Court -- the Court's observation, but we -- it's not as

1    if I woke up one morning and said I want to leave the case.

2    But if that would make the entire process to concentrate on

3    the issues before the Court, it is essentially the defense

4    of these young men and make sure that justice is done, I

5    would to do that if that would make it work.  But, again,

6    this kind of motions are not automatic.  They are at the

7    discretion of the honorable courts, and, of course, that's

8    why the rules provide that they have to be in the writing

9    and sent to the Court.  So I am open to whatever the Court

10   decides.  But I just want this Court to know that the events

11   that happened the last week and essentially 90 percent of

12   them doesn't really dwell on the merits of the matter before

13   you, after due considerations, I have decided to bring the

14   motion to withdraw.

15          THE COURT:  All right.  Well, let me come back to

16   this motion.  Let's move -- thank you, counsel.

17          MR. NWANERI:  Thank you, Your Honor.

18          THE COURT:  Let's move to Docket No. 384, the

19   government's motion for inquiry.  On March 25, 2016, the

20   government notified counsel of record for the defendant

21   Mohamed Farah of its intent to introduce testimony and

22   evidence at trial to which a member of Mohamed Farah's

23   defense team, Sheikh Hassan Jami, is referenced by a

24   co-conspirator apparently preaching by Jihad and related

25   topics.  The government filed its motion of inquiry, and now

1    I would like the government to come forth and give a full

2    proffer of what the evidence will be for the government and

3    why this will cause a possible problem.

4              MR. DOCHERTY:   Thank you, Your Honor.   On

5    March 25, 2016, as the Court has said, we sent a letter to

6    counsel stating that there was evidence from a cooperating

7    defendant that he had been taught the appropriate mode of

8    offering prayer while on a battlefield by a member of the

9    defense team who we know as Sheikh Hassan Jami.   I

10   understand that we may have misspelled the last name but I

11   believe the pronunciation is correct.

12             This evidence, Your Honor, was developed in a

13   tape-recording, made consensually, by a confidential human

14   source of the FBI on April the 2nd of 2015.   A

15   transcript -- or the audio recording of that was turned over

16   in September of 2015 in discovery.   The government went

17   beyond my view of the disclosure rules of Rule 16 and

18   undertook to prepare a transcript, not only of that

19   conversation but of all the conversations which the CHS had

20   tape-recorded.   Those transcripts included not just a

21   verbatim of what was said but also some commentary, for

22   example, clearing up ambiguous terms in bracketed notes.

23   These are not, I hasten to add, the transcripts that would

24   be used at trial because of this additional explanatory

25   material would have to be excised out.

1          On March the 2nd the government interviewed a

2     defendant who had agreed to plead guilty and cooperate with

3     the government at the trial of this case.  The April 2nd,

4     2015, recording was reviewed, among many other topics, at

5     that March 2nd of 2016 proffer session.  It was at that

6     point that the cooperating defendant definitively identified

7     the Sheikh Hassan, who is -- who -- the person who does the

8     teaching is referred to in the recording, and I believe the

9     Court has a transcript, only as Sheikh Hassan.  It was at

10    that meeting that the cooperating defendant definitively

11    identified which Sheikh Hassan, namely, the Sheikh Hassan

12    who is provided by Mr. Nwaneri's law firm.  Upon receiving

13    the FBI reports of that, the government discussed the matter

14    amongst ourselves and the result was the letter that was

15    sent on March the 25th of 2016.

16         The Court has asked why we believe that this could

17    be a problem.  There are a couple of reasons.  First of all,

18    we do anticipate that the cooperating defendant would

19    testify about this April 2nd of 2015 conversation which

20    involved not just this cooperating defendant but several

21    other defendants.  The context of the conversation indicates

22    that this is preparation --

23              THE COURT:  Excuse me.  Let's back up.

24              MR. DOCHERTY:  Yes.

25              THE COURT:  Proffer the other defendants that that

1    conversation would cover.

2            MR. DOCHERTY:  Could I consult with Mr. Winter,

3    please?  Just for a second.  I think I've got most of them,

4    but I want to be sure.

5        (Counsel conferred.)

6            MR. DOCHERTY:  Excuse me, Your Honor.  I'm just

7    going to check the attachments here.

8            MR. WINTER:  One moment, Your Honor.

9            MR. DOCHERTY:  Your Honor, I believe that I've got

10   the defendants who were there, but Mr. Winter is going to

11   check with the agent so that we're absolutely sure and don't

12   misstate anything on the record, if that's all right.  It

13   will just be one moment.

14           It was the other defendant present, Your Honor,

15   was Guled Ali Omar.

16           And our view of this tape-recorded conversation,

17   when placed in context, is that this was not a discussion of

18   an abstract theological point but rather was part of getting

19   psyched up to go to Syria to join a terrorist organization.

20   If that evidence is introduced, then the defense will be in

21   the position --

22           THE COURT:  Let me back you up.

23           MR. DOCHERTY:  Yes, sir.

24           THE COURT:  That's a conclusion.

25           MR. DOCHERTY:  It is.

1              THE COURT:  Give me the -- what evidence that

2      you're going to present that comes to that conclusion.

3              MR. DOCHERTY:  We would play the tape-recording

4      with the cooperating defendant on the stand, and we would

5      ask the cooperating defendant who was the Sheikh Hassan that

6      he was talking about, and if he was to answer that question,

7      he would identify a member of the defense team.

8              Even if -- and I know that the defense -- several

9      defendants that have suggested that while a solution of this

10     is simply don't allow the cooperating defendant to identify

11     the member of the defense team as the source, in the view of

12     Mr. Winter and myself, that is inadequate, and the reason

13     that it is inadequate is that that means that the defendants

14     could not call the Sheikh Hassan concerned to rebut that

15     testimony if they were under orders from the Court not to

16     identify the source of the theological teaching.

17             So this, I believe, puts, as we've put in our

18     letter to the Court, the potential for prejudice not just to

19     Mohamed Farah but to other defendants, the spillover effect,

20     if you will, onto other defendants.  It is something of

21     concern to the government.  We raised it with counsel.  We

22     copied the Court on our communication to counsel.  The Court

23     responded by asking us -- or directing us, excuse me, to

24     file a motion to inquire.  We have done so.  And, of course,

25     since the motion to inquire was filed, further facts have

1     come to light, particularly in a declaration by a

2     member -- by a defense lawyer for a defendant who has

3     pleaded guilty which has raised a further issue concerning

4     the behavior of the paralegal employed by Mr. Nwaneri.

5              THE COURT:  All right.  Anything else that you

6     wish to tell the Court?

7              MR. DOCHERTY:  Not at this time, Your Honor.  I

8     anticipate that as this afternoon's hearings go on, there

9     will be other things that I will want to address, but that

10    is all I have to say for this -- at this juncture.

11             THE COURT:  All right.  Let's have counsel come

12    forth and state their positions.  Ms. Murray.

13             MS. MURRAY:  Your Honor, I filed a motion either

14    to exclude the evidence identifying the teacher involved

15    with respect to this issue about how to pray in battlefield

16    or otherwise sever my client from the trial.  I propose

17    several remedies.  I agree with the government that I

18    believe it would be prejudicial if a cooperating witness

19    takes the stand and points over to the defense table and

20    says that someone at the defense table taught him how to

21    pray in battlefield.  I do believe that that would be

22    prejudicial.  And I agree with the government it would

23    diminish defense counsel and defendants in the eyes of the

24    jury and compromise our independence and our advocacy to the

25    jury.  But I propose that the solutions are either to allow

1    the witness to testify but without identifying who was the

2    teacher.  It still is not clear to me why it is necessary to

3    identify the teacher of that particular piece of

4    information.  I understand the government's concern that

5    perhaps the defense would want to rebut that evidence by

6    calling Mr. -- by Sheikh Hassan Jami to rebut that evidence,

7    although, again, I'm not sure what Sheikh Hassan Jami's

8    intentions, what it would add in terms of rebuttal.

9    Potentially an independent expert could provide the same

10   rebuttal.  But if -- if the evidence can come in without

11   identifying the teacher, then I think we don't have any

12   problem.

13          Or we could ask that if -- if the Court believes

14   that the identity is relevant, then I ask that Sheikh Hassan

15   Jami not be permitted to sit at the defense table.  And if

16   Sheikh Hassan Jami is permitted to sit at the table and he

17   will be identified as the teacher in question, then I ask

18   for a severance for Mr. Ahmed.

19          THE COURT:  Dealing with the second issue that has

20   arisen by the affidavit of Mr. Hopeman, do you wish to be

21   heard?

22          MS. MURRAY:  Not at this moment, Your Honor.

23          THE COURT:  Mr. Mohammad.

24          MR. MOHAMMAD:  Good afternoon, Your Honor.

25          THE COURT:  Counsel, I -- I would prefer, and if

1    you can -- you can overrule me on this issue, but I would

2    prefer that you not respond at this point because there's

3    going to be a combination of issues dealing with the

4    withdrawal of -- possible withdrawal of your co-counsel and

5    I will be asking you a number of questions, and I think that

6    you should wait until that time.

7              MR. MOHAMMAD:  I agree with the Court.

8              THE COURT:  All right.  Good afternoon.

9              MR. UDOIBOK:  Good afternoon, Your Honor.  Your

10   Honor, I have the misfortune of having to agree with the

11   government in this instance.  I usually don't do that.  But

12   I believe for the Court to exclude the identity of Sheikh

13   Jami, the jury would not be able to put whatever testimony

14   the cooperating witness would be offering in context and how

15   the information came or why and what is the nature of this

16   person.  Nonetheless, for my client being -- my client has

17   some relationship with Mr. Jami because his firm represents

18   my client's brother, and if the jury would be inclined to

19   agree with whatever testimony comes in regarding identity

20   and the nature of the preaching, it could be imputed on my

21   client in a way, I don't know what the testimony would be,

22   but let's assume it is what the government portends it is,

23   that is that battle, it's a battle prayer, in other words,

24   this is how you conduct Jihad and this is how you pray in

25   order to make it effective, it would then mean that somehow

1    my client agrees with that type of notion, idea, philosophy.

2    I don't see in any context that on a motion in limine to

3    partially allow the testimony to come in but then conceal

4    the identity of the proffer.  It does not cure the

5    prejudice.

6              THE COURT:  Thank you.

7              MR. UDOIBOK:  Thank you.

8              MR. NESTOR:  Good afternoon, Your Honor.

9              THE COURT:  Good afternoon.

10             MR. NESTOR:  Good afternoon again.  In my written

11   pleading I do not specifically raise any reference to

12   Federal Rule of Criminal Procedure or 403 -- or rule of

13   evidence, I'm sorry, but it does seem to me that there

14   is -- the initial question is whether this matter can just

15   be dealt with by the Court by excluding what the government

16   has sought to proffer in the testimony that it anticipates

17   to offer at trial and that it's not relevant.  The

18   government in its presentation today states that this is not

19   an abstract theological concept but part of getting psyched

20   up to go to Syria and join a terrorist organization.  And I

21   at least heard the Court inquire as to the fullness of

22   evidence that supports that assessment of the evidence by

23   the government and at least today I did not hear the

24   government respond to the Court's inquiry as to why they

25   believe this is part of getting psyched up to join a

1    terrorist organization as opposed to a theological concept,

2    and there is certainly a basis in the record in the filings

3    that it, at most, was a reference to an abstract theoretical

4    concept.

5            In the transcript of the April 2nd, 2015,

6    recording made by the confidential human source, there was a

7    reference by the human source to actually being present in

8    Mr. -- in Sheikh Hassan's mosque and that all the preachings

9    there were always moderate and against Jihad.  He then makes

10   a reference that on occasion Sheikh Hassan would speak after

11   services at other mosques or other areas in the Twin Cities,

12   and that's where he heard these description of what Sheikh

13   Hassan or what counsel for Mr. Farah indicates was more of

14   an abstract theoretical concept.  And I believe that

15   actually comes in through the Facebook posting of Sheikh

16   Hassan which the government has introduced as an exhibit to

17   its most recent filing.

18           And so I question that there's anywhere in the

19   government that believes that the confidential -- or that

20   the co-defendant who is recorded on April 2nd indicates that

21   he was taught this by Sheikh Hassan.  It appears more that

22   this was merely a part of a discussion where a number of

23   people were present and that it was in a public setting and

24   there was no teacher/student relationship and so I don't

25   understand the necessity for the testimony given the issues

1    that it introduces.

2             Separate from that, though, it having been raised

3    by the government and the press coverage that it has

4    generated, and I -- you know, obviously there are other

5    press issues and publicity issues that will be dealt with in

6    selecting a jury, but the implication of the government's

7    filings is that somehow defense counsel is part of a ongoing

8    conspiracy here, and for that suggestion to have been put

9    out there publically I think requires me on behalf of my

10   client to file a motion for severance from Mr. Mohamed Farah

11   as a defendant and from his current defense team.

12             THE COURT:  Thank you.

13             MR. BRUDER:  Good afternoon, Your Honor.

14             THE COURT:  Good afternoon.

15             MR. BRUDER:  To some degree I'm going to echo some

16   of Mr. Nestor's comments.  If the only issue before the

17   Court today were Mr. Hassan Jami's comments in this

18   April -- as related in this April 2015 transcript, I think

19   it could easily be addressed through a series of orders in

20   limine, and I'm frankly, as, for the reasons expressed in my

21   memorandum, relatively salient about those statements.

22   Although the government contends they were far more specific

23   than a abstract dialogue, a clear reading of the transcript

24   suggests that that's exactly what it was, an abstract

25   discussion.

1    In addition, when the cooperating defendant spoke

2    to the FBI in March, he characterized Mr. Hassan Jami's

3    message at his mosque of one of moderation and preaching

4    against Jihad.  The reason -- I think this could have been

5    handled, frankly, quite significantly more discretely than

6    it has been.  But there's nothing we can do about that now.

7    Now we're sitting here with front page articles on the

8    newspaper, and, frankly, I do share the government's concern

9    that Mr. Hassan Jami's continued participation as a member

10   of one of the defendant's defense teams could undermine the

11   credibility of all of the defense counsels in this case.

12        And, frankly, one need go no further than to look

13   at the reader comments on the *Star Tribune* articles that

14   have been appearing in the paper.  Those reader comments

15   routinely feature readers demanding to know more about the

16   other defense counsel and exactly what cast of villains is

17   involved in this case.  I think that's grossly unfair to me

18   and it's, more importantly, grossly unfair to my client.  So

19   the Court I think understandably needs to do something to

20   address that situation.

21        Regardless of what the Court does, it -- there are

22   going to have, from my perspective, there are going to have

23   to be a series of orders in limine because even if defense

24   counsel is allowed to withdraw, if the government is able to

25   put this information in as part of its case in chief, it

1    should not be allowed to identify this speaker himself or to

2    introduce any evidence or any testimony through any witness

3    that that speaker ever had any connection with any of the

4    defendants' counsel or it would re-create the same problem

5    that we face today.  So one way or another, there need to be

6    a series of orders in limine to, in essence, contain that

7    contamination.

8           Frankly, Your Honor, my real concern here is less

9    the statements that the government elicited in its proffer

10   than the information that's reflected in the declaration

11   from Mr. Hopeman which would suggest that Mr. Hassan Jami's

12   activities have gone beyond simply abstract theoretical

13   discussions of theology but have attempted to influence

14   defendants other than his firm's own client.  And if

15   that -- if the Court, in fact, attaches credibility to that

16   declaration, then I concur with counsel for Adnan Farah with

17   regard to the removal of certainly his defense counsel at

18   this point.  That's my position.

19          THE COURT:  All right.  And do I understand that

20   you're moving for severance also?

21          MR. BRUDER:  I didn't actually incorporate that in

22   my motion, but certainly that would be a remedy that the

23   Court could consider, and I would ask the Court to do that

24   under the circumstances if -- well, I mean, I think the

25   Court has a number of options.  But let me put it this way.

1    If we're going to go to trial, I don't want my client to be

2    the only one going to trial with Mr. Mohamed Farah.

3              THE COURT:  All right.  Thank you.

4              MR. BRUDER:  Thank you.

5              THE COURT:  Mr. Docherty.

6              MR. DOCHERTY:  Your Honor, just a couple of

7    points.  Ms. Murray inquired as to why it was necessary to

8    identify the speaker.  And on a certain level her argument

9    makes sense.  But the problem that I see with not

10   identifying the speaker is that it deprives the defense

11   counsel, not all of whom may choose the trial tactic that

12   Ms. Murray is apparently contemplating of calling an expert,

13   but meanwhile to put the speaker on the stand and ask him to

14   rebut or attempt to rebut the implications of the

15   transcript.  So even if the government did not give the name

16   and the identity and the affiliation of the speaker before

17   the jury, some defense lawyers might, well, in their own

18   independent professional judgment think that that was what

19   they needed to do and that would be something that they

20   could not do if we had all been ordered not to discuss that

21   matter in front of the jury.

22              The concentration on the bare words of the

23   transcript by Mr. Nestor, by Mr. Bruder ignores the context

24   of this conversation.  This is April the 2nd of 2015.  The

25   arrests in this case were on April the 19th of 2015, so

1    approximately two weeks and a little bit before two of these

2    defendants went to California in search of fake passports

3    which they could use to cross into Mexico, these young men

4    are sitting around talking about the way in which one prays

5    on a battlefield.  The force of the evidence is in the

6    context.  I think the words themselves are also important,

7    but the -- the context is critically important and should

8    not be overlooked.

9           And I believe that that is all that I wanted to

10   respond to, unless the Court has any questions.

11          THE COURT:  Thank you.  The Court will take this

12   matter under advisement.

13          Mr. Mohammad, if you would step forward.  Again,

14   good afternoon.

15          MR. MOHAMMAD:  Good afternoon.

16          THE COURT:  And co-counsel has filed a motion to

17   withdraw from this case, and that has implications upon your

18   client having adequate representation for trial.  And I'm

19   going to have to ask you a series of questions that normally

20   I would not have to ask because it's important for the Court

21   to understand what's going on here.  Both of -- both you and

22   co-counsel have called yourself co-counsel, and before trial

23   or motions in limine I would have announced that one of you

24   would have to be lead counsel and direct the case.  Who

25   would that have been?

1        MR. MOHAMMAD:  Judge, that would have been me, and

2    that's essentially why I was brought on to this case, Judge.

3    I was brought on for a variety of reasons, including my

4    Arabic language skills, my background is in Muslim, in

5    addition to some other items I bring to the table, Judge.

6    But the intention of our team was that I would take over as

7    lead counsel at trial, and that was our intention from the

8    very beginning.

9        THE COURT:  And when -- when both firms became

10   co-counsel, you became a team to represent one defendant.

11   Would that be accurate?

12       MR. MOHAMMAD:  That's accurate, Judge.

13       THE COURT:  And were you aware of Sheikh Mohamud

14   Jami being a law clerk in this case?

15       MR. MOHAMMAD:  I was, Your Honor.

16       THE COURT:  All right.  In your declaration, you

17   talk about you cautioned him several times about his duties.

18       MR. MOHAMMAD:  That's true, Judge.  I'm aware that

19   Mr. Jami shares a unique position of being a law school

20   graduate as well as an imam in a community that's being

21   investigated and implicated here in this case.  His insight,

22   Judge, I knew of being valuable.  He's one of the most, if

23   not the most, respected member of the Somali community that

24   I as an outsider can identify.  It is rare for me to meet a

25   Somali individual who does not know Mr. Hassan Jami and not

1   just know him but like and respect him.  So I was aware that

2   many people in his community, through his lectures or his

3   sermons or just by knowing him, would come to him about this

4   case.  He's been involved in the law since 2002 when he

5   graduated from William Mitchell.  He's taught at the law

6   school, Judge, so he's not somebody that comes here

7   flippantly and without a little weight behind him in terms

8   of the Somali community support.

9         So Judge, I knew that he -- I thought he was an

10   invaluable piece of the team.  I thought he was a critical

11   piece of the team.  But I also knew that people would come

12   to him and there would be a potential for conflict at some

13   point down the line.  And I think both Mr. Nwaneri and I

14   both cautioned him that when -- especially if you've got a

15   family member that has -- a family has two children listed

16   as co-defendants, we're going to have a tough time

17   communicating with that -- with the parents and we have to

18   be careful of what we say because whatever we say may be

19   communicated to co-defendant and that wouldn't be fair to

20   one brother versus the other.  And I know that they may have

21   similar or unique intentions of how to proceed to trial or

22   not to proceed to trial, but we have to protect the

23   integrity of our client and our client's case.  So that was

24   a discussion that we had several times in the beginning.

25   And I wasn't aware that it was an issue until it was raised

1   as a potential issue by the declaration of one of the

2   co-defendant's.

3           THE COURT:  What was Mr. Hassan Mohamud Jami's

4   role as a law clerk in your case?

5           MR. MOHAMMAD:  Judge, he had a role of

6   translating, of advising us regarding some of the issues

7   that we see.  When there was a discussion about some

8   language issues, religious issues, he would clarify things

9   for us.  He gave us valuable insight as to the community

10  structure, how kids interact with each other, why kids went

11  to the mosque to pray, why they went to go learn, what kind

12  of community members he saw.  So he was very valuable.  And

13  Judge, to lose him in a case like this would be a big blow

14  to anybody.

15          THE COURT:  And do you have any knowledge that he

16  had any contact with any co-defendants after you were his

17  counsel?

18          MR. MOHAMMAD:  Absolutely none.  And, Judge, as I

19  laid out in my declaration, I'm very aware of the rules

20  regarding that, and it was something that was on the

21  forefront of my mind.  In fact, I avoided contact with my

22  client's parents for that particular reason.

23          THE COURT:  Now, in the preparation for trial, it

24  has been indicated that you split up the discovery aspect,

25  and there's quite a bit of discovery in this case.

1          MR. MOHAMMAD:   Judge, when I heard the description

2     of the duties being split, I think there --

3          THE COURT:   I'll let you talk.  You tell me

4     how -- how you -- because you're the lead counsel, how were

5     you going to try this case?  How -- what do you know

6     about -- what was co-counsel going to be helping you with

7     and because I need to know what will be lacking in your

8     defense.

9          MR. MOHAMMAD:   Judge, to be fair, both of us, both

10    firms had equal access.  We had our own copies of the

11    discovery.  We've gone -- I've gone through everything, and

12    I presume that Mr. Nwaneri, based on our conversation, has

13    gone through everything.  So we didn't divide the discovery

14    down the middle and give one person half of it and the other

15    person the other half.  We both had equal access.  We both

16    reviewed the entire lot of discovery.  And when there were

17    issues, we would discuss them together with Mr. Hassan Jami,

18    and he would clarify some issues.  So I think the

19    characterization of half and half was -- you took it as a

20    quite literal as 50/50 physical division but that wasn't the

21    case.  We both had equal access to the documents and the

22    recordings and photos and everything, but we've reviewed

23    them all in their entirety on our own so.

24         THE COURT:   Do you feel you're competent to try

25    this case without co-counsel?

1           MR. MOHAMMAD:   Competent or confident?

2           THE COURT:   Competent and confident.

3           MR. MOHAMMAD:   Yes to both, Judge.  I will say

4    this.  I sought the advice of lawyers that are smarter than

5    me, older than me, wiser than me, and I agree with them that

6    in a case of this nature, even if I feel confident, even

7    though I feel like I'm competent, otherwise I wouldn't be

8    here, I would ask the Court, given the nature of this case

9    and losing a substantial part of the team that I was working

10   closely with, to appoint another lawyer to sit with us and

11   to co-counsel the case with us.  Whether I stay on as lead

12   or not doesn't matter, Judge.  What matters to me is that my

13   client, Mr. Farah, Mohamed Farah, get the competent

14   representation he needs.

15           THE CLERK:   He's retained.

16           THE COURT:   I didn't hear you.

17           THE CLERK:   He's retained.

18           THE COURT:   Go ahead.

19           MR. MOHAMMAD:   So, Your Honor, I'd ask the Court

20   to strongly consider appointing new counsel to -- co-counsel

21   to the case to assist.

22           And, Judge, I think, as you've seen here, we've

23   got some tremendous lawyers in this courtroom.  And I look

24   around, and they're working with other lawyers that are

25   supporting them, and I don't think that's an unusual thing

```
 1    to request in a case of this.  But if I were to proceed on

 2    my own, Judge, I would -- I feel confident that we're ready

 3    to move forward with it, that I'm well versed in this area,

 4    and we can move forward.

 5             THE COURT:  Will you be ready to go to trial on

 6    May 9th?

 7             MR. MOHAMMAD:  Yes.

 8             THE COURT:  Have you had an opportunity to discuss

 9    this with your client?

10             MR. MOHAMMAD:  I have.

11             THE COURT:  Have him come forward.

12             Good afternoon.

13             DEFENDANT FARAH:  Good afternoon, Your Honor.

14             THE COURT:  How are you?

15             DEFENDANT FARAH:  Pretty good.  Yourself?

16             THE COURT:  One of the things I'm trying to do is

17    make sure that you're protected.

18             DEFENDANT FARAH:  Yes.

19             THE COURT:  And that you have not only confident

20    counsel but competent counsel to represent you in this

21    matter.  Do you understand that?

22             DEFENDANT FARAH:  Yes, sir, Your Honor.

23             THE COURT:  All right.  And so have you had an

24    opportunity to talk to both of your attorneys about this

25    matter?
```

1          DEFENDANT FARAH:  Yes, sir, Your Honor.

2          THE COURT:  More than 15 minutes or 5 minutes, did

3     you -- did they sit down with you and talk to you about what

4     this means if one of the team leaves the -- your

5     representation?

6          DEFENDANT FARAH:  Yes, sir.

7          THE COURT:  And are you confident that

8     Mr. Mohammad can represent you in this matter?

9          DEFENDANT FARAH:  Yes, sir, Your Honor, fully.

10          THE COURT:  You understand that you have a right

11     to have your own counsel and you do.

12          DEFENDANT FARAH:  Yes.

13          THE COURT:  But I want to make sure that you feel

14     comfortable that you will get the best defense that you

15     think is possible through Mr. Mohammad.

16          DEFENDANT FARAH:  I understand that, Your Honor.

17          THE COURT:  Are you in agreement with the

18     withdrawal of co-counsel?

19          DEFENDANT FARAH:  Yes, sir.

20          THE COURT:  Was there some question about that?

21          DEFENDANT FARAH:  No.  No, Your Honor.

22          THE COURT:  And you understand with the withdrawal

23     of co-counsel that Sheikh Hassan Mohamud will not be part of

24     your team?

25          DEFENDANT FARAH:  Yes, sir, Your Honor.

1          THE COURT:  Counsel, why don't you set the record

2    on what you've talked to him about and make sure that we

3    have a record now and not a year later.

4          MR. MOHAMMAD:  Sounds good.

5          THE COURT:  All right.

6                          **EXAMINATION**

7    BY MR. MOHAMMAD:

8    Q.  Mr. Farah, you understand that there's been a lot of

9    things that have happened in the last week, correct?

10   A.  Yes, I understand that.

11   Q.  And do you understand that at this point now, you are

12   represented by both myself, my firm, and Mr. Nwaneri, and

13   his office and my office is being assisted by Sheikh Hassan

14   Jami.  Do you understand that?

15   A.  Yes, sir.

16   Q.  And do you understand some of the issues that have been

17   raised by the government and by some of your co-defendants

18   and their lawyers.  Do you understand those issues?

19   A.  Yes, sir.

20   Q.  And did we talk about those issues?

21   A.  Yes, sir.

22   Q.  And you understand the consequences of some of the

23   issues that both the government and the co-defendants have

24   raised?

25   A.  Yeah.

1    Q.  Yes?

2    A.  Yes, sir.

3    Q.  Do you understand that a decision has been discussed

4    with you and essentially made by one of your lawyers,

5    Patrick Nwaneri?

6    A.  Yes, sir.

7    Q.  And he feels it's in your best interest for him to

8    withdraw and, in essence, for Mr. Hassan Jami to no longer

9    assist on your case.  Do you understand that?

10   A.  Yes, sir.

11   Q.  And do you understand that you're losing basically two

12   of the people that are helping you?

13   A.  Yes, sir, I understand.

14   Q.  And that leaves just me?

15   A.  Yeah.

16   Q.  For now?

17   A.  Yes, sir.

18   Q.  And the judge asked you some questions, and these are

19   fair questions to ask, any time you lose one or two people

20   that are helping you and the guy that's still standing, can

21   he help you.  Do you understand those questions?

22   A.  I understand, yes.

23   Q.  And you understand that maybe the judge thinks I'm not

24   ready, maybe the judge thinks I'm not able to handle this

25   case on my own.  Do you understand that?

1    A.  I have full confidence in you.

2    Q.  The judge asked if you had confidence, and you just said

3    you do right now?

4    A.  Yes, sir, I have full confidence in Mr. Mohammad's

5    ability to represent me in this case.

6    Q.  And you understand that if you wanted another lawyer,

7    you could ask for one right now?

8    A.  Yeah.

9    Q.  It would create problems for everybody, but that's none

10   of your business and none of your issues.  You understand

11   that?

12   A.  Yes, sir.  I have full confidence in Mr. Mohammad.

13   Q.  I appreciate that, but I want to make sure this is not

14   about me.

15   A.  Yeah.

16   Q.  It's about whether you're getting the representation you

17   deserve.

18   A.  I feel like I'm getting adequate defense.

19   Q.  Do you want the Court to appoint a new team of people to

20   represent you?

21   A.  No, sir.

22   Q.  There are a lot of really good lawyers out there.

23   A.  No, sir.  I've been in here for 11 months, and I feel

24   like you've won my confidence, and there's no reason for me

25   to change your representation of me at this time.

1    Q.  Is anybody forcing you to make this decision?

2    A.  No, sir.

3    Q.  You're making it voluntarily?

4    A.  Yes, sir.

5    Q.  Do you have any questions for me now?

6    A.  No.

7    Q.  Any questions for the Court?

8    A.  No, sir.

9            THE COURT:  Okay.  How far have you gone in

10   school?

11           DEFENDANT FARAH:  Till high school -- I mean,

12   college.

13           THE COURT:  College?

14           DEFENDANT FARAH:  Yeah.

15           THE COURT:  Okay.  And you have never been in

16   trouble before?

17           DEFENDANT FARAH:  No, sir.

18           THE COURT:  And I know you're nervous.

19           DEFENDANT FARAH:  Yeah.

20           THE COURT:  I know, let's take a few minutes and

21   take a deep breath here.  I'm not going to make a decision

22   right now.

23           DEFENDANT FARAH:  Okay.

24           THE COURT:  I want you to be able to think about

25   it, because it's like you going into the doctor's office and

1     them saying you have cancer and all of a sudden you don't

2     hear anything of what the doctor is saying, you're just

3     thinking about cancer.

4              DEFENDANT FARAH:  Yeah.

5              THE COURT:  And I want you to be able to go back

6     and think about your case and the representation that you

7     will be getting and make sure that you, you, are satisfied,

8     not somebody else but you.

9              DEFENDANT FARAH:  Yeah.

10             THE COURT:  And that you ask your -- Mr. Mohammad

11    the right questions to make sure that he is prepared to

12    adequately defend you.  All right?

13             DEFENDANT FARAH:  Yes, sir.

14             THE COURT:  Because you're way too nervous for me

15    to make any kind of decisions today.

16             DEFENDANT FARAH:  No, Your Honor, I feel -- I'm

17    not nervous.  I'm just nervous talking, but I understand

18    fully what's going on, and I know what's -- the implication

19    of this, what will happen after this, but I feel confident

20    that Mr. Mohammad's representation of me will be sufficient

21    and adequate to proceed.

22             THE COURT:  Okay.

23             DEFENDANT FARAH:  Like you don't need me to come

24    back.  And I understand, I'm happy with Mr. Mohammad.

25             THE COURT:  Are you certain of that?

1          DEFENDANT FARAH:  Yes, sir, 100 percent.

2          THE COURT:  Is there any other issues that,

3    dealing with this issue, that I should cover that the

4    government believes that the Circuit would want me to cover?

5          MR. DOCHERTY:  I don't believe so, Your Honor.  I

6    will offer following that if the Court wants to inquire into

7    matters that it believes should not concern the government,

8    we would not object to the Court continuing the inquiry in

9    chambers and we would absent ourselves from that

10   conversation.

11         THE COURT:  Okay.  All right.

12         MR. DOCHERTY:  But I don't believe that there's

13   any other topics that need to be covered.

14         THE COURT:  All right.  Mr. Farah and

15   Mr. Mohammad, is there any reason we should talk in chambers

16   with my court reporter out of the hearing of all the other

17   people that are here?  You have a right to do that.  I would

18   have your attorney present and you and my court reporter and

19   everything would be taken down, and you could tell me

20   anything that you want to tell me, and I'll try to answer

21   any questions that you may have that deal with any issues

22   that you are concerned about.

23         DEFENDANT FARAH:  No, sir.  There's nothing you

24   need to know to that.

25         THE COURT:  Okay.  And you know that at any point

1    in time you can meet with your attorney or you just send me

2    a letter, if there's some issue that you're concerned about

3    because understand, I have to make sure that you're

4    adequately represented.

5              DEFENDANT FARAH:  Yes, sir, Your Honor.

6              THE COURT:  You understand that?

7              DEFENDANT FARAH:  Yes, sir.

8              THE COURT:  And I don't want you to think that

9    you're getting railroaded down off to prison.  I want to

10   make sure that you understand everything.

11             DEFENDANT FARAH:  Yes, sir.

12             THE COURT:  You understand that?

13             DEFENDANT FARAH:  Yes, sir, Your Honor.

14             THE COURT:  All right.  So you can always send me

15   a letter.  All the jailhouse lawyers know my address.

16             MR. MOHAMMAD:  Judge, if it helps reenforce what

17   you're saying, if I could inquire of my client just to make

18   sure he understands.

19   BY MR. MOHAMMAD:

20   Q.  This is not about anybody else other than you right now.

21   A.  Yeah.

22   Q.  Okay.  You don't have to worry about anybody's feelings,

23   about doing what you think the Court wants you to do.

24   A.  Yeah.

25   Q.  What, you know, the marshal wants you to do, your

1    friends want you to do, what I want you to do, even what

2    your family wants you to do.

3    A.   Yeah.

4    Q.   This is 100 percent about what you think is best for you

5    and your case, so the judge is offering you an invitation

6    into his private chambers, with a lawyer, to talk to him

7    about any issues that you have regarding your

8    representation, whether you feel bad that you've lost

9    two-thirds of your team, whether you're not confident with

10   me moving forward alone, any of those issues are fair game,

11   okay, and I know the judge is being sincere --

12   A.   Yes.

13   Q.   -- when he's telling you to come back there and tell him

14   what you need to tell him.

15   A.   Yeah.

16   Q.   Do you understand that?

17   A.   Yes, I do.

18   Q.   Don't worry about me, don't worry about anything but

19   you.

20   A.   Yeah.

21   Q.   Can you do that?

22   A.   Yeah.

23          THE COURT:   Okay.  All right.  At this point I'm

24   not going to schedule you to come back here, but I know how

25   it is.  You -- you go back and something might come to your

1  mind and I don't want you to be afraid to ask me.  You have

2  never been in the system before.

3              DEFENDANT FARAH:  Yes, sir.

4              THE COURT:  All right.  It's not like you've had

5  five convictions and you've gone off to prison a number of

6  times and you've had ten lawyers represent you and you know

7  the criminal justice system better than lawyers that are

8  representing you.  It's not the case.

9              DEFENDANT FARAH:  Yeah.

10             THE COURT:  And so I want to make sure that you

11  understand that this is -- this is not a traffic ticket.

12  It's not juvenile court.

13             DEFENDANT FARAH:  Yeah.

14             THE COURT:  This is extremely serious matter, and

15  you're, what, 19?

16             DEFENDANT FARAH:  22, Your Honor.

17             THE COURT:  Yeah.  You're still -- you're still

18  young.

19             DEFENDANT FARAH:  Yeah.

20             THE COURT:  And so I want to make sure that you

21  understand.

22             DEFENDANT FARAH:  Yes, sir.

23             THE COURT:  All right.

24             DEFENDANT FARAH:  I appreciate that.

25             THE COURT:  And so understand -- and Mr. Mohammed

1     will tell you that I'm not just saying this to hear myself

2     talk, it's I need you to feel comfortable and understand

3     what's going on, and if you can't -- if you don't know

4     what's going on, then it's incumbent upon me to make sure

5     that you understand that.  Do you understand that?

6             DEFENDANT FARAH:  I understand that, Your Honor,

7     yes.

8             THE COURT:  All right.  You may be seated.

9             DEFENDANT FARAH:  Thank you.

10            THE COURT:  Anything else, Mr. Mohammad?

11            MR. MOHAMMAD:  Judge, you're taking the rest of

12    the matters under advisement, and I'm not sure I have

13    anything to add, unless the Court would like me to add

14    anything on the original issue that the government brought

15    forward.

16            THE COURT:  Well, I'm concerned about you

17    have -- you've lost two-thirds of your team and that is --

18    that's a big, big loss, and so I need you to think about it

19    too.  I need you to go back and look over the evidence and

20    see whether or not, not that you're not competent to try the

21    case but whether or not you'll be fully prepared to try the

22    case.

23            MR. MOHAMMAD:  And Judge, that's a very valid

24    concern that I have losing critical pieces of people that

25    were helping me.  That's why I'm asking the Court to

1    consider appointing another lawyer as co-counsel, whether as

2    lead counsel or a second chair, it doesn't matter, but I'd

3    ask the Court to consider doing that.  I think that would

4    remedy some of the concerns the Court has about losing a

5    significant portion of the defense team.  I know it is late

6    in the game, Judge, and we probably need more time, but I'd

7    rather get it right the first time around.

8            THE COURT:  Well, I'll take that under advisement.

9    What I would like you to do is have you meet with the Chief

10   Federal Defender Ms. Roe and because I'm not going to -- I'm

11   not going to be a judge that just throws a lawyer at you and

12   says, guess what, you've got to work together at this level.

13   If there's somebody on the CJA panel that's willing to work

14   or give you a list of two or three lawyers, we can see

15   whether or not we can do that.  And I think Ms. Roe is here

16   or is she -- is she here?  I'd ask -- is she here?

17           THE COURTROOM DEPUTY:  She's not.

18           THE COURT:  We'll make contact with her, and you

19   should be in contact with her, and I think that's a good

20   suggestion that we get somebody else on board, and then

21   we'll see where we're at and what we can do.

22           Counsel, if you want to step to the podium.  You

23   both stay there.

24           Any other questions that the government believes

25   the Court should ask to make sure there's an appropriate

1          record dealing with this discharge of the lawyer here?

2                    MR. DOCHERTY:  No, Your Honor.  Thank you.

3                    THE COURT:  Mr. Nwaneri, I sincerely thank you for

4          your candor, and I will grant your motion to be dismissed

5          from this case.

6                    MR. NWANERI:  Thank you, Your Honor.

7                    THE COURT:  All right.

8                    MR. NWANERI:  Thank you.

9                    THE COURT:  All right.  All right,

10         dealing with the other issues, severance, I'll take those

11         under advisement.  Any other issues that I have not covered?

12                   MR. WINTER:  Your Honor, I know it's late in the

13         afternoon.  We did --

14                   MR. NWANERI:  May I be excused?

15                   THE COURT:  You may be excused.

16                   MR. WINTER: -- this morning file a motion for

17         extension on the --

18                   THE COURT:  Granted.

19                   MR. WINTER:  Okay.  Thank you.

20                   THE COURT:  Correct.

21                   MR. WINTER:  And one other matter just briefly.  I

22         would ask the Court to consider giving opportunities to the

23         defense counsel, all defense counsel, opportunities to talk

24         to you in chambers if they have issues as to influence such

25         as was laid out in the declarations.

1              THE COURT:  Yes, of course.

2              MR. WINTER:  Thank you.

3              THE COURT:  Counsel and defendants, my chambers

4     are always open to you.  If you need to talk to me on the

5     record, anything that is happening on this case, we can have

6     a ex parte, ex parte, for the defendants, that means you'll

7     be in private with your attorney and if you don't even want

8     your attorney there, we would try to figure that out, but

9     your attorney would be present but the government would not

10    be present and it will be recorded, my court reporter will

11    be taking down everything.  You have that opportunity and

12    your lawyers can't keep you from asking for that.

13              Anything else for the government?

14              MR. DOCHERTY:  Nothing further for the government,

15    Your Honor.

16              THE COURT:  Ms. Murray, anything further?

17              MS. MURRAY:  Nothing further from me, Your Honor.

18              THE COURT:  All right.  Mr. Mohammad.

19              MR. MOHAMMAD:  Nothing further, Your Honor.

20              THE COURT:  Mr. Udoibok.

21              MR. UDOIBOK:  Nothing further, other than what I

22    had intimated already.

23              THE COURT:  Mr. Nestor.

24              MR. NESTOR:  Nothing further, Your Honor.

25              THE COURT:  Mr. Bruder, spelled B-R-U-D-E-R.

1          MR. BRUDER:  Thank you, Your Honor.  I have

2      nothing further.

3          THE COURT:  Thank you, counsel.  I'll see you,

4      what's the date for our motions in limine?

5          THE COURTROOM DEPUTY:  April 26th.

6          THE COURT:  I will have a order out in the next

7      week dealing with any issues that we've -- that I've taken

8      under advisement.  Thank you very much.

9          (Proceedings concluded at 3:14 p.m.)

10

11                          *      *      *

12

13

14          I, Staci A. Heichert, certify that the foregoing is

15      a correct transcript from the record of proceedings in the

16      above-entitled matter.

17

18              Certified by:  *s/ Staci A. Heichert*

19                             Staci A. Heichert,
                               RDR, CRR, CRC
20

21

22

23

24

25